1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

8

## DISTRICT OF NEVADA

9

| | | |
|---|---|---|
| 10 | UNITED STATES OF AMERICA, ) | |
| 11 | Plaintiff, ) | Case No.  2:05-cr-00078-PMP-GWF |
| 12 | vs. ) | **FINDINGS AND** |
| 13 | SDI FUTURE HEALTH, INC., TODD STUART ) | **RECOMMENDATIONS** |
| | KAPLAN, and JACK BRUNK, ) | |
| 14 | Defendants. ) | |
| 15 | _____ ) | |

16      This matter is before the Court on Defendants' Motion to Suppress Evidence From the Illegal

17  Search of SDI Pursuant to Invalid General Warrant (#41), filed on December 2, 2005; the

18  Government's Opposition to Defendants' Motion To Suppress (#58), filed on January 31, 2006; and

19  Defendants' Reply (#69), filed on March 15, 2006.  The Court held an evidentiary hearing in this matter

20  on April 27 and 28, 2006.

21      The principal contention of Defendants' Motion to Suppress is that the search warrant for the

22  premises of Defendant SDI Future Health, Inc. ("SDI") violated the Fourth Amendment because it did

23  not "particularly describe the things to be seized" and therefore constituted an impermissible "general

24  warrant."   Accordingly, Defendants argue that all evidence resulting from the illegal seizure of

25  documents from SDI should be suppressed as the "fruits of the poisonous tree."   Defendants also argue

26  that signed consents obtained from its corporate officers to search an offsite storage facility were tainted

27  by the illegality of the search warrant and are therefore invalid.  Defendants additionally contend that

28  the written consents were executed under duress and were not freely and voluntarily given.

1   Accordingly, Defendants also argue that all evidence seized from the storage facility should be

2   suppressed.[1]

3          The Government argues that because of the complex nature of the health care insurance fraud

4   and tax evasion investigation, the search warrant's description of items to be seized was reasonably

5   specific and complied with the Fourth Amendment. The Government also argues that the warrant was

6   valid under the exception to the particularity requirement for a business or enterprise that is permeated

7   with fraud.  The Government also argues that even if the search warrant violated the Fourth

8   Amendment, the Government's agents acted in good faith reliance on the validity of the search warrant

9   and, therefore, the evidence seized pursuant to the warrant should not be suppressed.  The Government

10  argues that the consents to search the offsite storage facility obtained from SDI's officers Todd Kaplan

11  and Robert Kaplan were knowingly and voluntarily made.  The Government also challenges the

12  standing of Defendants Todd Kaplan and Jack Brunk to contest the constitutionality of the search and

13  seizure of SDI's business records.

14         At the evidentiary hearing, the Government presented the testimony of Julie Bomstad, formerly

15  Julie Raftery, a special agent of the Internal Revenue Service/Criminal Investigation, whose  affidavit

16  was submitted in support of the search warrant application and who was one of the supervising agents

17  who conducted the search pursuant to the warrant.  Defendants presented testimony by Robert Kaplan,

18  an officer and employee of SDI, regarding the manner in which the search was executed and the

19  circumstances regarding his written consent to search an offsite storage facility where SDI records were

20  housed.  Defendant Jack Brunk also testified regarding SDI's and its officers' alleged expectation of

21  privacy in SDI's premises and records and the manner in which the search warrant was executed.  As

22  rebuttal evidence, the Government introduced videotapes which depicted the SDI offices and the offsite

23  storage facility on January 31, 2002 before and after the Government's agents seized documents and

24  computer records pursuant to the search warrant.

25  _____

26         [1]Defendants have also filed a Motion for a *Franks* Hearing (#42 ) in which they allege that the
    Government intentionally misrepresented or recklessly omitted material facts from the affidavit, which,
27  if properly stated, would have rendered the agent's affidavit insufficient to support a finding of probable
    cause by the magistrate judge.
28

**FACTS**

On January 28, 2002, the Government applied to United States Magistrate Judge Stephen J. Hillman in the Central District of California for the issuance of a warrant to search the business premises of Defendant SDI located in Westlake Village, California.  The application for the search warrant was based on a 34 page affidavit prepared by Julie Raftery, now Bomstad,[2] a special agent of the Internal Revenue Service/Criminal Investigation which sought to seize SDI's business records described in the affidavit and in Attachment "B" to the search warrant.  The Government also sought to seize the state and federal income tax returns and any information relating to the preparation of those returns for Todd Kaplan and Denise Kaplan, and SDI.

Pursuant to a stipulation by the parties during the evidentiary hearing, it was agreed that at the time of the application for the search warrant, Defendant Todd Kaplan was the president of SDI and owned 48 percent of its stock.  Defendant Jack Brunk was a vice-president of SDI in charge of clinical services and owned 11 percent of SDI's stock.  The other remaining 41 percent of SDI's stock was owned by other SDI officers, employees or outside investors.

**1.      Allegations in Affidavit Supporting Issuance of the Search Warrant.**

Agent Bomstad testified that her affidavit was prepared after months of investigation by Nevada and Federal law enforcement agencies into the suspected fraudulent insurance billings of SDI and tax fraud or tax evasion allegedly committed by Todd Kaplan and SDI.  According to Agent Bomstad, the affidavit was prepared over several weeks time and was reviewed by fellow case agents and supervisory personnel, including district counsel of the IRS Las Vegas Field Office, the supervisory special agents of the IRS and FBI, the IRS Special Agent in charge of the Las Vegas Office, and the Assistant United States Attorney for the District of Nevada, Steven Myhre.

**A.      Health Care Fraud Allegations.**

Agent Bomstad's affidavit alleged that SDI and its principal officer, Todd Kaplan, engaged in a conspiracy with physicians and certain entities referred to as "cardiac diagnostic companies (CDCs)" to

---

[2]For simplicity and clarity Agent Bomstad will be referred to herein by her present last name rather than her former last name of Raftery.

3

1  fraudulently bill Medicare and private health insurers for unnecessary sleep studies and fraudulent

2  cardiac risk assessment studies that were allegedly performed in conjunction with the sleep studies.

3  The affidavit alleged that the information gathered during the Government's investigation provided

4  probable cause to believe that SDI and Todd Kaplan had engaged in mail fraud in violation of 18

5  U.S.C. § 1341, wire fraud in violation of  18 U.S.C. § 1343, and health care fraud in violation of 18

6  U.S.C. § 1347.  The alleged fraudulent conspiracy as described in the affidavit was as follows:

7        Through agreements with referring physicians, SDI placed its own employees, known as health

8  service coordinators, in the referring physicians' offices.  These SDI employees met with the

9  physicians' patients and had them fill out questionnaires regarding sleep problems.  Based on the

10  patients' questionnaire responses, the SDI employee completed a physician referral for a sleep study to

11  be performed by SDI.  The physician signed the referral which the SDI employee then faxed to SDI

12  corporate headquarters to schedule a sleep study.  According to the affidavit, many of the patients

13  referred to SDI for sleep studies did not need them.  SDI would arrange for the sleep studies to be

14  performed in sleep labs, in hotel rooms or in the patients' homes.  The SDI sleep studies were

15  performed by attaching the patient to electrocardiographic monitoring equipment, commonly called a

16  24 Hour Holter Monitor, which was connected to an SDI "lap-top" computer.  This equipment would

17  then monitor various parameters of sleep and cardiac responses to sleep.  The sleep study would

18  generally last 6-8 hours.

19        The computer data would then be analyzed by a non-physician SDI employee who prepared a

20  sleep study report.  Although SDI allegedly employed staff physicians who reviewed the sleep study

21  data and drafted and signed the sleep study reports, the affidavit alleged that these staff physicians, in

22  fact, did not actually draft, review, approve or sign the reports.  Instead, SDI affixed the staff

23  physicians' signatures to the reports with signature stamps.  The affidavit alleges that the SDI sleep

24  studies were of poor quality.  The affidavit also alleged that SDI frequently and improperly scheduled

25  patients for a second sleep study and CPAP titration before the results of the first sleep study were

26  known.  SDI's decision to schedule a second sleep study was based on whether the patient's insurer

27  would pay for a second study rather than on whether it was medically reasonable or necessary.

28  . . .

4

As part of the alleged fraudulent scheme, the affidavit alleged that SDI sent the 24 Hour Holter Monitor data to the cardiac diagnostic companies (CDCs) which would analyze the data and prepare cardiac risk assessment studies for the referring physicians.  These tests or studies included a Heart Rate Variability (HRV) test, 24-hour electrocardiogram (ECG) test and a Signal Average Electrocardiogram (SAECG) test.  The cardiac diagnostic companies (CDCs) would separately bill Medicare or the patient's private health insurer for performing these tests.  The affidavit alleged that these cardiac risk assessment studies were not actually performed for the required 24 hour monitoring period billed by the cardiac diagnostic companies because the sleep studies only lasted 6-8 hours; the tests were not conducted under proper conditions to test a patient's cardiac responses; and that a sleep study, which included its own cardiac component, was not a legitimate medical reason for performing such tests.

Agent Bomstad's affidavit alleged that physicians were induced to accept SDI employees into their offices and participate in the fraudulent sleep study referral scheme through SDI's "revenue enhancement program."   Under this program, SDI allegedly advised the physicians that they could earn additional revenue by billing Medicare and private insurers for the professional component – physician review and interpretation – of the cardiac risk assessment tests performed by the cardiac diagnostic companies (CDC's).  SDI also allegedly advised the physicians that they could earn additional revenue by billing for follow-up appointments with the patients to review the cardiac risk assessments and sleep study reports.  The affidavit also alleged that there was a "kick-back" scheme between SDI and the cardiac diagnostic companies (CDC's).  One of the cardiac diagnostic companies, Cardiac Monitoring Services (CMS) paid SDI over $1,572,000 from June 2000 through April 2001.  Another cardiac diagnostic company with whom SDI later did business, Comprehensive Cardiac Care, was incorporated in 2000.  SDI's president Todd Kaplan was also president of Comprehensive Cardiac Care and its "registered office" address was the same as SDI's corporate headquarters in Westlake Village, California.

The affidavit described the information provided by the individuals whom the Government interviewed during its investigation, the Government's review of insurance claims records regarding SDI's and the cardiac diagnostic companies' billings, and the opinions provided by the Government's medical consultants regarding the illegitimacy of the cardiac risk assessment studies and the billing

1   practices of SDI and the cardiac diagnostic companies.

2   The affidavit listed three former SDI employees who provided information which the

3   Government relied on in support of its affidavit.  Randy Lollar, a former SDI sales manager, provided

4   the Government with information regarding SDI's "revenue enhancement program" with the referring

5   physicians.  Erin Beglinger, a registered polysomnographer, who was responsible for training and

6   supervising SDI's sleep study technicians, advised the Government that many of the patients did not

7   need sleep studies[3], that SDI's sleep studies were of poor quality, that she had not been permitted to

8   meet with the staff physicians who allegedly signed the sleep study reports,  and that she was told by

9   other SDI employees that none of them had seen the physicians who allegedly interpreted the sleep

10  studies and wrote the reports.  Ms. Beglinger also allegedly told the Government that Defendant Jack

11  Brunk told her that the sleep study reports were actually written by a 17 year old high school girl.

12  John Gardner, a former vice-president and Chief Operating Officer of SDI, allegedly told the

13  Government that there was ongoing concern at SDI about billing for the 24 Hour Holter Monitor.   Mr.

14  Gardner also stated that Defendant Jack Brunk informed him that Dr. Awerbuch, one of SDI's staff

15  doctors whose name appeared on many of the sleep study reports, trained him to write the reports and

16  that Brunk then placed the physician's signature on the reports with a signature stamp.

17  The affidavit also named two other persons who owned companies that did business with SDI

18  and provided information relevant to the allegations in the affidavit: Darlene Steljes and Christine

19  Gibaud.  Ms. Steljes was the owner of Sleep Clinic of Nevada, a certified sleep lab.  According to the

20  affidavit, Ms. Steljes entered into a limited liability company with Todd Kaplan in 1998-1999, but

21  terminated the business relationship when SDI's business practices became of concern to her.  Ms.

22  Gibaud was a former owner of Sleep Consultants, located in Saginaw, Michigan.  In 1998 Ms. Gibaud

23  entered into an LLC to form SDI Future Health of Michigan.  In 1999 Kaplan "successfully took total

24  control of SDI of Michigan."  Ms. Steljes and Ms. Gibaud also allegedly informed the Government that

25  

26  [3]As exhibits to their *Motion for a Franks Hearing (#42)*, Defendants attached copies of the
    Government notes regarding its interviews with Ms. Beglinger.  According to those notes, Ms.

27  Beglinger advised the Government that approximately 60 percent of the patients referred for sleep

28  studies needed them and approximately 40 percent did not.

1    SDI's sleep studies were of very poor quality, lacked analysis, and were often contradictory in their

2    conclusions.   Ms. Steljes also told the Government's investigators that reports appeared to be signed

3    with a signature stamp for Dr. Awerbuch and another physician, Dr. Susan Sprau.  She also reported

4    that she had attempted to meet with the staff physicians who signed the SDI sleep study reports but was

5    not allowed to do so.

6            The affidavit also listed three Medicare physician consultants who provided medical opinions

7    regarding the legitimacy of the studies or tests performed by SDI and the cardiac diagnostic companies

8    and/or opinions regarding medical billing practices of SDI, the referring physicians and the cardiac

9    diagnostic companies.  According to the affidavit, these consultants advised the Government that the

10   cardiac risk assessment tests cannot appropriately be prescribed in conjunction with routine sleep

11   studies and that the tests require patients to engage in various activities and responses that cannot be

12   done while a patient is asleep.  The consultants also advised that a Holter Monitor test cannot be

13   appropriately billed in conjunction with a sleep study which contains its own cardiac billing parameter.

14           Based on the Government's analysis of insurance claims records, the affidavit alleged that SDI

15   and the cardiac diagnostic companies billed private insurance and government employee plans twice for

16   the same services.  Based on the Government's analysis of CPT billing codes, the companies billed for

17   components of the same tests which resulted in higher payments than justified.  The affidavit also

18   alleged that the dates for cardiac risk assessments were altered to indicate that they were performed on

19   different dates than the sleep studies in order to avoid rejection by the insurers or Medicare.

20           **B.    Allegations Regarding Tax Evasion.**

21           The affidavit also alleged that there was probable cause to believe that SDI and Todd Kaplan

22   had engaged in tax evasion in violation of 26 U.S.C. §§ 7201, 7202 and 7203.  The affidavit listed Todd

23   and Denise Kaplan's adjusted gross income and total tax liability on their Federal Income Tax 1040

24   forms for the years 1996 through 2000.  In the years 1996, 1998 and 1999, the Kaplans reported a

25   negative gross income and paid no taxes.  In 1997 the Kaplans reported gross income of $31,679 and a

26   tax liability of $524.  The Kaplans also claimed the earned income tax credit for low income taxpayers

27   in 1999 and received a tax refund based on that credit.  In 2000, the Kaplans reported gross income of

28   $69,867 and a tax liability of $2,119.

1    According to the affidavit, other IRS records show that Mr. Kaplan reported $137,833 in wages

2    for 2000.  The affidavit also alleged that Mr. Gardner, SDI's former chief operating officer, stated that

3    Todd Kaplan earned $15,000 per month from SDI during 2000 and, therefore, should have reported

4    wages of at least $180,000 from SDI for that year.

5    The affidavit also alleged that an analysis of the Kaplans' filed income tax returns for 1996

6    through 2000 indicated "little justification for their current lifestyle."  Although the Kaplans reported

7    negative gross income or only modest income in 1998 and 1999, they paid $9,138 and $11,916 in

8    mortgage interest in those years.  Between 1996 and 2001, the Kaplans purchased several expensive

9    automobiles and on their credit applications for the purchase of these vehicles, the Kaplans listed

10   substantially greater monthly income than they reported on their tax returns.  In 1998, 1999 and 2000,

11   Mr. Kaplan also submitted financial statements to a bank which also indicated that he had annual

12   employment income and interest income substantially greater than the annual employment or interest

13   income listed on the Kaplans' tax returns.  Based on the foregoing information, the affidavit alleged

14   that the Kaplans substantially under-reported their gross income in 1996-2000.

15   The affidavit also alleged that SDI significantly under-reported its gross sales on its 2000 tax

16   return.  According to the return, SDI reported $9,139,283 in gross sales.  The affidavit states, however,

17   that SDI submitted a report to Dun & Bradstreet for the period ending December 31, 2000 which listed

18   its gross sales as $10,640,545, thus indicating that SDI under-reported its 2000 income by

19   approximately $500,000.  The affidavit also states that SDI was also required to withhold and pay to the

20   IRS employee taxes and file quarterly IRS statements for employment withholding taxes.  The affidavit

21   alleged, however, that SDI did not file quarterly 941 forms or pay employee withholding taxes as

22   required during 1996- 2000.  Finally, the affidavit stated that Todd Kaplan incorporated Comprehensive

23   Cardiac Care as a corporation in 2000.  The affidavit alleges, however, that no corporate income tax

24   return was filed for this corporation in 2000 as required by law.  *Id.,* ¶67, p. 34.

25       **2.      Preparation and Issuance of "Affidavit For Search Warrant" and "Search
            Warrant."**

26

27   Ms. Bomstad's affidavit included a list of the items sought to be seized.  *Government's Exhibit*

28   *1-B,* ¶14, pages 11-16.  Ms. Bomstad also prepared attachments "A" and "B" for the proposed search

8

1   warrant. *Government's Exhibit 1-A.* Attachment "A" was a description of the premises to be searched -

2   SDI's corporate headquarters located in Westlake Village, California. Attachment "B" listed 24

3   separate categories of documents or records that the Government sought to seize and provided a

4   description of the protocol to be used by the Government in searching for and seizing documents and

5   records located in SDI's computer data bases. *Government's Exhibit 1-A.* The list of items to be seized

6   in Attachment "B" was substantially identical to the list of items set forth in paragraph 14 of Ms.

7   Bomstad's affidavit.

8        Ms. Bomstad testified that on January 28, 2002, she took her 34 page affidavit and Attachments

9   "A" and "B" to the Assistant United States Attorney in the Central District of California (Los Angeles,

10  California). The affidavit and the attachments were reviewed by Assistant United States Attorney

11  (AUSA) Andrew Cowan. AUSA Cowan's office filled out the search warrant form and the "affidavit

12  cover sheet" used in the Central District of California. *Government's Exhibit 1-A.* Ms. Bomstad

13  testified that AUSA Cowan also suggested certain unspecified revisions to Ms. Bomstad's affidavit to

14  comply with the requirements of the Central District. Ms. Bomstad reviewed these revisions with the

15  AUSA in Nevada who approved them.

16       The document that Agent Bomstad referred to as the "affidavit cover sheet" is a form "Affidavit

17  for Search Warrant" to which her 34 page affidavit was attached. *Government's Exhibit 1-B.* This

18  "Affidavit for Search Warrant" incorporated Agent Bomstad's affidavit through the following language:

19              Affiant states the following facts establishing the foregoing
                grounds for issuance of a Search Warrant [:]

20

21              (SEE ATTACHED AFFIDAVIT WHICH IS
                INCORPORATED AS PART OF THIS AFFIDAVIT
                FOR SEARCH WARRANT)

22

23  *Government's Exhibit 1-B.*

24       The completed "Search Warrant" form stated as follows:

25              TO:   ANY AGENT(S) OF THE INTERNAL REVENUE SERVICE,
                      CRIMINAL INVESTIGATION OR ANY OTHER

26                    AUTHORIZED OFFICER(S)

27              Affidavit(s) having been made before me by the below-named
                affiant that he/she has reason to believe that on the premises known as:

28

1      SEE ATTACHMENT A

2      in the Central District of California there is now being concealed certain
       property, namely:
3
       SEE ATTACHMENT B
4
       and as I am satisfied that there is probable cause to believe that the
5      property so described is being concealed on the person or premises
       above-described and the grounds for application for issuance of the
6      search warrant exist as stated in the supporting affidavit(s).

7      YOU ARE HEREBY COMMANDED to search on or before <u>ten (10)</u>
       <u>days</u> (not to exceed 10 days) the person or place named above for the
8      property specified, serving this warrant and making the search (in the
       daytime  - - 6:00 A.M. to 10:00 P.M.) and if the property be found there
9      to seize it, leaving a copy of this warrant and receipt for the property
       taken, and prepare a written inventory of the property seized and
10     promptly return this warrant to <u>the duty U.S. Magistrate Judge</u> as required
       by law.
11

12  *Government's Exhibit 1-A.*

13       Ms. Bomstad testified that she took the "Affidavit for Search Warrant" and the search warrant

14  with  Attachments "A" and "B" to Magistrate Judge Hillman, who took them into his chambers where

15  he remained for approximately two hours.  From time to time, Judge Hillman came out of his chambers

16  and asked Ms. Bomstad questions regarding the meaning of certain terms contained in the 34 page

17  affidavit.  At one point, the magistrate judge expressed concern about the handling of confidential

18  patient records and asked that Ms. Bomstad's affidavit be revised to include instructions that would

19  ensure greater protection for the confidentiality of patient information.  Ms. Bomstad consulted with the

20  AUSA in Nevada regarding these changes to the affidavit, which were then made in Las Vegas and

21  faxed to Ms. Bomstad at Judge Hillman's chambers.  These revisions are contained in paragraph 14.e.

22  at pages 15-16 of Ms. Bomstad's affidavit.  *Government's Exhibit 1-A.*  Agent Bomstad testified that

23  Judge Hillman also added the following handwritten sentence at the end of Attachment "B":

24            8.     Patient Confidential medical information shall be handled in
                     accordance with the procedures set forth in the Affidavit.
25

26  *Government's Exhibit 1-A.*

27       After the foregoing changes were made to Ms. Bomstad's affidavit and attachment "B" to the

28  search warrant, Agent Bomstad signed the affidavits and Judge Hillman issued the search warrant.  The

1    "Affidavit for Search Warrant" was sealed by an order entered by Magistrate Judge Hillman.

2            **3.       Execution of Search Warrant.**

3            Ms. Bomstad testified that a pre-search meeting was held in Encino, California on January 30,

4    2002 and was attended by the 42 agents participating in the execution of the search warrant.  Ms.

5    Bomstad testified that the search team was comprised of agents experienced in conducting federal

6    searches and that the core of the search team was comprised of agents experienced in and familiar with

7    health care investigations.  According to Ms. Bomstad, she informed the search team that the crimes for

8    which SDI and Todd Kaplan were being investigated were health care fraud and tax evasion.   She

9    testified that the agents were verbally informed about the scope of the Government's investigation of

10   SDI and Todd Kaplan and the documents to be seized during the search.

11           Ms. Bomstad testified that copies of the affidavit and the search warrant were distributed during

12   the meeting and the agents were instructed to read the affidavit as well as the search warrant and its

13   attachments.  Ms. Bomstad testified that a written search warrant plan was prepared regarding the

14   proposed search.  On motion by the Defendants, the Court ordered that redacted portions of this plan

15   relevant to Ms. Bomstad's testimony be produced.  *Defendant's Exhibit "DDD".* This search warrant

16   plan stated that a copy of the search warrant would be read during the briefing and initialed by all

17   participating agents.   Although each agent signed a roster of persons who attended the pre-search

18   meeting, *Government's Exhibit 1-C,* neither the roster, the search warrant plan, nor any other written

19   document introduced in evidence specifically stated that each agent was also required to read the

20   affidavit.

21           The search commenced at approximately 7:00 a.m. on January 31, 2002.  Ms. Bomstad testified

22   that upon making entry into the SDI offices, the agents deployed throughout the offices for purposes of

23   securing the premises and the documents therein, and to contact any employees or other persons on the

24   premises to ensure that they did not remove records or interfere with the computer system.  The agents

25   responsible for inventorying the records to be seized also set up a location in the conference room

26   where they would conduct that activity.  Ms. Bomstad testified that before the agents began the process

27   of actually reviewing documents to determine if they were subject to seizure, or accessing the SDI

28   computer system(s), agents made a videotape record of the SDI premises, on both the first and second

                                                       11

1   floors.

2          The videotape shows that the agent(s) videotaping the second floor entered the offices of a

3   company known as Spectramed and videotaped the interior of that office.  The search warrant did not

4   authorize the Government to search any premises other than those of SDI.  Although the Government

5   videotaped the interior of Spectramed's office, Ms. Bomstad testified that the Government did not

6   otherwise inspect the records in that office or seize any records in Spectramed's office.  The inventory

7   of documents seized from SDI's offices, *Government's Exhibit 1-F*, page 31, indicates that the

8   Government seized a Spectramed-SDI contract, but indicates that this document was seized from an

9   SDI employee's office.

10         After arriving at SDI's offices, Ms. Bomstad met Robert Kaplan, an officer and employee of

11  SDI, and handed him a copy of the search warrant.  Because the affidavit was sealed, Ms. Bomstad did

12  not provide a copy of the affidavit to Robert Kaplan or any other representative of SDI.  She states,

13  however, that the affidavit was available during the search for reference by any member of the

14  Government's search team.

15         Ms. Bomstad testified that during the first hour of the search, an employee of SDI informed her

16  that many of the documents listed in Attachment "B" to the search warrant were located in an offsite

17  storage facility.  Ms. Bomstad testified that  Robert Kaplan confirmed that SDI records were stored in

18  an offsite storage facility.  Robert Kaplan stated that he did not know the address of the offsite storage

19  facility, but he was willing to give consent to permit the Government to search the storage facility for

20  records in accordance with Attachment "B" of the search warrant.  At the agents' request, Robert

21  Kaplan signed a handwritten consent to search document that was witnessed by Ms. Bomstad and two

22  other female Government agents.  *Government's Exhibit 1-D.*  Ms. Bomstad testified that her encounter

23  with Robert Kaplan regarding her request for consent to search the storage facility was cordial and

24  cooperative.

25         Robert Kaplan's testimony regarding his written consent to search the storage facility sharply

26  conflicted with the testimony of Agent Bomstad.  Robert Kaplan testified that he was sitting with Jack

27  Brunk at approximately 7:00 a.m. when he looked out an interior window in the office and observed

28  several Government agents inside the office.  Robert Kaplan testified that he stood up, at which point,

1    an agent sternly instructed him to take his hands out of his pockets.  He was then escorted to a

2    conference room in the office.  The agents demanded that he give them the password codes to SDI's

3    computer system – otherwise the Government would seize the computers and take them away and SDI

4    would never see them again.

5         Robert Kaplan testified that Agent Bomstad and another female agent acted out "good cop/bad

6    cop" roles regarding obtaining his consent to search the offsite storage facility.  According to Robert

7    Kaplan, the other agent whose identity he does not know or recall, acted in a friendly manner toward

8    him and advised him that it would be best for everyone if he gave consent to search the offsite storage

9    facility.  Robert Kaplan testified that Ms. Bomstad acted the part of the "bad cop" by telling him that if

10   he did not consent to the search of the storage facility, the Government would, in any event, seize the

11   records.  He also testified that Ms. Bomstad called him a liar when he told her that he did not know the

12   address of the storage facility.  Robert Kaplan also testified that he saw the "entry tools" that the agents

13   had brought with them, including a crow bar and grappling hook.  Although the agents did not point any

14   guns at him, Robert Kaplan observed that Ms. Bomstad was armed.

15        On cross-examination, Robert Kaplan acknowledged that at the time of the search, he knew

16   where the storage facility was located, but did not know the street address.  Although Robert Kaplan

17   acknowledged that the written consent to search stated that he knowingly and voluntarily gave his

18   consent, Robert Kaplan testified that he signed the consent to search because he feared that the

19   Government agents would break into the storage facility, damage the property, and seize the records

20   anyway.

21        After Robert Kaplan signed the written consent to search the storage facility, SDI's president,

22   Todd Kaplan, arrived at the SDI offices.  Ms. Bomstad testified that Todd Kaplan was also provided

23   with a copy of the search warrant, and she told him that he and SDI were being investigated for criminal

24   violations of the health care fraud and tax laws.  Ms. Bomstad also obtained a signed written consent

25   from Todd Kaplan to search the offsite storage location.  *Government's Exhibit 1-E.*  Todd Kaplan

26   contacted the person who was in charge of the storage location and obtained the address of the facility

27   for the Government's agents and gave the person authorization to permit the Government access to the

28   storage facility.  Ms. Bomstad testified that no threats or coercion were used to obtain Todd Kaplan's

1   written consent to search the storage facility.   No testimony was adduced from the defense witnesses

2   regarding the circumstances under which Todd Kaplan's consent to search the storage facility was

3   obtained.

4          Ms. Bomstad testified that at some point during the first two hours of the search, Todd Kaplan

5   informed the Government agents that some of the documents on SDI's premises might be protected by

6   the attorney-client privilege.   Upon learning this, the search team ceased its search and two federal

7   agents who were not involved in the search were summoned to the SDI office to identify allegedly

8   privileged documents in the locations pointed out by Todd Kaplan.   After the allegedly privileged

9   documents were identified and segregated, the search team proceeded with its search.   The privileged

10  documents were left at SDI premises when the search concluded.   Ms. Bomstad also testified that

11  during the search, an SDI attorney came to the offices and was present for most of the day.

12         According to Ms. Bomstad, SDI employees informed the agents that SDI's business was

13  operated from computers in a "paperless" manner.   After obtaining the computer passwords, the agents

14  copied the computer hard drives onto equipment they brought with them, through a process known as

15  "mirroring," so that SDI could continue to operate its business.   Prior to and at the time of the

16  evidentiary hearing, the Government asserted that it was able to retrieve SDI's computer data records

17  through the mirroring process and, therefore, the Government's agents did not seize or remove any of

18  SDI's computer equipment.

19          Ms. Bomstad testified that search agents assigned to that task prepared computer inventories of

20  the documents and things seized from SDI's offices and the offsite storage facility.   The search

21  concluded at approximately 10:00 p.m.   The search team gave the SDI officers separate printed

22  inventories for the documents seized from SDI's offices and from the offsite storage location. During

23  Ms. Bomstad's direct testimony, the Government introduced the two inventories that the agents

24  prepared at the time of the search, one listing the items seized from SDI's corporate offices and the

25  other listing the items seized from the offsite storage facility.  *Government Exhibits 1-F* and *1-G.*  On

26  cross-examination, however, defense counsel showed Ms. Bomstad another printed inventory for the

27  property seized from SDI's corporate offices which included a final, "add-on," handwritten inventory

28  entry stating that the Government seized and removed two computer servers during the search.

1   *Defendants' Exhibit "BBB".*[4]   Defendants' counsel also introduced a letter to the United States

2   Attorney, dated July 25, 2002, regarding the seizure of SDI's servers.  *Defendants' Exhibit "AAA".*

3   Ms. Bomstad could neither confirm nor refute that *Defendants' Exhibit "BBB"* was prepared and left at

4   the premises by the Government's agents on January 31, 2002, and she appeared to have no personal

5   knowledge or recollection whether the two servers were, in fact, seized and removed by the

6   Government.  Robert Kaplan testified that the two servers were present in the computer room when the

7   search commenced on January 31, 2002, but were no longer there when the agents departed.  Robert

8   Kaplan testified that it was several days before SDI could resume its business operations.

9          Defendants contend that the Government seized 567 boxes of documents and seven file cabinets

10   of documents and "close to one terabyte of electronic data."  According to the Defendants, the

11   Government seized approximately 90 percent of SDI's paper documents and 100 percent of its

12   computer or electronic files during the search.  Robert Kaplan and Jack Brunk testified that they

13   determined the percentage amount of paper documents seized from SDI based on their visual

14   observation of what was present before the search began and what was left after the agents departed.

15          The videotape of SDI's offices indicates that there was less paper visible in the offices after the

16   search ended than when it began.  The post-search videotape indicates that after the search and seizure

17   was completed, various books, papers, plaques and other items still remained in the SDI offices.  The

18   videotape does not provide an independent basis upon which to determine the amount of paper that was

19   seized and, therefore, does not confirm or refute Defendants' assertion that the Government seized 90

20   percent of SDI's paper business records.

21          According to Robert Kaplan and Jack Brunk, the Government's agents seized Jack Brunk's

22   personal tax and financial records, assembly and restoration manuals for Corvette automobiles, bills for

23   vitamin supplies purchased by an SDI employee, videotapes from leadership and business clubs,

24   paperwork from a typewriter ribbon company started by Defendant Kaplan in 1980, which he no longer

25   operated at the time SDI was incorporated in 1994, records from another company that Kaplan worked

26   _____

27          [4]Robert Kaplan testified that he found this inventory, *Defendants' Exhibit "BBB,"* in the SDI
     offices after the agents left on the evening of January 31, 2006.  He testified that this inventory

28   remained in the possession of SDI until shortly before the evidentiary hearing in this matter.

1  for before SDI opened, and business records for another company that Kaplan owned which had no

2  connection to SDI.

3          Defendants also state that after the Indictment was filed in this case in March 2005, the

4  Government returned to SDI 362 of the 567 boxes seized during the search.  Defendants argue that the

5  return of these documents is an implied concession that the Government seized SDI's business records

6  that had no legitimate relationship to the criminal investigation or purpose of the search warrant.  The

7  Government acknowledges that it returned a substantial number of documents to the Defendants after

8  the filing of the Indictment but disputes that the return of these documents is a concession that the

9  search warrant was overbroad.   Rather, the Government contends it decided to base its prosecution of

10  SDI, Todd Kaplan and Jack Brunk on approximately 570 randomly selected sleep study patient files.

11  To prove that the alleged fraud encompassed SDI's other patient files and billings, the Government

12  intends to present expert witness statistical-survey testimony.  Because the Government will not be

13  relying on the other patient files and insurance claim/billing records to prove its case against

14  Defendants, the Government contends that it no longer needed the other records and, therefore, returned

15  them to Defendants.

16                          **DISCUSSION**

17  **1.      Defendants Kaplan's and Brunk's Standing to Challenge Search and Seizures
           Under the Fourth Amendment.**

18

19          The Government argues that Defendants Todd Kaplan and Jack Brunk lack standing to

20  challenge the seizure of SDI's business records either from the corporate offices of SDI or the off-site

21  storage location because, as employees or officers of SDI, they did not have a reasonable expectation of

22  privacy in those business records or the premises where they were located.  The Government does not

23  contest Defendant SDI's standing to challenge the seizure of its business records under the Fourth

24  Amendment.[5]

25

26          [5]A corporation is generally deemed to have standing with respect to searches of corporate

27  premises and seizures of corporate records. *United States v. Leary*, 846 F.2d 592, 596 (10th Cir. 1988),
   quoting 4 W. LaFave, *Search and Seizure* § 11.3(d)(2d ed. 1987); citing *G.M. Leasing Corp. v. United*

28  *States*, 429 U.S. 338, 97 S.Ct. 619, 629, 50 L.Ed.2d 530 (1977); *Auster Oil & Gas, Inc. v. Stream*, 835

                                16

1    In *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), the Supreme Court

2    abandoned the terminology of "standing" as the basis for analyzing claims of violations of the Fourth

3    Amendment in favor of an analysis focusing on whether the individual movant's Fourth Amendment

4    rights were infringed by the search and seizure.  *See also Minnesota v. Carter*, 525 U.S. 83, 88. 119

5    S.Ct. 469, 142 L.Ed.2d 373 (1998).  Despite the Supreme Court's disapproval of "standing"

6    terminology, the courts have continued to refer to these issues in terms of "standing."  Thus, in *United*

7    *States v. Sarkisian*, 197 F.3d 966, 986 (9th Cir. 1999), the court set forth the basic requirements for a

8    defendant to assert a Fourth Amendment violation as follows:

9    To establish standing to challenge the legality of a search or
     seizure, the defendants must demonstrate that they have a "legitimate
10   expectation of privacy" in the items seized or the area searched.  *United*
     *States v. Padilla,* 508 U.S. 77, 82, 113 S.Ct. 1936, 123 L.Ed.2d 635
11   (1993) (per curiam) ("*Padilla I* ");  *see also Rakas v. Illinois,* 439 U.S.
     128, 143-44, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).   To demonstrate this,
12   the defendants must manifest a subjective expectation of privacy in the
     area searched, and their expectation must be one that society would
13   recognize as objectively reasonable.  *See United States v. Echegoyen,*
     799 F.2d 1271, 1277 (9th Cir.1986) (citing *Smith v. Maryland,* 442 U.S.
14   735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979)).   The defendants have
     the burden of establishing that, under the totality of the circumstances, the
15   search or seizure violated their legitimate expectation of privacy in the
     storage room.  *See Rawlings v. Kentucky,* 448 U.S. 98, 104, 100 S.Ct.
16   2556, 65 L.Ed.2d 633 (1980);  *United States v. Kovac,* 795 F.2d 1509,
     1510 (9th Cir.1986).

17

18   The fact that a defendant is a target of an investigation does not confer automatic standing on

19   the defendant to challenge the search and seizure of another's premises or property.  In *United States v.*

20   *Padilla*, 508 U.S. 77, 82, 113 S.Ct. 1936, 123 L.Ed.2d 635 (1993), the Court overruled the Ninth

21   Circuit's "co-conspirator exception" which provided that a co-conspirator's participation in an

22   operation or arrangement that indicates joint control or supervision of the place searched establishes

23   standing.  In so holding, the Court stated that violations of the Fourth Amendment can only be

24   challenged by those whose rights were violated by the search itself, not by those who are aggrieved

25   solely by the introduction of damaging evidence.  Co-conspirators and co-defendants have been

26   accorded no special standing.

27   _____

28   F.2d 597 (5th Cir. 1988).

1    In *Lagow v. United States*, 159 F.2d 245, 246 (2d Cir. 1946), *cert. denied*, 331 U.S. 858, 67

2    S.Ct. 1750, 91 L.Ed. 1865 (1947), the court held that a corporate officer, even if the sole shareholder,

3    could not vicariously assert the violation of the corporation's Fourth Amendment rights regarding the

4    seizure of corporate records because he had no ownership interest in the records.   Subsequent cases

5    tempered this rule based on the circumstances of the particular case, *e.g. Jones v. United States*, 362

6    U.S. 257, 80 S.Ct. 725, 4 L.Ed2d 697 (1960);  *Mancusi v. DeForte*, 392 U.S. 364, 88 S.Ct. 2120, 20

7    L.Ed.2d 1154 (1968).  In *United States v. Britt*, 508 F.2d 1052, 1055 (5th Cir. 1975), however, the court

8    held that the *Lagow* rule remains applicable in situations where a defendant seeks to suppress illegally

9    seized corporate records simply because he is a corporate officer.  *Britt* held that the president and sole

10   shareholder of the corporation in that case did not have standing to challenge the seizure of corporate

11   records from an office used as a "storage area" where the records were normal corporate records that

12   were not prepared personally by the defendant.  The defendant did not personally use the office for

13   work and was not present during the search.  The purpose of the search was not directed at him, and no

14   records were seized from his personal desk, briefcase or files.

15       In *United States v. Lefkowitz*, 618 F.2d 1313, 1316 n. 2 (9th Cir. 1980), the court, in a relatively

16   brief footnote, held that the president and secretary of corporations had standing to challenge the

17   government's search of the corporate offices and seizure of corporation records.  In so holding the court

18   stated:

19           The Government correctly notes that Lefkowitz does not have standing
             merely because he was a corporate officer, *United States v. Britt*, 508
20           F.2d 1052, 1055(5th Cir. 1975), and that mere presence at a search does
             not automatically impart standing, *Rakas v. Illinois*, 439 U.S. 128, 99
21           S.Ct. 421, 58 L.Ed.2d 387 (1978).  Applying these rules, however, the
             court below nevertheless found that Lefkowitz had "a sufficient
22           proprietary interest in the suite, which was the target of the search and
             where the corporate records were seized, to impart standing."  This
23           finding is amply supported in the record.

24       The district court opinion in *United States v. Lefkowitz,* 464 F.Supp. 227 (C.D.Cal. 1979), stated

25   that the corporate office searched by the government was also the office where the corporation's

26   president and secretary maintained their employment.  In refusing to restrict the defendants' standing to

27   challenge only the seizure of records from the defendants' personal offices and desks, the district court

28   further stated:

18

1
2
3
4
5
6

> The fact that Lefkowitz and Sullivan did not reserve exclusive use of the entire suite does not, in and of itself, vitiate a finding of a reasonable expectation of privacy. See Mancusi v. DeForte, supra at 368-9, 88 S.Ct. 2120. The suite was apparently not open to the general public. Both Lefkowitz and Sullivan could reasonably expect that the "private" suite, where both were employed, would be permissibly entered only by the employees of the corporations and those individuals receiving permission from the appropriate individuals. This expectation of privacy would be infringed, as it was in the case at bar, by the examination and seizure of such corporate records by government officials.

7     Although the *Lefkowitz* decisions have occasionally been cited on the issue of standing by other

8   circuit court opinions, *see United States v. Chuang*, 897 F.2d 646, 649 (2d Cir. 1990); *United States v.*

9   *Leary*, 846 F.2d 592, 596 (10th Cir. 1988), *Lefkowitz* has not been cited on the standing issue by later

10  Ninth Circuit decisions. The cases cited by the Government that an employee's privacy interest is

11  limited only to the areas given over to the employee's "exclusive use" did not involve Fourth

12  Amendment claims made by corporate owners and officers under facts similar to *Lefkowitz* or this case.

13  *See United States v. Taketa*, 923 F.2d 665 (9th Cir. 1991); *Schowengerdt v. General Dynamics Corp.*,

14  823 F.2d 1328 (9th Cir 1987); *United States v. Silva,* 247 F.3d 1051,1056 (9th Cir. 2001);and *United*

15  *States v. Sarkisian*, 197 F.3d 966, 986 (9th Cir. 1999).

16      In *United States v. Gonzalez, Inc.*, 412 F.3d 1102 (9th Cir. 2005), the court held that the

17  individual owners/officers of a public bus company had standing to challenge the legality of intercepted

18  communications pursuant to a wiretap on the company's telephones even though the defendants did not

19  personally participate in the intercepted calls. The court noted that the Supreme Court has interpreted

20  the provisions of the federal wiretap statute to limit standing to persons whose Fourth Amendment

21  rights were violated by the interception. *Alderman v. United States*, 394 U.S. 165, 175-76, 89 S.Ct. 961

22  (1969). The court, citing *Alderman*, stated that an owner of premises where the wiretap was placed has

23  standing to challenge illegal wiretaps even if he did not participate in the intercepted conversations.

24  The government attempted to distinguish *Alderman* on the grounds that it involved the wiretapping of a

25  residence as opposed to a commercial property. In rejecting this distinction, the court stated that the

26  subject office was a small, family-run business housing only 25 employees at its peak. In such an office,

27  individuals who own and manage the business operation have a reasonable expectation of privacy over

28  the onsite business conversations between their agents. Defendants not only owned the business

19

1  premises, they also exercised full control over access to the building as well as managerial control over

2  its day-to-day operations and had a reasonable expectation of privacy regarding calls made on the

3  premises.  Although *Gonzalez* did not cite *Lefkowitz* or other cases involving the standing of corporate

4  officers or employees to challenge the search and seizure of corporate offices and records, it appears

5  consistent with *Lefkowitz* and other decisions involving such searches and seizures.

6       In *United States v. Mancini*, 8 F.3d 104 (1st.Cir. 1993), the court stated the following factors are

7  relevant to the standing determination: ownership, possession and/or control; historical use of the

8  property searched or the thing seized; ability to regulate access; the totality of the surrounding

9  circumstances; the existence or non-existence of a subjective anticipation of privacy; and the objective

10 reasonableness of such an expectancy under the facts of the case.  The court also stated that it takes

11 notice of the position of authority of the person asserting violation of his or her Fourth Amendment

12 rights.  *Mancini*, 8 F.3d at 109, *citing United States v. Brien,* 617 F.2d 299, 306 (1st Cir. 1980).  More

13 specifically, *Mancini*, stated that in determining the expectation of privacy of corporate employees in

14 business records seized from areas of the corporate offices other than their own work stations, the

15 following factors are considered:  (1) each defendant's position in the firm; (2) his ownership interest;

16 (3) his responsibilities; (4) his power to exclude others from the area; (5) whether he worked in the

17 area; and (6) his presence at the time of the search.  It is also relevant whether the office in question was

18 noteworthy for its extreme security measures.  *Mancini* also noted that some standing decisions turn on

19 the applicability of certain business regulations that may reduce one's reasonable expectation of

20 privacy.  *United States v. Leary*, 846 F.2d 592, 596 (10th Cir. 1988) and *United States v. Chuang*, 897

21 F.2d 646, 649-51 (2d Cir. 1990), *cert denied,* 498 U.S. 824, 111 S.Ct. 77, 112 L.Ed.2d 50 (1990).

22       In *Leary*, the court held that defendants' expectation of privacy in their arms export company's

23 records was not lost by the fact that they had previously participated in a voluntary open door policy

24 which allowed custom agents to inspect their records.  Because the defendants had the right to terminate

25 the voluntary inspections and require the government to obtain a search warrant, the agreement was not

26 sufficient to overcome defendants' reasonable expectation of privacy in the company's records.  In

27 *Chuang,* however, the court held that a lawyer and bank officer, who operated his law practice on the

28 same premises as the bank, had a substantially reduced expectation of privacy in the premises and the

1  bank records because the bank was a closely regulated business whose records were subject to routine

2  examination by the Comptroller of the Currency.

3         It is this latter factor that the Government places substantial reliance on in arguing that because

4  SDI was a closely regulated health services company, Defendants Kaplan and Brunk had essentially no

5  expectation of privacy in SDI's records and therefore no standing to challenge the search and seizure of

6  SDI records.   In support of these arguments, the Government attached to its Opposition portions of a

7  Department of Health and Human Services' manual that provides for administrate inspections under the

8  authority of the Health Insurance Portability Amendments Act ("HIPAA"), 42 U.S.C. § 1395ddd.  The

9  portion of the manual attached to the Government's Opposition appears to deal with records reviews of

10 health care providers where there is an issue of overpayment of Medicare benefits.  The Government

11 has also referenced 18 U.S.C. § 3486 which authorizes the Department of Justice to issue subpoenas to

12 health care providers who are merely suspected of criminal health care fraud offenses to obtain records

13 relevant to the investigation.

14        In *New York v. Burger*, 482 U.S. 691, 699-700 (1987), the Court upheld a state statutory scheme

15 providing for warrantless inspections of  "closely regulated" businesses (in that case junkyards) as a

16 form of special needs inspections that are beyond the normal need for law enforcement and which make

17 the warrant and probable cause requirements impracticable.  The Court based its approval of such

18 warrantless inspection schemes on the grounds that a business or commercial enterprise  has a lower

19 expectation of privacy than does an individual in his home.  Warrantless inspections of closely

20 regulated businesses are proper where the regulations are designed to establish how the business should

21 be operated and inspection is conducted to ensure that those rules are followed.  Such a regulatory

22 approach contrasts with the penal laws, a major emphasis of which is the punishment of individuals for

23 specific acts of misbehavior.  *New York v. Burger, supra,* 482 U.S. 691, 712-713.

24        It does not follow, however, that where the Government is pursuing a criminal investigation of a

25 business or its employees, that the Government is not required to obtain a search warrant in  compliance

26 with the probable cause and particularity requirements of the Fourth Amendment.  If the primary focus

27 of a warrantless search is ordinary crime control, it cannot be justified under a special needs exception

28 to the Fourth Amendment.  *See United States v. Jones,* 286 F.3d 1146 (9th Cir. 2002) (warrantless

1  search of employee's office for evidence of a crime not justified under "government employee

2  exception"); *City of Indianapolis v. Edmund*, 531 U.S. 32, 121 S.Ct. 447 (2000) (highway checkpoint

3  program whose primary purpose was to detect narcotics smugglers violated Fourth Amendment). *See*

4  *also Griffin v. Wisconsin,* 483 U.S. 868, 872 (1987).[6]

5        Similarly, the Government's argument that it could have subpoenaed SDI's business records

6  under 18 U.S.C. § 3486, did not eliminate its duty to demonstrate probable cause and comply with the

7  particularity requirement of the Fourth Amendment where it chose to proceed by search warrant.  As

8  stated in the two cases cited by the Government,  *Doe v. United States*, 253 F.3d 256 (6th Cir. 2001)

9  and *In re Subpoena Duces Tecum (United States v. Bailey)*, 228 F.3d 341 (4th Cir. 2000), there is an

10  important distinction between seizing records pursuant to a search warrant versus subpoenaing the

11  records pursuant to a statute such as 18 U.S.C. § 3486.  In  *In re Subpoena Duces Tecum, supra,* the

12  Fourth Circuit explained this distinction as follows:

13        A warrant is a judicial authorization to a law enforcement officer to
search or seize persons or things.  To preserve advantages of speed and

14  surprise, the order is issued without prior notice and is executed, often by
force, with an unannounced and unanticipated physical intrusion.  *See*

15  *Marshall v. Barlow's Inc.*, 436 U.S. 307, 316 98 S.Ct. 1816, 56 L.Ed.2d
305 (1978) (recognizing that search warrants may be "executed without

16  delay and without prior notice, thereby, preserving the element of
surprise.") Because this intrusion is both an immediate and substantial

17  invasion of privacy, a warrant must be issued only by a judicial officer
upon a demonstration of probable cause -the safeguard required by the

18  Fourth Amendment.  (Citations omitted)  The demonstration of probable
cause to a "neutral and detached judicial officer" places a "checkpoint

19  between the Government and the citizen" where there would otherwise be
no judicial supervision.  *Steagald v. United States*, 451 U.S. 204, 212,

20  101 S.Ct. 16421, 68 L.Ed.2d 38 (1981).

21       *Doe v. United States* also states that in the case of a subpoena issued under 18 U.S.C. § 3486,

22  the person has the opportunity to object and obtain judicial review before production is compelled.

23  Thus, the lower "reasonably relevant" standard for obtaining records pursuant to a subpoena cannot be

24  substituted as the standard for obtaining a search warrant governed by the Fourth Amendment.

25        In support of their position, Defendants Kaplan and Brunk argue that SDI is a small, closely

26  ――――――――――

27      [6]Because the Government did not seize SDI's records as part of an administrative review of
SDI's records, the Court is not called upon to decide whether the procedures adopted in the manual are

28  legally valid under the Fourth Amendment.

1    held corporation.  At the time of the search, Defendant Todd Kaplan owned 48 percent of SDI's stock,

2    and was a corporate director and the president/chief executive officer of the corporation.  Defendant

3    Brunk owned 11 percent of the corporate stock.  Defendant Brunk was also a corporate director and was

4    the vice-president of SDI in charge of clinical services.  The remaining stock of the company was

5    owned by other officers, employees and non-employee investors.  SDI employed approximately 40-50

6    persons in its corporate headquarters in Westlake Village, California.  According to Defendant Brunk at

7    the time of the search, SDI had approximately 300-400 employees in its other offices located around the

8    country.  Defendants Kaplan and Brunk both maintained their offices in SDI's corporate headquarters

9    and their personal offices were searched and records were seized from their offices.  Defendant Brunk

10    was present at the SDI offices when the search began and remained at the premises until the search was

11    concluded.  Defendant Todd Kaplan arrived at the offices after the search began and was requested by

12    Agent Bomstad to give consent to the search of the offsite storage facility.  During the search,

13    Defendant Kaplan also identified allegedly attorney-client privileged materials to the agents.

14        Robert Kaplan and Jack Brunk both testified regarding the measures taken by SDI to maintain

15    the security and privacy of its business premises and records.   They testified that the public is generally

16    not allowed into the office beyond the reception-lobby area.  Defendant Brunk testified that if a non-

17    employee had business at the SDI headquarters, he or she generally had a pre-arranged appointment and

18    would be met by the company employee or officer, or escorted to the appropriate office upon arrival.

19    The SDI offices are locked and alarmed at night.  Robert Kaplan and Defendant Brunk also testified

20    that most of SDI's patient records were kept on the computer system.  The computer servers were

21    located in a secure area of the premises and employee access to the computers was governed by

22    different levels of password access depending on their employment duties.  SDI did not use email or

23    have its computers connected to outside lines for security purposes.

24        Defendant Brunk testified that access to patient records was restricted to SDI employees

25    performing duties in regard to those files, the patient, his or her physician and the insurance company or

26    plan that covered the patient.  Defendant Brunk testified that if a representative of Blue Cross/Blue

27    Shield, for example, requested to inspect or obtain records of patients it insured or covered, he or she

28    would be allowed to do so consistent with the legal right of the provider to review such records.  He

1    indicated that this was a frequent occurrence.  Defendant Brunk testified, however, that SDI would not

2    have allowed an insurer to review files of patients it did not insure or cover.  He also testified that if an

3    FBI agent had requested to review patient files or other company records or had served a subpoena for

4    SDI records, he would have consulted with SDI counsel before granting access to the records.

5    Defendant Brunk testified the agents seized his personal tax returns and diploma certificates

6    from his office.  Robert Kaplan also testified that agents seized car manuals, records of unrelated

7    companies from his office and an area outside his office.  No specific testimony was provided regarding

8    what records were seized from the office of Defendant Todd Kaplan.  The Government's Inventory

9    Listing of All Items Seized At Search Warrant Site, *Government's Exhibit 1-F*, however, contains a

10   brief item-by-item description of the documents and records seized and where they were located and

11   found.  Control numbers 181, 182, 183, 184, 194, 195, 196, 203, 204, 205, 207, 214, 216, 226, 228,

12   246, 247, 262, 263, 275, and 284 list the items that were seized from the office of T. Kaplan, which the

13   Court infers is the office of Defendant Todd Kaplan.  Control numbers 257, 272, 273, 277, 278, and

14   306 list items seized from the office of Defendant Jack Brunk.

15   In regard to the records stored in the offsite storage facility, Mr. Brunk testified that some

16   patient records were located in that facility.  Otherwise, neither he nor Mr. Kaplan testified what

17   specific records were located in the storage facility.  Mr. Kaplan testified, however, that SDI did not

18   dispose of records and kept everything from its inception.  Robert Kaplan's testimony indicates that

19   access to SDI's records at this storage facility was restricted and as evidenced by the consents to search

20   and Agent Bomstad's testimony, assistance had to be obtained from SDI's officers for the Government

21   to gain access to these records.

22   Relatively speaking, SDI was a moderate size company employing approximately 40-50

23   employees at its corporate headquarters and several hundred others at other locations around the

24   country.  Both Defendants Kaplan and Brunk had significant ownership interests in the company, were

25   corporate directors and upper managerial employees of the company who exercised a high level of

26   authority over the operations of SDI.  Given their positions in the company, the Court is satisfied that

27   both Defendant Kaplan and Brunk had the authority to control and set policy regarding access to SDI's

28   records.  Both Defendants maintained offices at the corporate headquarter which were searched by the

1   agents.  Both Defendants were present during the search.  The evidence also establishes that SDI

2   maintained a level of security and confidentiality practices regarding its premises and records that one

3   would reasonably expect of a health care provider.  Access to patient or other company business records

4   was restricted to employees performing job duties relating to those records, and to the patient, his or her

5   physician or insurance carrier.  Based on Robert Kaplan's testimony, SDI arguably maintained a higher

6   than average level of security regarding its computer system.  Employee access to computer records was

7   restricted by different levels of password access based on the employees' job duties.  Only Robert

8   Kaplan or upper management had general access to the entire computer system.  SDI did not have an

9   email system or external connections to its computer system.

10          Although Medicare and other insurers were entitled to administratively review SDI patient and

11   billing records without a warrant, the Court does not find that this was sufficient to extinguish

12   Defendants' reasonable expectation of privacy or right to challenge the search warrant in this case.

13   Such a conclusion would be contrary to cases such as *United States v. Jones,* 286 F.3d 1146 (9th Cir.

14   2002), in which the courts have refused to permit warrantless searches for purposes of a criminal

15   investigation, notwithstanding that a warrantless search could have been conducted for some other

16   purposes within one of the "special needs" exceptions to the warrant requirement.  Based on the

17   forgoing facts and circumstances, the Court finds that Defendants Todd Kaplan and Jack Brunk have

18   standing to challenge the search and seizure of SDI records from the corporate headquarters and off-site

19   storage facility maintained by SDI.[7]

20          **2.      Particularity of Search Warrant.**

21          The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause . . . and

22   particularly describing the place to be searched and the persons or things to be seized."  *U.S. Const.*

23   *Amend. IV.*  The particularity requirement of the Fourth Amendment "makes 'general searches under [a

24   warrant] impossible and prevents seizure of one thing under a warrant describing another.  As to what is

25   to be taken, nothing is left to the discretion of the officer executing the warrant.'"  *United States v.*

26

27          _____

28          [7]Defendant Kaplan clearly also has standing to challenge the seizure of his personal income tax and financial records.

1   *Bridges*, 344 F.3d 1010, 1016 (9th Cir.  2003),  *citing United States v. Cardwell,* 680 F.2d 75,77 (9th

2   Cir. 1982), quoting *Marrion v. United States*, 275 U.S. 192, 196, 48 S.Ct. 74, 72 L.Ed. 231 (1927).

3   *Bridges* further states:

4           The Fourth Amendment requires search warrants to state with reasonable
            particularity what items are being targeted for search or, alternatively,
5           what criminal activity is suspected of having been perpetrated. *Marrion
            v. United States*, 275 U.S. 192, 196, 48 S.Ct. 74, 72 L.Ed. 231 (1927).
6           Otherwise, the officers charged with executing the search are left to
            speculate as to what is the underlying purpose or nature of the search.
7           The executing officers must be able to identify from the face of the
            warrant, as well as any attached or expressly incorporated documents,
8           what it is they are being asked to search for and seize from the targeted
            property.

9

10   344 F.3d at 1016-17.

11          Quoting  *United States v. Rude*, 88 F.3d 1538, 1551 (9th Cir. 1996), *Bridges* also states,

12   however:

13           Yet, "[w]hile a search warrant must describe items to be seized
             with particularity sufficient to prevent a general, exploratory rummaging
14           into a person's belongings, it need only be reasonably specific, rather than
             elaborately detailed, and the specificity required varies depending on the
15           circumstances of the case and the type of items involved."

16          To determine whether a warrant lacks sufficient specificity, the courts must examine both the

17   warrant's particularity and its breadth.  The courts consider one or more of the following factors in

18   determining whether a description is sufficiently precise:  (1) whether probable cause exists to seize all

19   items of a particular type described in the warrant, (2) whether the warrant sets out objective standards

20   by which executing officers can differentiate items subject to seizure from those which are not, and (3)

21   whether the government was able to describe the items more particularly in light of the information

22   available to it at the time the warrant was issued. *Center Art Galleries – Hawaii, Inc. v. United States*,

23   875 F.2d 747, 749 (1989), *citing United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986).

24          The Ninth Circuit has also stated that generic classifications of documents in a warrant are

25   acceptable only when a more precise description was not possible based on the information available to

26   the Government at the time the warrant was issued. *United States v. Meek*, 366 F.3d 705, 716 (9th Cir.

27   2004)*; United States v. Kow*, 58 F.3d 423, 427 (9th Cir.1995)  The court has also stated, however, that

28   "when probable cause exists, 'all items in a set of files may be inspected during a search, provided that

1   sufficiently specific guidelines for identifying the documents sought are provided in the search warrant

2   and are followed by the officers conducting the search.'" *United States v. Hayes*, 794 F.2d 1348, 1355

3   (9th Cir. 1986), quoting *United States v. Tamura*, 694 F.2d 591, 595 (9th Cir. 1982).

4        *Andresen v. Maryland*, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976), is arguably the

5   leading Supreme Court decision regarding the degree of particularity required in a search warrant

6   relating to evidence of fraudulent business practices.  In *Andresen*, the state established probable cause

7   to believe that the petitioner, an attorney, had committed fraud on the purchaser in a transaction

8   involving a real estate parcel known as "Lot 13T in the Potomac Woods Subdivision of Montgomery

9   County."  The state obtained search warrants to search defendant's offices and seize documents relating

10  to the transaction.  In holding that the search warrants described the documents to be seized with

11  sufficient particularity, the Court noted that the warrants began by stating that:

12          "[T]he following items pertaining to the sale, purchase, settlement and
            conveyance of lot 13, block T, Potomac Woods subdivision, Montgomery
13          County, Maryland:"

14       This statement was followed by a lengthy list of various types of documents which the warrant

15  described as "showing or tending to show a fraudulent intent, and/or knowledge as elements of the

16  crime of false pretenses ... together with other fruits, instrumentalities and evidence of crime at this

17  (time) unknown."  427 U.S. at 480, n.10.  The Court rejected petitioner's argument that the list of

18  documents to be seized was overbroad and, therefore, constituted a "general" warrant.  In so holding,

19  the Court stated:

20          Under investigation was a complex real estate scheme whose existence
            could only be proved by piecing together many bits of evidence.  Like a
21          jigsaw puzzle, the whole "picture" of petitioner's false-pretense scheme
            with respect to Lot 13T could be shown only by placing in proper place
22          the many pieces of evidence that, taken singly, would show
            comparatively little.  The complexity of an illegal scheme may not be
23          used as a shield to avoid detection when the State has demonstrated
            probable cause to believe a crime has been committed and probable cause
24          to believe that evidence of this crime is in the suspect's possession."

25       In  *United States v. Cardwell*, 680 F.2d 75,77 (9th Cir. 1982), however, the Ninth Circuit

26  distinguished *Andresen* as follows:

27          The warrant at issue in our case is significantly different from the one
            involved in Andresen.  Here there is no preambulatory statement limiting
28          the search to evidence of particular criminal episodes.  Thus, our situation

                                         27

is more akin to that which would have faced the Andresen Court had no
reference to the Lot 13T sale been made.  The Court's heavy reliance on
the Lot 13T limitation suggests that the omission of such a limitation
would have been fatal to the warrant's validity.  Andresen clearly does
not dictate that appellee prevail in this case.

Defendants rely on a series of Ninth Circuit decisions dating back from *United States Bridges,*
344 F.3d 1010 (9th Cir.  2003), in which the court has declared warrants in violation of the Fourth
Amendment's particularity requirement.  In *Bridges,* the court held that the government's affidavit was
sufficient to support probable cause that defendant had engaged in mail fraud and a conspiracy to
defraud the United States by making false claims. The affidavit showed that Defendant operated a tax
consulting business, through which he advised clients that they could avoid paying federal income taxes
if they declared that they were "non-resident aliens."  Defendant's business filed more than 100 claims
with the IRS requesting tax refunds for its "non-resident alien" clients none of which were ever granted.
Although there was probable cause to issue a search warrant, the court nevertheless held that the
warrant's description of the items to be seized violated the particularity requirement of the Fourth
Amendment.

The attachment to the warrant in *Bridges* listed thirteen categories of generic types of business
records or equipment to be seized, but without any additional description of the items which limited
them to the criminal acts described in the affidavit.  *Id.* at 1017.  Although the list of items and
categories of property was detailed, the court found that it was so expansive that its language authorized
the government to seize almost all of defendant's property, papers and office equipment.[8]  The court,
quoting *United States v. Kow,* 58 F.3d 423, 427 (9th Cir.1995), noted that it had "criticized repeatedly
the failure to describe in a warrant the specific criminal activity suspected by the Government[.]"  The

---

[8]The warrant in *Bridges* also contained a "catch-all" provision that authorized "the seizure of
records relating to clients or victims 'including *but not limited to'* the specific records listed on the
warrant."  *Id.,* at 1017.  In regard to this provision, the court stated:  "If, however, the scope of the
warrant is 'not limited to' the specific records listed on the warrant, it is unclear what is its precise
scope or what exactly it is that the agents are expected to be looking for during the search."  *Id.,* 344
F.3d at 1018.  The search warrant in this case does not contain the type of "catch-all" provision
disapproved by the court in *Bridges.*

28

1   warrant did not state what criminal activity was being investigated by the IRS and, thus, there was

2   nothing in the warrant to guide the government's agents in seizing property under the broad categories

3   of items to be seized. *Bridges* concluded that "[s]uch warrants are suspect because "[n]othing on the

4   face of the warrant tells the searching officers for what crime the search is being undertaken.' *United*

5   *States v. George*, 975 F.2d 72, 76 (2d Cir. 1992)." *Id.,* at 1018.

6          In *United States v. Kow*, 58 F.3d 423 (9th Cir. 1995), the defendants were indicted and

7   convicted for corporate tax evasion, individual tax fraud and profit skimming.  The affidavit in that case

8   alleged that the business maintained multiple sets of accounting records, paid falsified invoices

9   submitted by phony corporations, and paid employees under the table all for the purpose of defrauding

10  the IRS.  The search warrant contained a list of 14 categories of documents to be seized.  As in *Bridges*,

11  many, but not all, of the list of documents consisted of nothing more than generalized descriptions of

12  various types of business records.  The court characterized this list as authorizing "the seizure of

13  virtually every document and computer file at HK Video." *Id.,* at 427.  The court stated:

14                To the extent it provided any guidance to the officers executing the
                  warrant, the warrant apparently sought to describe every document on the
15                premises and direct that everything be seized.  The government
                  emphasizes that the warrant outlined fourteen separate categories of
16                business records.  However, the warrant contained no limitation on which
                  documents within each category could be seized or suggested how they
17                related to criminal activity.  By failing to describe with any particularity
                  the items to be seized, the warrant is indistinguishable from the general
18                warrants repeatedly held by this court to be unconstitutional. *E.g., Center
                  Art Galleries – Hawaii, Inc. v. United States*, 875 F.2d 747, 750 (1989);
19                *United States v. Stubbs*, 873 F.2d 210, 211, (9th Cir. 1989) (warrant
                  invalid "because of the complete lack of any standard by which an
20                executing officer could determine what to seize.")

21         The court in *Kow* held that the government could have made the warrant more particular by

22  specifying the suspected criminal conduct.  Additionally, the government did not limit the scope of the

23  seizure to a time frame in which the suspected criminal activity occurred even though the affidavit

24  indicated that the criminal activity began relatively late in the business's existence. *Id.*

25         *Bridges, Kow* and the other Ninth Circuit decisions discussed therein do not require that every

26  search warrant describe the alleged criminal activity *in addition to particularly describing the things to*

27  *be seized.*  Such a reading would be inconsistent with the language of the Fourth Amendment as

28  recently construed by the Supreme Court in *United States v. Grubbs*, 126 S.Ct.1494, 1500,74 USLW

29

1  4173 (2006), in which the Court states:

2          The Fourth Amendment, however, does not set forth some general
3  "particularity requirement." It specifies only two matters that must be
  'particularly describ[ed]" in the warrant: "the place to be searched" and
  "the persons or things to be seized." We have previously rejected efforts
4  to expand the scope of this provision to embrace unenumerated matters.

5        Consistent with the Fourth Amendment and the Supreme Court's decision in *Grubbs, Bridges*

6  states that "[t]he Fourth Amendment requires search warrants to state with reasonable particularity what

7  items are being targeted for search *or, alternatively,* what criminal activity is suspected of having been

8  perpetrated." (Emphasis added.). 344 F.3d at 1016-17. Therefore, if a warrant particularly describes

9  the items to be seized within the scope of the probable cause set forth in the affidavit, the warrant does

10  not also have to describe the criminal activity under investigation. As the Supreme Court has stated,

11  however, there are grave dangers inherent in executing a warrant authorizing a search and seizure of a

12  person's papers that are not necessarily present in executing a warrant to search for physical objects

13  whose relevance is more easily ascertainable. *United States v. Washington*, 797 F.2d 1461,1468 (1984),

14  citing *Andresen v. Maryland*, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976). Where the warrant

15  lists generic categories of business records, some but not all of which relate to the criminal activity

16  described in the affidavit, the warrant should also describe the criminal activity in order to provide

17  particularity to the description of the records to be seized.

18        In other cases, the court has found a warrant unconstitutionally overbroad where it did not limit

19  the scope of items to be seized to the evidence that the government knew it was seeking and had

20  probable cause to seize. In *Center Art Galleries – Hawaii, Inc. v. United States*, 875 F.2d 747, 750

21  (1989), the affidavit provided probable cause that the defendant was engaged in the sale of forged

22  Salvador Dali artwork. The search warrants, however, authorized the seizure of a lengthy list of

23  business records and equipment that was not restricted to the allegedly forged artwork. Because the

24  government had the means to identify and limit the warrants to the accounts that might have involved

25  Dali artwork, the court held that the warrant violated the Fourth Amendment. *VonderAhe v. Howland*,

26  508 F.2d 364 (9th Cir. 1974) and *United States v. Cardwell*, 680 F.2d 75 (9th Cir. 1982), also involved

27  cases in the government's affidavit demonstrated that it had fairly specific knowledge of the records it

28  was seeking and for which probable cause existed, but the warrants nevertheless unlawfully authorized

1    the seizure of a broad range of defendants' business records beyond the probable cause set forth in the

2    affidavit.

3          Based on these and other cases, Defendants argue that the search warrant in this case violates

4    the particularity requirement of the Fourth Amendment.  Defendants point out that the search warrant

5    did not provide any description of the suspected criminal activity to which the list of items to be seized

6    from SDI's offices related.  Nor did the search warrant make any reference to the criminal statutes that

7    SDI or Todd Kaplan were suspected of violating – although such reference would not have been

8    sufficient to satisfy the Fourth Amendment.  *United States v. Spilotro, supra*.  The warrant also did not

9    limit the seizure to SDI's records, and it contained no time restrictions regarding the records that could

10   be seized.  Because of these deficiencies, Defendants argue that the warrant in this case, like those in

11   the foregoing cases, was a general warrant that provided no reasonable guidance to the Government's

12   agents in conducting the search, but instead permitted them to seize virtually all of SDI's business

13   records without regard to whether they related to the alleged fraudulent scheme or tax evasion

14   allegations.

15         The Government argues that the warrant in this case is distinguishable from the warrants held

16   invalid in *Bridges, Kow,* and *Center Art Galleries*.  Because of the broad scope of fraudulent activity

17   described in Agent Bomstad's affidavit, the Government argues that it was reasonable to provide fairly

18   broad descriptions of  the types of documents to be seized.  The Government argues that the categories

19   of records to be seized were sufficiently descriptive of all records in a given category for which

20   probable cause existed to justify seizure.  Relying on *Andresen v. Maryland, supra,* the Government

21   argues that a broad-based fraudulent conspiracy such as that described in the affidavit could only be

22   shown by seizing and reviewing a broad range of SDI's records relating to its sleep studies business in

23   order piece together the many bits of evidence proving the scheme.

24          In addition to *Andresen*, the Government cites other Ninth Circuit decisions, including *United*

25   *States v. Hayes*, 794 F.2d 1348, 1355 (9th Cir. 1986) and *United States v. Meek*, 366 F.3d 705, 715 (9th

26   Cir. 2004), in support of its position.  In *United States v. Hayes*, the government obtained search

27   warrants to search a physician's office based on probable cause to believe that he was illegally

28   prescribing and distributing controlled substances to many patients.  The warrant authorized the

31

1   government to seize controlled substances and documents regarding the purchasing, dispensing and

2   prescribing of controlled substances, including, but not limited to, records contained in patient charts

3   and all relevant records required to be maintained under specified federal and state regulations and

4   statutes, patient logs, appointment books and other records or ledgers reflecting distribution of

5   controlled substances and correspondence concerning the procuring, transferring, administering,

6   prescribing or dispensing of controlled substances by the physician.

7          *Hayes* stated that the fact that there were over 10,000 patient files did not detract from the

8   issuing magistrate's initial finding of probable cause.  *Id.*  The court stated that "[t]he number of files

9   that could be scrutinized is not determinative.  The search and seizure of large quantities of material is

10  justified if the material is within the scope of the probable cause underlying the warrant. [Citations

11  omitted.]"  794 F.2d at 1355.  The court also rejected the defendant's assertion that the warrant failed to

12  provide standards for the officers to distinguish between those files the officers could seize and those

13  they could not.  The  warrant limited the officers' seizure to documents dealing with the distribution of

14  controlled substances and did not permit the seizure of any documents unrelated to controlled

15  substances.  Therefore, the warrant was sufficiently particular in only authorizing the seizure of

16  documents within the scope of the probable cause set forth in the affidavit.  The court also rejected the

17  defendant's argument that the warrants should have been limited to the 58 cases of potential violations

18  described in the affidavit.  The affidavit provided probable cause to believe that the defendant was

19  engaged in more pervasive violations and, therefore, also justified the seizure of additional patient

20  records relating to the prescription or distribution of controlled substances.[9]

21         Similarly, in *United States v. Meek*, 366 F.3d 705, 715 (9th Cir. 2004), the court held that a

22  search warrant authorizing the search of defendant's house and automobile for material relating to child

23  pornography satisfied the particularity requirement of the Fourth Amendment.  In so holding, the court

24  stated:

25  _____

26         [9]The dissenting judge disagreed with the majority opinion precisely on this point, arguing that
    under cases such as *Cardwell* and *VanderAhe,* there was no probable cause to support the search of all
27  the patient files to look for evidence of the illegal prescription or distribution of controlled substances
    and the warrants, therefore, constituted "general" warrants.
28

1    
2    
3    The warrant also provided the officers with objective guidance in their
     search because all items listed in the warrant were limited to materials
     related to "sexual exploitation of a child." Unlike the circumstances
     before us in *United States v. Kow*, 58 F.3d 423 (9th Cir. 1995), the
     warrant here did not authorize the seizure of virtually every document and
     computer file without indicating how the items related to the suspected
4    crime.

5    *Meek* states that "[t]he proper metric of sufficient specificity is whether it was reasonable to

6    provide a more specific description of the items at that juncture of the investigation." 366 F.3d at 716.

7    The Government argues that this is the standard the Court should apply to the warrant in this case and

8    uphold it on that basis. *Meek* also held, however, that the government met the requirement because the

9    warrant specifically referred to items relating to sexual exploitation of children, describing those items

10   with as much precision as possible. *See also, United States v. Lacy*, 119 F.3d 742 (9th Cir. 1997),

11   upholding a warrant authorizing the seizure of a computer system based on probable cause that it

12   contained evidence of child pornography.

13         The flaw in the Government's position is that, unlike *Hayes* and *Meek*, the search warrant in this

14   case provided absolutely no description of the suspected criminal activity to which the documents to be

15   seized related. If the search warrant had contained such a description, the 24 categories of items or

16   records listed in Attachment "B" could probably be justified as only authorizing seizure of documents

17   relating to some aspect of the alleged fraudulent scheme or SDI's and Todd Kaplan's alleged tax

18   evasion. Because no description of the criminal activity was set forth in the warrant, however, it

19   provided no direction to the Government agents regarding the purpose of the search or what types of

20   records in each category were within the scope of the alleged criminal activity described in Agent

21   Bomstad's affidavit. It would not have been difficult for the Government to have limited the scope of

22   the search warrant by setting forth a sufficient description of the criminal activity, as was done in *Hayes*

23   and *Meek, supra.* The Court, therefore, cannot agree with the Government's position that it was not

24   reasonably possible at the time the warrant was issued to have described the documents to be seized

25   with more particularity and avoid the overbreadth of this warrant.

26         Nevertheless, some of the categories of documents listed in Attachment "B" are sufficiently

27   specific because the Government had probable cause to seize all records within those categories as

28   evidence of the fraudulent health care insurance scheme or tax evasion crimes described in Agent

33

Bomstad's affidavit.  The following categories of documents listed in Attachment "B" are of this nature:

1.       Patient lists.

3.       lists of referring physicians, both active and inactive.

5.       contracts or "purchase service agreements" with referring physicians.

6.       contracts and agreements with cardiac diagnostic companies.

14.      patient records including patient questionnaires, sleep study referrals, results of cardiac assessment tests, results of sleep studies, and sleep study reports.

15.      raw sleep study data.

17.      signature stamps for Dr. Awerbuch, Dr. Sprau and any other physician signature stamps.

16.      Documents relating to all state and federal income tax returns including personal, corporate, trust, estate and partnership, and information relating to the preparation of those returns for the following:
            a)     Todd Stuart Kaplan
            b)     Denise Kaplan
            c)     SDI

18.      computer zip discs containing sleep study data.

20.      employee training materials regarding the health service coordinator program, cardiac risk assessment program, and/or physician practice enhancement program.

21.      presentations and/or training materials used to solicit patient referrals from physicians, and/or placement of HSCs in the physician's offices.

22.      Holter monitor tapes containing cardiac monitoring data.

23.      Documents relating to material that provides instructions or examples concerning the operation of the computer system, computer software, and/or related devices.

*Government's Exhibit 1-A.*

These categories are not simply generic descriptions of business records.  They describe with a reasonable degree of specificity the records sought by the Government based on the information set forth in Agent Bomstad's affidavit.  The Government had probable cause to believe that SDI was engaging in a fraudulent scheme with referring physicians and the cardiac diagnostic companies to refer patients for unnecessary sleep studies and unnecessary and improperly performed cardiac risk assessment studies and to improperly bill Medicare and private insurers for those services.  Except for item 16 which was relevant to the tax evasion allegations, each of the foregoing categories of

34

1  documents reasonably related to evidence that the Government was seeking to prove that fraudulent

2  scheme.  There is no evidence that SDI was engaged in any other business activity, separate and apart

3  from sleep study services.  Therefore, records relating to patient lists, lists of referring physicians,

4  contracts with referring physicians and cardiac diagnostic companies all appear to be within the scope

5  of documents that the Government was entitled to seize pursuant to the probable cause established in

6  the affidavit.  It was, therefore, unnecessary for the warrant to describe the suspected criminal activity in

7  regard to the above items because the Government had probable cause to seize all documents within the

8  listed categories.  Because the Government had information that the foregoing records were likely or

9  possibly kept on computers or in computer data bases, it was also reasonable for the Government to

10  seize documents regarding the operation of the computer system in order to search for records within

11  the scope of the warrant.

12         The search warrant, however, also did not contain any time limitations or restrictions regarding

13  the seizure of the foregoing records.  The Ninth Circuit, in *Center Art Galleries* and *Kow,* criticized the

14  absence of time limitations in the warrants regarding the generically described documents in those

15  cases.  Unlike those cases, however, there is no evidence that the Government had knowledge that the

16  alleged fraudulent scheme was limited to a distinct part of SDI's business or that the fraudulent activity

17  had begun or was limited to some discrete time period in SDI's existence.  Rather, the information set

18  forth in the affidavit indicated that the alleged fraudulent practices were a widespread part of SDI's

19  business.  The information set forth in the affidavit was also sufficient to support an inference or

20  conclusion that the alleged fraudulent practices had been ongoing since the inception of SDI's business.

21  Moreover, the foregoing categories of documents were not over broad, generic descriptions of general

22  business documents.  Although the Government could have included a time period in the warrant to

23  limit the seizure to the period beginning from SDI's formation, the Court finds that such a limitation

24  was not reasonably required in regard to the foregoing categories of documents.

25         Some  categories of documents listed in Attachment "B" fall near the borderline between being

26  reasonably related to the health care fraud scheme and being too general in their description to justify

27  seizure of all documents falling within the specified category.  These categories include the following:

28         2.       Documents relating to billing procedures, billing manuals, and billing materials.

4.     Documents relating to billing records and records of payments received.

8.     Documents relating to correspondence with Medicare intermediaries and private insurance companies.

19.    Documents relating to mailing and shipping records between physicians and SDI.

Reasonably, some additional description could and should have been provided regarding these categories to limit them to the alleged fraudulent scheme under investigation.  These categories are borderline in acceptability because SDI's entire business appears to have been the conducting of sleep studies, and the affidavit supported the conclusion that SDI's allegedly fraudulent conduct was routine.  SDI's billing procedures, manuals and materials, and its billing records and records of payments received from insurers for sleep studies all potentially related to the alleged fraudulent scheme.  Likewise, correspondence with Medicare intermediaries and private insurance companies regarding billing and payments for sleep studies could arguably all relate to the fraudulent scheme.  Again, it would not have taken very much for the Government to have included some limiting language in the warrant to ensure that the Government was only seeking billing and payment records and correspondence with Medicare and intermediaries and private insurers that related to the fraudulent scheme.  The Government, however, did not do so.   The Court, therefore, concludes that these categories of documents were overbroad and vague in their description of the items to be seized and were not adequately limited to seizure only of documents relating to the fraudulent scheme under investigation.

The remaining categories of records listed in Attachment "B" of the warrant were so generic and general in their description that, in the absence a description of the suspected criminal activity in the warrant and some reasonable time limitations, the Government's agents had no guidance in limiting the search and seizure to records relating to the alleged criminal activity.  These categories are as follows:

7.     Documents relating to non-privileged correspondence with consultants.

9.     Documents relating to non-privileged internal memoranda and E-mail.

10.    Documents relating to bank accounts, brokerage accounts, trusts.

11.    Checking, savings, and money market account records, including check registers, cancelled checks, monthly statements, wire transfers, and cashier checks.

1      12.     Documents relating to personnel and payroll records.

2      13.     Documents relating to accounting records.

3      24.     Rolodexes, address books and calendars.

4          It is certainly possible that within these categories of records the Government would expect to

5   find evidence relating to the health care fraud conspiracy or evidence relating to the alleged tax evasion

6   of Mr. and Mrs. Kaplan and SDI.  It is not the general relevancy of the categories, but rather their

7   vagueness and overbreadth that is the issue.  The search warrant did not limit these general categories of

8   business documents and financial records to the seizure of records relating to the criminal activity

9   described in the affidavit.  The search warrant, in fact, did not even limit the list of items to SDI's

10  records or to records concerning Todd and Denise Kaplan.  It is precisely these type of generic

11  categories of business documents that the Ninth Circuit has held require that the warrant describe the

12  criminal activity under investigation in order to provide some reasonable limitation and guidance on the

13  scope of records to be seized.

14         The absence of any time restriction in regard to these categories of documents also contributes

15  to the overbreadth of the warrant.  It would not have been unreasonable or impossible for the

16  Government to have included some date restrictions in the search warrant, such as restricting the search

17  to records from when SDI began business or limiting the seizure of financial records to a time period

18  corresponding to the period of the suspected tax evasion crimes.  The combination of the lack of any

19  description of the criminal activity, the failure to restrict these categories to SDI's or the Kaplans'

20  records, and the lack of any time limitations regarding the scope of the documents to be seized,

21  however, may have contributed to the seizure of records outside the scope of the alleged criminal

22  activity set forth in the affidavit.

23         Defendants have presented evidence, through the testimony of Robert Kaplan and Jack Brunk,

24  that the Government's agents seized business records regarding persons, companies, entities or subject

25  matters that had no relevance to the criminal conduct under investigation.  The Government has not

26  specifically denied that such records were seized.  It argues, however, that if such documents were

27  seized, it was a result of the agents exceeding the scope of the search warrant and only the seizure of

28  those records outside the scope of the warrant should be suppressed.  While the seizure of such

1    documents could arguably be attributed to an agent's mistake or carelessness in executing the warrant,

2    it is also reasonable to conclude that such records were seized  because the list of items in the warrant

3    contained no descriptions of the criminal activity or reasonably descriptive limitations on what

4    documents were subject to seizure.   In regard to these categories, the warrant provided the agents with

5    no reasonable guidance as to what documents within these categories related to the criminal activity

6    under investigation.

7         The Court, therefore, finds that items 2, 4, 7, 8, 9, 10, 11, 12, 13, 19 and 24 in Attachment "B"

8    to the search warrant failed to particularly describe the items to be seized and were overly broad and

9    general in their scope.

10        **3.    The Affidavit Was Not Incorporated Into The Search Warrant And Therefore
         Does Not Provide a Basis for Curing the Particularity Defects In the Search

11        Warrant.**

12    _____Having concluded that several categories of documents listed in the search warrant were

13    overbroad and failed to described the items to be seized with sufficient particularity, the next issue is

14    whether the deficiencies in these items can be cured by the Government's reliance on Agent Bomstad's

15    affidavit.  The Defendants argue that the Government cannot rely on Agent Bomstad's affidavit to cure

16    the overbreadth in the search warrant because the affidavit was not expressly incorporated into the

17    search warrant.

18        The Ninth Circuit requires two things in order for the Government to rely on the affidavit to

19    provide the particularity missing in the search warrant.  First, the affidavit must be expressly

20    incorporated into and made a part of the warrant through use of suitable words of reference.  Second,

21    the affidavit must be present during the execution of the warrant so that it can be referred to by the

22    agents in guiding their seizure of documents or things.  *United States v. Towne*, 997 F.2d 537, 545 (9th

23    Cir. 1993), *citing In re Property Belonging to Talk of the Town Bookstore, Inc.*, 644 F.2d 1317, 1319

24    (9th Cir. 1981).  *Towne* explained that "when the affidavit is incorporated by reference into the warrant

25    and limits the generality of the description in the warrant, the discretion of the officers executing the

26    warrant is limited.  When the affidavit accompanies the warrant, the person being searched has notice of

27    the specific items the officer is entitled to seize."  997 F.2d at 545.  The court in *Towne* also reviewed

28    its prior decisions regarding whether the affidavit must also be physically attached to the warrant.

38

1  Although noting that prior decisions were vague or confusing on this point, *Towne* concluded that

2  physical attachment is not required so long as the affidavit is incorporated into the warrant and the

3  affidavit is present at the time and place that the warrant is executed.  In so holding, the court stated that

4  "[w]e simply do not believe that the Constitution requires us to draw the line between lawful and

5  unlawful searches according to the presence or absence of a staple, a paper clip, a bit of tape, or a

6  rubber band."  *Id.*

7          Although the form Search Warrant on Affidavit, *Government's Exhibit 1-A,* refers to the

8  affidavit, it does not contain express language incorporating the affidavit into the warrant.  It is

9  noteworthy that the form Affidavit for Search Warrant, *Government's Exhibit 1-B,* expressly stated that

10 Agent Bomstad's affidavit was incorporated into the form affidavit.  If the Government had also desired

11 to incorporate the affidavit into the search warrant and make it a part thereof, it could and should have

12 used similar language of incorporation.  As *Towne* and later decisions make clear, such incorporation is

13 a rigid requirement in order for the Government to rely on the provisions of the affidavit to supply the

14 particularity missing from the warrant.  *Towne, supra; United States v. Bridges*, 344 F.3d at 1018;

15 *United States v. Kow*, 58 F.3d at 429 n.3.

16         Agent Bomstad testified that the magistrate judge requested that changes be made to her

17 affidavit regarding the handling of confidential patient files and those changes were made.   The

18 magistrate judge also made a handwritten addition on attachment B of the search warrant, stating:

19                 8.      Patient confidential medical information shall be handled in
                           accordance with the procedures set forth in the Affidavit.
20

21         Although the language added to Attachment "B" by the magistrate judge directs the

22 Government's agents to comply with the provisions of the affidavit in handling patient confidential

23 medical information, a reasonable person would not conclude from this addition that the entire

24 affidavit was incorporated into the search warrant.   The Court, therefore, finds that this addition was

25 not sufficient to satisfy the incorporation requirement.

26         Defendants also argue that the Government cannot rely on the affidavit to cure the defects in the

27 warrant because the affidavit was sealed by order of the court, and Defendants were not provided with a

28 copy of the affidavit at the time of the search.  The Ninth Circuit has repeatedly stated that in addition

1     to limiting the discretion of the officers conducting the search, the particularity requirement also

2     notifies the individual whose property is being searched of the lawful authority of the executing officer,

3     his need to search, and the limits of his power to search.  *See e.g., United States v. Grubb*, 377 F.3d

4     1072 (9th Cir. 2004); *Ramirez v. Butte-Silver Bow County*, 298 F.3d 1022, 1027 (9th Cir. 2002).  The

5     court has also held that the incorporation rule also ensures that the person subject to the search is

6     notified of limitations imposed on the officers' seizure of documents and things pursuant to the

7     affidavit.  In furtherance of this notice purpose, the Ninth Circuit also interpreted Rule 41(d) of the

8     Federal Rules of Criminal Procedure as requiring that the warrant must be presented to the person at the

9     outset of the search.  *United States v. Gantt*, 194 F.3d 987 (9th Cir. 1999);  *United States v. Mann*, 389

10     F.3d 869, 875 n.1 (9th Cir. 2004).

11        The Supreme Court's decision in *United States v. Grubbs*, 126 S.Ct.1494, 1501,74 USLW 4173

12     (2006), however, clearly rejects the Ninth Circuit's rationale that the particularity requirement serves

13     the interest of the individual in monitoring or policing the officer's conduct in executing the warrant or

14     that Rule 41(d) requires that the person be provided with the warrant before the search commences.

15     *Grubbs* held that the triggering condition for an anticipatory search warrant does not have to be

16     described in the warrant because it only establishes the probable cause basis upon which the warrant

17     will be executed.  The Court also rejected the defendant's argument that because the triggering

18     condition was not set forth in the warrant, he had no ability to monitor the legality of the search.  The

19     Court noted that this argument presumes that the executing officer must present the warrant to the

20     person before the search commences.  The Court stated:

21              In fact, however, neither the Fourth Amendment nor Rule 41 of the Federal Rules of Criminal Procedure imposes such a requirement.

22           See *Groh v. Ramirez*, 540 U.S. 551, 562, n.5, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004).  "The absence of a constitutional requirement that

23           the warrant be exhibited at the outset of the search, or indeed until the search has ended, is ... evidence that the requirement of particular

24           description does not protect an interest in monitoring searches." *United States v. Stefonek*, 179 F.3d 1030, 1034 (C.A. 7 1999) (citations omitted.)

25           The Constitution protects property owners not by giving them license to engage the police in a debate over the basis of the warrant, but by

26           interposing, *ex ante*, the "deliberate, impartial judgment of a judicial officer ... between the citizen and the police." *Wong Sun v. United States,*

27           371 U.S. 471, 481-82, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), and by providing, *ex post*, a right to suppress evidence improperly obtained and a

28           cause of action for damages.

1    While *Grubbs* may be distinguishable where an incorporated affidavit is used to provide

2    particularity to the description of the items to be seized, it is unnecessary for the Court to decide

3    whether the officers were required to provide Defendants with a copy of the affidavit at the time of the

4    search.  Because Agent Bomstad's affidavit was not incorporated into the search warrant, the

5    Government cannot rely on it to cure the alleged particularity defects in the warrant.

6    **4.    Permeated-With-Fraud Exception to Particularity Requirement.**

7    Defendants argue that the Government cannot rely on the "permeated-with-fraud" exception to

8    the particularity requirement under which a warrant may authorize the seizure of all of a business's

9    records where the affidavit demonstrates that it is permeated with fraud or that the records evidencing

10   the fraud are inseparable from the business's other records.  *United States v. The Offices Known as 50*

11   *State Distributing Co.*, 708 F.2d 1371 (9th Cir. 1983).

12   *50 State* involved a "boiler room" sales operation through which the defendant falsely advised

13   prospective customers that they had won a free prize which they could only collect by purchasing "high

14   quality" merchandise that turned out to be shoddy.  The search warrant generally authorized the seizure

15   of all of defendant's business records.  In upholding the warrant, the court held that it did not violate the

16   particularity requirement because:

17           The warrant left the executing officers with no discretion.  While the
             seizure was extraordinarily broad, and in that sense "general", under the
18           particular facts of this case the scope of the warrant was justified.  It was
             not possible through a more particular description to segregate those
19           business records that would be evidence of fraud from those that would
             not, for the reason that there was probable cause to believe that fraud
20           permeated the entire business operation of 50 State.  *Id.,* 708 F.2d at
             1374.

21

22   Cases since *50 State* have limited the exception to businesses which are essentially sham

23   enterprises that have little or no legitimate business purpose.  *United States v. Rude*, 88 F.3d 1538, 1551

24   (9th Cir.1996) (fraudulent investment scheme); *United States v. Smith*, 424 F.3d 992, 1006 (2005)

25   (fraudulent tax avoidance and investment scheme).  The court has refused, however, to apply the

26   exception where the business appears to have some legitimate purpose even though it is allegedly

27   engaging in fraudulent criminal activity.  *Center Art Galleries – Hawaii, Inc. v. United States*, 875 F.2d

28   747, 751 (9th Cir. 1989) (otherwise legitimate art gallery business allegedly engaged in the sale of

1   forged Salvador Dali paintings);  *United States v. Kow*, 58 F.3d 423 (9th Cir. 1995) (arguably legitimate

2   video distribution business engaged in fraudulent concealment of revenues to avoid payment of taxes);

3   *Solid State Devices, Inc. v. United States*, 130 F.3d 853 (9th Cir. 1997) (semiconductor supplier

4   allegedly engaged in fraudulent sale of defective devices).  In *Solid State Devices*, the court

5   distinguished *50 State* as follows:

6           Where a business appears, as SSDI does here, to be engaged in some
           legitimate activity, this Court has required a more substantial showing of
7           pervasive fraud than that provided by the Government in the instant case.
           *See, e.g., United States v. Hayes,* 794 F.2d 1348, 1356 (9th Cir.1986)
8           (search of all of physician's patient records justified by complaints of
           illegal prescriptions to very large number of patients).

9

10          Thus, in *Center Art Galleries – Hawaii, Inc. v. United States*, *supra,* the court rejected the

11  application of the "permeated-with-fraud" exception because only approximately twenty percent of

12  defendant's business was related to the alleged sale of forged Dali artwork.  The affidavit also did not

13  aver that evidence of defendant's fraud was inseparable from other documents or that defendant was

14  permeated with fraud.  In *United States v. Kow*, *supra*, the court held that the affidavit did not support

15  the  application of the "permeated-with-fraud" exception, noting that the government's affidavit

16  conceded that the business was "a legitimate business and serves a need in the communities where it is

17  located."  There was also no allegation that the business was so permeated with fraud that the

18  government could not reasonably segregate the business's documents on the basis of whether they were

19  likely to evidence criminal activity.

20          By contrast in *United States v. Rude* and *United States v. Smith,* the affidavits established that

21  the businesses were completely sham enterprises which were set up to bilk their customers or clients.

22  In upholding the application of the exception, *Rude* noted that "[t]he affidavit supporting the search

23  warrant validates the lower court's finding, as it is clear therefrom that NPI's central purpose was to

24  serve as a front for defrauding prime bank note investors."  88 F.3d at 1551.  In uphold the warrant in

25  *Smith,* the court also stated:

26          The magistrate judge reviewed Agent O'Keeffe's affidavit in support of
           the application for the search warrant, which detailed her comprehensive
27          investigation of the UBO scheme.  The affidavit concludes that the
           "entirety of the business operated by Bates, Smith and their associates are
28          criminal in nature."  Agent O'Keeffe's affidavit provided ample probable

42

1                cause to meet the "permeated-with-fraud" exception to the particularity
2                and breadth requirements.

3   424 F.3d at 1006.

4          The Ninth Circuit's decisions regarding the "permeated-with-fraud" exception indicate that the

5 exception is narrowly and strictly applied. *Bridges* also states that the affidavit must clearly aver that

6 the business is permeated with fraud or the records evidencing the fraud are inseparable from the other

7 business records. The court stated:

8                In *Rude*, we explained that such a seizure may be justified if the
9                Government's supporting affidavit made it clear that the target's "central
                purpose was to serve as a front for defrauding" investors. *See Rude*, 88
10                F.3d at 1551. This, however, is not such a case. Here , the IRS did not
                allege in its application that ATC's operations were permeated with
11                fraud. *See id.*, at 428 (citing *Center Art*, 875 F2d at 751 ("permeated with
                fraud" doctrine not applicable where supporting affidavit "did not aver
12                that evidence of [the alleged] fraud was inseparable from other [business]
                documents or that [the business] was permeated with fraud.") Similarly,
13                Agent Rodriguez's Affidavit does not make it sufficiently clear that
                ATC's operations were entirely fraudulent in nature. Specifically, it is
14                not clear to us whether the Government knew at the time it was making
                the application that ATC's operations were permeated with fraud. If that
15                was the case, the Government should have made this clear to the district
                court, so that the district court could examine the Government's evidence
16                with greater depth and fashion a sufficiently tailored warrant consistent
                with the principles of the Fourth Amendment. In this case, however,
17                there is insufficient evidence in the record to justify the Government's
                claim ex post facto.

18          In this case, Agent Bomstad's affidavit did not expressly assert that SDI was "permeated with

19 fraud." Nor did the affidavit expressly assert that SDI's business records evidencing the fraud were

20 inseparable from other business records. The affidavit describes the nature of the records that the

21 Government sought to seize as follows:

22                The records maintained by SDI will help show that HRV, SAEGG, and
                nerve conduction studies of the upper extremities are not rendered, and
23                for some of the patients, the patient referral records are expected to show
                these tests were not ordered by the physician. Financial records will
24                provide further evidence of payments from the CDCs to SDI. SDI is
                likely to have contracts, memoranda, E-mail, and/or other documents
25                explaining the relationship between SDI and the CDCs and the reasons
                for the payments. *Affidavit*, ¶13.b, pp. 8-9.[10]

26

27 ────────────────

28        [10]Had similar language been included in the search warrant, it would have provided some basis
for finding that the warrant particularly described the financial records, memoranda, E-mail and other

1    SDI's business involved a legitimate type of medical service business, providing sleep studies,

2    which Defendants allegedly operated in a fraudulent manner to improperly collect insurance benefits

3    from Medicare and private insurers.   If the affidavit merely alleged that SDI referred many patients for

4    unnecessary sleep studies, then, as Defendants argue, it would clearly not be sufficient to show that SDI

5    was "permeated with fraud" because the majority of patients were legitimate candidates for sleep

6    studies.  Agent Bomstad's affidavit, however, makes a number of additional allegations regarding SDI's

7    allegedly fraudulent practices regarding the sleep studies and associated cardiac risk assessments.

8    These include allegations that the computer monitoring equipment did not function or was not

9    connected properly, many of the sleep study reports were of poor quality, that the sleep study reports

10   were prepared by persons not qualified to do so, that the SDI physicians did not actually review the

11   sleep study reports and that their signatures were instead affixed with signature stamps.  Agent

12   Bomstad's affidavit also alleges that SDI, in conjunction with the referring physicians and cardiac

13   diagnostic companies (CDC's), arranged for unnecessary and improperly performed cardiac risk

14   assessment tests, and that SDI and its co-conspirators double billed for these studies by manipulating

15   the CPT billing codes and billing procedures.  The affidavit alleges that as part of this fraudulent

16   scheme, SDI advised the referring physicians how to improperly bill for their alleged services and that

17   the cardiac diagnostic companies paid "kickbacks" to SDI.  The information set forth in Agent

18   Bomstad's affidavit suggests that these alleged practices were a routine and widespread part of SDI's

19   and the co-conspirators' business practices.

20        The information set forth in Agent Bomstad's affidavit, therefore, supports the conclusion that

21   SDI's alleged fraudulent conduct was more pervasive than was demonstrated by the affidavits in *Center

22   Art Galleries* and *Solid State Devices*, *supra.*  The alleged fraudulent activity was also arguably more

23   pervasive than that described in *United States v. Kow.*  It cannot be said, however, that the alleged fraud

24   here was any more pervasive than was set forth in the affidavit in *Bridges.* Nor did the alleged fraud rise

25   to the level of demonstrating that SDI was nothing more than a mere "front" for illegal activity or a

26   totally sham enterprise such as existed in *50 State, Rude* or *Smith, supra.*

27   ────────────────────

28   documents to be seized.

44

1    The Court finds that the decision in *United States v. Bridges* is controlling because Agent

2    Bomstad's affidavit did not contain express averments that SDI was permeated with fraud or that its

3    entire business was fraudulent.  Had it done so, the magistrate judge may have had the basis for

4    analyzing the affidavit and authorizing the broad search warrant under the "permeated-with fraud"

5    exception.  Because the affidavit did not contain the express averments that *Bridges* states are essential,

6    however, the Court concludes that the "permeated-with-fraud" exception does not apply in this case.

7    **5.    Whether The Valid Provisions of the Warrant May Be Severed from the
          Overbroad Provisions.**

8

9    _____Because the Court finds that portions of the search warrant in this case are overbroad and violate

10   the particularity requirement of the Fourth Amendment, the Court must determine whether the valid

11   portions of the warrant can be severed from the invalid portions, and the warrant upheld as to the

12   seizure of the properly described items.

13   In *United States v. Sears*, 411 F.3d 1124, 1128 (9th Cir. 2005), the court states that the "'prime

14   purpose of the exclusionary rule is to deter future unlawful police conduct and thereby effectuate the

15   guarantee of the Fourth Amendment against unreasonable searches and seizures.' *Illinois v. Krull*, 480

16   U.S. 340, 347, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987)."  Evidence should be suppressed only if the

17   officer had knowledge or may properly be charged with knowledge that the search was unconstitutional.

18   *Id., citing Krull, supra,* and *United States v. Leon*, 468 U.S. 897, 918, 104 S.Ct. 3405, 82 L.Ed.2d 677

19   (1984).  *Sears* states that partial suppression is proper under the Ninth Circuit's doctrine of severance

20   which allows a court to strike from a warrant those portions that are invalid and preserve those portions

21   that satisfy the Fourth Amendment.  *Id., citing United States v. Gomez-Soto,* 723 F.2d 649, 654 (9th

22   Cir. 1984); *United States v. Washington*, 797 F.3d 1461, 1473 (9th Cir. 1984).

23   *Sears* states that "total suppression, on the other hand, is appropriate when a warrant is wholly

24   lacking in particularity."  *Id.*  The court has used total suppression as a remedy in cases involving

25   warrants with serious particularity defects such as where the warrant failed to specify any type of

26   criminal activity suspected or "any type of evidence sought 'lacked the requisite -- indeed, any --

27   particularity .'" *Sears, citing United States v. McGrew*, 122 F.3d 847 (9th Cir. 1997).  *Sears* further

28   states that "[t]he doctrine of severance requires that "identifiable portions of the warrant be sufficiently

45

1     specific and particular to support severance.' *United States v. Spilotro,* 800 F.2d 959, 967 (9th Cir.

2     1986)."

3        In *Spilotro,* the court refused to apply severance because none of the items in the warrant were

4     set forth in textually severable portions.  In *Cardwell,* the court also held that severance was improper

5     where even the most specific descriptions in the warrant, "checks, journals, ledgers, etc." were fairly

6     general.  In determining whether severance is appropriate, the court takes into account the relative size

7     of the valid and invalid portions of the warrant.  Thus, in *Spilotro,* the court refused to sever and permit

8     seizure of items that "were only a relatively insignificant part of the sweeping search for evidence of

9     any violation of thirteen enumerated statutes."  *Sears,* at 1130.  In *Kow, supra,* 58 F.3d at 428, the court

10     also refused to grant partial severance where only one of the fourteen categories in the warrant was

11     arguably not overbroad, holding that "severance is not available when the valid portion of the warrant is

12     'a relatively insignificant part' of an otherwise invalid search."

13        By contrast, the court permitted severance in *Gomez-Soto*, 723 F.2d at 654, where only one of

14     thirteen descriptions was insufficiently particularized, and also permitted severance in *In re Grand Jury*

15     *Subpoenas Dated December 10, 1987,* 926 F.2d 847, 858 (9th Cir. 1991), where documents of the

16     persons or entities for which there was probable cause constituted the focus and vast majority of the

17     files searched and two of the three categories of documents to be seized were described with sufficient

18     particularity.  *Sears,* at 1131.  In *VonderAhe, supra,* 508 F.2d at 372, the court also granted severance

19     and upheld the warrant as to the seizure of those records described in the warrant that were particularly

20     described and for which probable cause existed. Only a portion of the warrant in *VonderAhe* was valid,

21     and the facts indicated that the government obtained a broad and general warrant which it used to seize

22     all of defendant's business records.  It is questionable whether the result in *VonderAhe* would have been

23     the same if it had been decided under the standards for severance set forth in the later cases discussed in

24     *Sears.*

25        In contrast to the cases discussed above, the list of valid and invalid items in the search warrant

26     in this case do not fall into either extreme.  Numerically, the number of items that were described with

27     sufficient particularity is roughly equal to the number which were not.  The Court, however, does not

28     view Ninth Circuit's doctrine of severance to be simply a matter of arithmetic by which the court adds

1   up the number of valid items versus the invalid ones.  A warrant, for example, might list several items

2   which satisfy the particularity requirement, but which contains an equal or lesser number of provisions

3   which authorize an overbroad and general search of the defendant's records.  In such a case, the court

4   might still conclude that the valid items were only a relatively insignificant part of the sweeping search

5   and seizure of records which were not particularly described.

6        As evidenced by Agent Bomstad's affidavit, a principal, if not the primary, purpose of the

7   search and seizure was to seize records regarding SDI patient lists, lists of referring physicians,

8   contracts or "purchase service agreements" with referring physicians, contracts and agreements with

9   cardiac diagnostic companies, patient records regarding the sleep study questionnaires, sleep study

10  referrals, results of cardiac assessment tests and sleep study reports, together with other documents and

11  data pertaining thereto, which the Court has found were sufficiently described in the warrant.  In view

12  of the allegations set forth in Agent Bomstad's affidavit, the Court cannot conclude that these items

13  were only a relatively insignificant part of the warrant.  Rather, they may be properly characterized as a

14  principal portion of the evidence that the Government was seeking based on the information that had

15  been provided to it by the persons it interviewed, and also based on its review of insurance claims

16  records submitted to insurers by SDI.

17       Although the Government also seized a voluminous amount of other documents falling within

18  the overbroad categories of the search warrant, as evidenced by its inventories, *Government's Exhibits*

19  *1-F* and *1-G,* the Court finds that the deterrent effect of partial suppression is appropriate in this case.

20  In this regard, suppression of the overbroad seizure of documents will result in suppression of

21  improperly seized evidence regarding the alleged fraudulent scheme which might have been properly

22  seized by the Government had it obtained a search warrant describing the items to be seized with

23  sufficient particularity and avoided the penalties that are appropriately prescribed for a general warrant.

24  Suppression of the valid portions of the warrant is, therefore, not necessary in order to sufficiently deter

25  the Government's violation of the Fourth Amendment.

26       The Court, therefore, concludes that severance is appropriate in this case as to category numbers

27  3, 5, 6, 14, 15, 16, 17, 18, 20, 21, 22 and 23 in Attachment "B" to the search warrant and that the

28  seizure of documents in these categories should not be suppressed.

1          **6.      <u>Good Faith Exception.</u>**

2    _____The Government argues that the documents seized pursuant to the allegedly invalid warrant

3    should not be suppressed because the Government's agents acted in the objective good faith belief that

4    the warrant was valid. *United States v. Leon*, 468 U.S. 897, 921 (984) and *Massachusetts v. Sheppard*,

5    468 U.S. 981, 987-988 (1984). *Leon* adopted the "good faith exception" to the exclusionary rule under

6    the Fourth Amendment, holding that evidence seized pursuant to an invalid search warrant will not be

7    suppressed if the officers had an objective good faith belief that the warrant was valid. *Leon* applied

8    this good faith exception where the affidavit in support of the warrant failed to establish probable cause,

9    but where the officers had an objective good faith belief that probable cause existed and relied on the

10   determination of the issuing judge that the warrant was supported by probable cause. The Court also

11   applied the good faith exception in *Sheppard* to a warrant which violated the particularity requirement.

12        *Leon* states that a warrant issued by a judge normally suffices to establish that a law

13   enforcement officer has acted in good faith in conducting a search pursuant to the warrant. The Court

14   identified four circumstances, however, in which the evidence may still be suppressed. *Leon,* 468 U.S.

15   at 925. The only one of those circumstances relevant to Defendants' instant Motion to Suppress is

16   whether the search warrant is so facially deficient in failing to particularly describe the things to be

17   seized that the executing officers could not reasonably presume it to be valid.

18        The Government bears the burden of proving that its agents' reliance upon the warrant was

19   objectively reasonable. *United States v. Michaelian*, 803 F.2d 1042, 1048 (9th Cir. 1986), *citing United*

20   *States v. Hendricks*, 743 F.2d 653, 656 (9th Cir. 1984), *cert. denied,* 470 U.S. 1006, 105 S.Ct. 1362, 84

21   L.Ed.2d 382 (1985). The determination of whether a warrant is so facially deficient that it cannot be

22   relied on in good faith, in large measure, depends on the degree or extent of overbreadth in the warrant.

23   *See United States v. Kow*, 58 F.3d 428-29; *Center Art Galleries v. United States*, 875 F.2d 752-53.

24        In *Michaelian*, the court held that the agents had an objective good faith belief that the warrant

25   was valid. *Center Art Galleries*, however, distinguished *Michaelian* on the grounds that the warrant in

26   that case limited the property to be seized to certain categories of documents within specified time

27   periods. The warrant also restricted the search to evidence of specific crimes described in the texts of

28   the warrant. The warrants in *Center Art Galleries*, however, contained no similar meaningful

                                                       48

1  restrictions on what could be seized and, therefore, were so overbroad that absent some exceptional

2  circumstances, no agent could reasonably rely on them.  *Center Art Galleries* also rejected the

3  government's assertion that exceptional circumstances existed because the defendant's business was

4  permeated with fraud.  Having found that the government had made no showing that defendant's

5  business was permeated with fraud, the court held that this assertion did not support a finding of good

6  faith reliance on the warrant.

7          In *United States v. Kow,* the court held that the warrant had substantially the same deficiencies

8  as those found in the warrant in *Center Art Galleries* – broad categories of documents to be seized,

9  without description of the criminal activity or time period restrictions.  *Kow,* therefore, also held that

10  the warrant was so facially overbroad that no agent could rely in good faith on its validity.  *See also*

11  *United States v. Stubbs*, 873 F.2d 210 (9th Cir. 1989).  *Kow*, therefore, rejected the government's

12  assertion of good faith reliance on the basis that prior to the warrant's issuance, it had been reviewed by

13  two Assistant United States Attorneys and had been approved by the issuing magistrate judge.  The

14  court held that these circumstances did not amount to "exceptional circumstances" which would justify

15  reliance on a warrant that was so clearly facially deficient.  Citing its earlier decision in *Center Art*

16  *Galleries*, the court explained that when a warrant is facially overbroad, absent *specific assurances*

17  from an impartial judge or magistrate that the defective warrant is valid despite its overbreadth, a

18  reasonable reliance argument fails.

19          The warrant in this case did not contain any description of the alleged criminal activity relating

20  the listed categories of documents.  The warrant also did not contain any time limitations or even limit

21  the scope of documents to be seized to those of SDI or related entities.  The Court, therefore, concludes

22  that as to items 2, 4, 7, 8, 9, 10, 11, 12, 13, 19, and 24, the warrant in this case was facially overbroad to

23  the same extent as the warrants in *Kow* and *Center Art Galleries*.  Therefore, the Government's agents

24  could not have objectively in good faith believed that the warrant was valid as to those items.  Although

25  the facts in this case were arguably more supportive of a finding that SDI's business was "permeated-

26  with-fraud," the Court has also concluded that the Government's affidavit failed to make the requisite

27  showing to support application of the "permeated-with-fraud" exception.  The Court, therefore,

28  concludes that this circumstance also does not support the agents' good faith belief in the validity of the

1    warrant in this case.

2         Agent Bomstad's affidavit, which contained a substantially identical list of the items to be

3    seized as set forth in Attachment "B" to the search warrant, was also reviewed by senior supervisory

4    agents and the Assistant United States Attorneys in Nevada and the Central District of California before

5    it was submitted to the magistrate judge.  The magistrate judge reviewed the affidavit and search

6    warrant for approximately two hours and asked Agent Bomstad questions about matters in the affidavit.

7    The magistrate judge also requested that changes be made to the affidavit regarding the handling of

8    confidential patient records and added a provision to Attachment "B" that patient records would be

9    handled in accordance with the affidavit as modified.  There is no evidence, however, that the

10   magistrate judge gave Agent Bomstad specific assurances that the warrant was valid.  Under *Kow* and

11   *Center Art Galleries*, these circumstances are not sufficient to establish good faith reliance on validity

12   of the facially overbroad portions of the warrant.

13        Agent Bomstad also testified that prior to the search, copies of the affidavit and search warrant

14   were distributed and read by the agents participating in the search.  She also testified that copies of the

15   sealed affidavit were present during the search of SDI's premises and were available for reference by

16   the agents.  The reliability of Agent Bomstad's recollection that the affidavit was read by the agents

17   during the pre-search meeting is questionable.  The search plan, *Exhibit "DDD,"* stated that copies of

18   the search warrant would be distributed to the agents during the pre-search meeting, but made no

19   reference to distributing the affidavit to the agents or requiring them to read it.

20        In *United States v. Luk*, 859 F.2d 667 (9th Cir. 1988), the court upheld the seizure of documents

21   pursuant to an overbroad search warrant under the good faith exception.  In that case, the agent

22   erroneously believed the affidavit had been incorporated into the search warrant.  The affidavit, which

23   contained more specific descriptions of the items to be seized, was present during the search and the

24   agents relied on the more specific description of items contained in the affidavit and limited their

25   seizure of documents accordingly.  On these facts, the court upheld the seizure under the good faith

26   exception.  *Kow* and *Center Art Galleries*, however, distinguished *Luk* on the grounds that the warrant

27   in *Luk* did not involve the same degree of overbreadth as the warrants before the court in those cases.

28   In addition, there was no evidence that the agents actually relied on information in the affidavits to

50

1   restrict the scope of their seizures.  *Kow* and *Center Art Galleries* also held that the affidavits in those

2   cases contained identically overbroad descriptions of items to be seized as stated in the warrants.  Thus,

3   the affidavits were also overbroad.

4          No evidence was presented in this case that the Government's agents recognized the

5   overbreadth of the warrant or that the agents in fact relied on the affidavit to restrict their seizures under

6   the overbroad categories contained in the warrant.  Although the affidavit in this case provided a

7   description of the alleged criminal activity, some information pertaining to the relevant time periods of

8   the criminal activity, and the purpose for which seizure of various types of documents was sought, the

9   affidavit also set forth the identical list of items to be seized as was contained in Attachment "B" of the

10  search warrant.  The evidence presented to the Court, partly through the testimony of Defendants'

11  witnesses, Robert Kaplan and Jack Brunk, but also as set forth in the Government's inventories,

12  *Government's Exhibits 1-F* and *1-G*, supports the conclusion that the Government seized documents in

13  these overbroad categories, including documents having no relevance to the persons, entities or subject

14  matter under investigation.  The Government did not present any evidence, as in *Luk,* that agents

15  actually used the affidavit to limit the scope of their seizure of documents.  The Court, therefore, finds

16  that exceptional circumstances have not been shown in this case that would satisfy the Government's

17  burden of proof that the good faith exception should apply to the overbroad categories of the warrant.

18      **7.    Validity of Robert Kaplan's and Todd Kaplan's Consents to Search Offsite
               Storage Facility.**

19

20       Two issues are presented regarding the validity of the written consents to search SDI's offsite

21  storage facility.  The first issue is whether these consents were tainted by the illegality of the search

22  warrant due to its overbreadth.  The second issue is whether either or both Kaplans' consents were

23  voluntary under the factual circumstances.

24         In *United States v. Chavez-Valenzuela*, 268 F.3d 719, 727 (9th Cir. 2001), the court held that

25  under the Fourth Amendment, evidence obtained subsequent to an illegal investigation is tainted by the

26  illegality and thus inadmissible, notwithstanding the defendant's consent, unless subsequent events

27  have purged the taint.  In determining whether the taint has been sufficiently purged, the court asks

28  "'whether, granting establishment of the primary illegality, the evidence ... has been come at by means

51

1    sufficiently distinguishable to be purged of the primary taint.' *United States v. Millan*, 36 F.3d 886, 890

2    (9th Cir. 1994)."  Elements to be considered include the temporal proximity between the illegality and

3    the consent and the presence of intervening circumstances.  The Court also takes into consideration the

4    purpose and flagrancy of the official misconduct.

5         In *United States v. Hotal*, 143 F.3d 1223 (9th Cir. 1998), the government obtained an

6    anticipatory search warrant to search defendant's residence for child pornography.  After entering

7    defendant's residence, the agents observed other incriminating evidence in "plain view" and also

8    obtained a general consent from defendant to search his residence which resulted in the discovery and

9    seizure of additional evidence.  The court held that the warrant was invalid because it did not set forth

10   the anticipatory condition for execution of the warrant. The court held that the additional evidence

11   seized in "plain view" or pursuant to defendant's consent to search should also be suppressed because

12   the officers gained entry into the premises through an unlawful search warrant.  *Hotal* distinguished

13   *United States v. Van Damme*, 48 F.3d 461 (9th Cir.1995), in which the court upheld the seizure of

14   evidence that was observed in "plain view" even though the search warrant, itself, violated the Fourth

15   Amendment by failing to describe the things to be seized with sufficient particularity.  *Van Damme*

16   stated that "[b]ecause we have concluded that probable cause was established for issuance of the

17   warrant, and that it adequately described the places to be searched, our conclusion would not require

18   suppression of contraband in plain view such as the marijuana in the greenhouses." 48 F.3d at 466-67.

19        In distinguishing *Van Damme,* the court in *Hotal* stated:

20              The vice in the warrant in this case is different in nature from the *Van
                *Damme* warrant's failure to identify the items to be seized.  The warrant
21              in this case failed to set forth the necessary conditions that permitted entry
                into Hotal's residence in the first place.  Because the officer's entry into
22              Hotal's residence pursuant to the unconstitutional search warrant was not
                lawful, the "plain view" doctrine does not apply to any of the evidence
23              seized.

24   *Hotal, supra,* 143 F.3d at 1228, n. 7.

25        As previously discussed, the Supreme Court in *United States v. Grubbs, supra,* held that the

26   anticipatory search condition is part of the probable cause determination validating the search and is not

27   required to be set forth in the warrant.  *Hotal* and the other decisions cited and discussed in Defendant's

28   Motion, however, stand for the proposition that if the initial search or detention is entirely unlawful,

52

1    then all evidence obtained from a tainted consent to search must also be suppressed.  In *United States v.*

2    *Furrow*, 229 F.3d 805 (9th Cir. 2000) and *United States v. Jones*, 286 F.3d 1146 (9th Cir. 2002), the

3    consents were invalid because the officers unlawfully conducted a warrantless search.  In *State v.*

4    *Poaipuni*, 49 P.3d 353, *reconsideration granted in part,* 53 P.2d 820 (Hawaii 2002), the search warrant

5    was not supported by probable cause.  Likewise, the consent to search in *Chavez-Valenzuela*, *supra,*

6    was tainted by the officer's illegal detention and questioning of the defendant during a routine traffic

7    stop.  Thus, like *Hotal,* the consents to search arose from completely unlawful searches and seizures

8    and, therefore, required the suppression of all evidence obtained as a result of the tainted consents.

9         Defendants' instant Motion to Suppress, however, is predicated on the invalidity of the search

10   warrant because it failed to describe the things to be seized with sufficient particularity.[11]  Defendant's

11   Motion to Suppress does not allege that Agent Bomstad's affidavit failed to establish sufficient

12   probable cause to obtain a warrant to search SDI's headquarters for evidence of criminal activity.  The

13   Court has determined that some of the categories of items described in the warrant were vague and

14   overbroad and therefore in violation of the Fourth Amendment's particularity requirement.  The Court

15   has also determined, however, that other categories were described with sufficient particularity and that

16   the seizure of those categories of documents should be upheld under the doctrine of severance.[12]

17        The Court finds that partial suppression of evidence seized from the storage facility, in the same

18   manner as the evidence seized from SDI's headquarters, is the proper remedy in this case.  The

19   _____

20        [11]The evidence presented at the hearing also showed that agents entered and videotaped the
offices of Spectramed which was located on the second floor of the building.  There is no evidence that

21   the agents seized any documents from Spectramed's offices.  Nor is there any evidence that the Kaplans
were even aware that the agents entered Spectramed's office.  Therefore, even though the agents did not

22   have authority to search Spectramed's office, the Court finds that this unauthorized search is irrelevant

23   to either the seizure of records from SDI's offices or to the consents obtained from the Kaplans.  *See
United States v. Furrow*, 229 F.3d 805 (9th Cir. 2000), in which the court held that defendant's consent

24   to search was not tainted if he was unaware of the agent's prior illegal entry.

25        [12]The Court recognizes, of course, that Defendants have separately filed a Motion for a *Franks*

26   Hearing.  Should that Motion be granted, and should the Court subsequently determine that an
accurately stated affidavit would not have supported a finding of probable cause to search SDI's

27   premises, then all evidence seized pursuant to the warrant, as well as evidence seized pursuant to

28   tainted consents to search, would be subject to suppression.

1    Government's agents had a lawful basis to search SDI's headquarters for the evidence that was

2    sufficiently described in the search warrant and which this Court has determined should be upheld

3    under the doctrine of severance.  Thus, the officers did not unlawfully encounter the Kaplans as a result

4    of a wholly improper entry.  There were, however, no intervening circumstances that purged the taint of

5    the partially invalid warrant.  The Kaplans' consents were obtained during the midst of the search of

6    SDI's headquarters and were premised on the search of the offsite storage facility for the same items

7    listed in the warrant.  The consents to search, therefore, are valid or invalid to the same extent that the

8    search warrant, itself, is valid or invalid.  The Court, therefore, finds that the consents to search the

9    offsite storage facility were not tainted insofar as they authorized the Government to seize documents

10   that were properly described in the search warrant.  The consents were tainted and therefore invalid,

11   however, as to the seizure of those categories of documents that the Court has found were overbroad

12   and in violation of the Fourth Amendment.

13        The second issue is whether Robert Kaplan or Todd Kaplan voluntarily consented to the search

14   of the offsite storage facility.  It is the Government's burden to prove that the consent was freely and

15   voluntarily given.  Whether consent to search was voluntarily given is "to be determined from the

16   totality of the circumstances."  *United States v. Soriano*, 361 F.3d 494, 501 (9th Cir.2004), *citing*

17   *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).  The Ninth

18   Circuit has identified five factors to be considered in determining the voluntariness of consent to a

19   search: (1) whether the defendant was in custody; (2) whether the arresting officers had their guns

20   drawn; (3) whether *Miranda* warnings were given; (4) whether the defendant was notified that he had

21   the right not to consent; and (5) whether the defendant had been told a search warrant could be

22   obtained.  *Id., citing United States v. Jones,* 286 F.3d1146, 1152 (9th Cir. 2002); *United States v.*

23   *Castillo*, 866 F.2d 1071, 1082 (9th Cir. 1989).  *Soriano* states that no factor is determinative in the

24   equation, and it is not necessary to check off all five factors.  The factors are only guideposts and not a

25   mechanized formula for resolving the voluntariness inquiry.  The full richness of the encounter must be

26   considered in determining whether there was voluntary consent.

27        Agent Bomstad testified that after the search commenced, she was informed by an SDI

28   employee that many of the records the agents were seeking were located in an offsite storage facility.

1   She thereafter made contact with Robert Kaplan and requested consent to search the offsite storage

2   facility to which he agreed.  Ms. Bomstad or another agent then prepared a handwritten consent to

3   search form which Robert Kaplan signed and which stated that he gave voluntary consent to search the

4   offsite storage facility and to seize the records listed in the attachment.  The form further stated that his

5   consent was "given voluntary (sic) and knowingly." *Government's Exhibit 1-D.*  Agent Bomstad

6   testified that no threats or coercion was used to obtain Robert Kaplan's written consent.  Agent

7   Bomstad testified that after Defendant Todd Kaplan arrived at SDI headquarters, she also requested his

8   permission to search the offsite storage facility, given his position as president of SDI.  She testified

9   that Todd Kaplan also voluntarily consented to the search of the offsite storage facility and signed a

10  written consent to search. *Government's Exhibit 1-E.*  Todd Kaplan also provided the agents with the

11  address for the offsite storage facility and contacted the person in charge of the facility to allow the

12  agents to gain access to the SDI records.

13          Robert Kaplan testified, however, that Agent Bomstad demanded that he consent to the search

14  of the storage facility, called him a liar and indicated that if he did not consent, the agents would break

15  into the storage facility.  Robert Kaplan also testified that he saw the entry tools, including a crowbar,

16  that the agents had brought with them.  He asserted that he executed the consent to search because he

17  feared that the agents would break into the offsite storage facility and damage the property if he did not

18  consent. The fact that a person executes a written consent stating that he has voluntarily and knowingly

19  consented to the search provides assurance that his consent was given voluntarily.  Robert Kaplan

20  acknowledged that he read the consent form before he signed it.  His testimony that he executed the

21  written consent to search form under duress lacks credibility.  If the agents had, in fact, threatened to

22  search the offsite storage facility regardless of whether Robert Kaplan gave his consent, then Mr.

23  Kaplan could and should have refused to give written consent and have required the Government to

24  seek a search warrant.  Absent some credible evidence that Robert Kaplan did not understand the

25  consent form or was misled as to its purpose, or corroborating evidence that he signed the consent form

26  under duress, the Court finds that his consent was voluntarily given.

27          The fact that Defendant Todd Kaplan thereafter also executed a written consent casts further

28  doubt on the credibility of Robert Kaplan's testimony and, in any event, provides an independent and

valid consent to search the storage facility.  Robert Kaplan testified that he did not speak with his brother, Todd Kaplan, after the latter arrived at the SDI offices.  There is no evidence that Todd Kaplan was aware of the alleged threats or coercion used to obtain Robert Kaplan's consent to search such that his consent was tainted by the measures allegedly used to obtain Robert Kaplan's consent.  No testimony was presented that Todd Kaplan's written consent was obtained by threats or other forms of coercion.

Neither Robert Kaplan, Todd Kaplan nor any other person were arrested or placed in custody during the search of the SDI premises.  Accordingly, the Kaplans were not read the *Miranda* warnings. The agents did not have their guns drawn, although Robert Kaplan testified that he observed that Agent Bomstad was armed.  It is not clear from Agent Bomstad's testimony whether she or another agent specifically told Robert Kaplan or Todd Kaplan that they had a right not to consent.  However, both individuals signed written consents to search which indicated they gave voluntary and knowing consents to search the offsite storage facility.  Based on the totality of the circumstances, the Court therefore finds that the consents to search executed by Robert Kaplan and Todd Kaplan were voluntary. The Government was, therefore, authorized to search the offsite storage facility and to seize records within those categories set forth in Attachment "B" to the search warrant which the Court has found were described with sufficient particularity.

## CONCLUSION

The Court therefore finds the search warrant in this case was partially invalid under the Fourth Amendment because it failed to describe the documents or records to be seized with sufficient particularity in the following categories:

2.    Documents relating to billing procedures, billing manuals, and billing materials.

4.    Documents relating to billing records and records of payments received.

7.    Documents relating to non-privileged correspondence with consultants.

8.    Documents relating to correspondence with Medicare intermediaries and private insurance companies.

9.    Documents relating to non-privileged internal memoranda and E-mail.

10.    Documents relating to bank accounts, brokerage accounts, trusts.

56

11.     Checking, savings, and money market account records, including check registers, cancelled checks, monthly statements, wire transfers, and cashier checks.

12.     Documents relating to personnel and payroll records.

13.     Documents relating to accounting records.

19.     Documents relating to mailing and shipping records between physicians and SDI.

24.     Rolodexes, address books and calendars.

The Court finds that Defendants SDI, Todd Kaplan and Jack Brunk have standing to challenge the seizure of documents within these overbroad and invalid categories. The Court further finds that the seizure of documents in these categories cannot be upheld under the incorporation by affidavit doctrine, the "permeated-with-fraud" exception, or the good faith exception to the Fourth Amendment. The Court therefore finds that the Government's seizure of documents in the foregoing categories should be suppressed. The Court also finds that Defendant Todd Kaplan's and Robert Kaplan's consents to search the offsite storage facility, although voluntary, were tainted to the extent that the search warrant was invalid. Therefore, seizure of documents in the foregoing categories from the offsite storage facility should also be suppressed.

The Court finds that the remaining of categories of documents in the search warrant, items 1, 3, 5, 6, 14, 15, 16, 17, 18, 20, 21, 22 and 23, were described with sufficient particularity and that under the doctrine of severance, the seizure of documents in those categories was proper and should not be suppressed, notwithstanding the invalidity of other portions of the warrant.

Defendants argued in their Motion (#41), page 8, that based on the records illegally seized from SDI, the Government was able to subpoena records from insurance companies and physicians which should also be suppressed as "fruits of the poisonous tree." Because the Court, here, has recommended only partial suppression of the records seized by the Government, it cannot be determined on this record whether the evidence obtained by the Government through subsequent subpoenas were the fruits of the illegally obtained evidence. If the District Court approves and adopts these Findings and Recommendations, further proceedings may be required to determine whether evidence subsequently obtained by the Government through subpoenas should also be suppressed.

57

1

**RECOMMENDATION**

2          **IT IS RECOMMENDED** that Defendants' Motion to Suppress (#41) be **GRANTED**, in part,

3     and **DENIED**, in part, in accordance with the foregoing Findings.

4                                                **NOTICE**

5          Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in

6     writing and filed with the Clerk of the Court within ten (10) days.  The Supreme Court has held that the

7     courts of appeal may determine that an appeal has been waived due to the failure to file objections

8     within the specified time.  *Thomas v. Arn*, 474 U.S 140, 142 (1985).  This circuit has also held that (1)

9     failure to file objections within the specified time and (2) failure to properly address and brief the

10    objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues

11    from the order of the District Court.  *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi*

12    *Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

13          DATED this 26th day of June, 2006.

14

15                                                _____

16                                                **GEORGE FOLEY, JR.**
                                                 **UNITED STATES MAGISTRATE JUDGE**

17

18

19

20

21

22

23

24

25

26

27

28

                                                 58