1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

UNITED STATES OF AMERICA,               )
                                        )
                            Plaintiff,  )   Case No.  2:05-cr-00078-PMP-GWF
                                        )
vs.                                     )   **FINDINGS & RECOMMENDATIONS**
                                        )   **REGARDING DEFENDANT'S**
SDI FUTURE HEALTH, INC., TODD STUART    )   **MOTION FOR *FRANKS* HEARING**
KAPLAN, and JACK BRUNK,                 )
                                        )
                            Defendants. )
_____)

     This matter is before the Court on Defendants SDI Future Health, Inc.'s, Todd Kaplan's and Jack Brunk's Motion for a Franks Hearing (#42), filed on December 2, 2005; the Government's Opposition to Defendants' Motion for a Franks Hearing (#56), filed on January 31, 2006; and Defendants' Reply In Support of Defendants' Motion for a Franks Hearing (#68), filed on March 15, 2006.  The Court heard oral argument on the Motion on May 17, 2006.

     Defendants move this Court for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), primarily on the grounds that the affidavit in support of the search warrant contained reckless omissions of fact which misled the magistrate judge into concluding that there was probable cause for the issuance of the warrant.

## FACTS

     The Court's *Report and Recommendations* (#101), filed on June 26, 2006, regarding Defendants' Motion to Suppress (#39), summarizes the factual allegations set forth in the affidavit of

Agent Julie Raftery (Bomstad) in support of issuance of the search warrant.[1]  The Government's allegations that there was probable cause to believe that SDI and Todd Kaplan were engaged in health care fraud were based on the following allegations set forth in the affidavit:

(1)     SDI entered into a scheme with physicians to refer their patients for unnecessary and improperly conducted sleep studies.  The sleep study reports generated by these studies were not actually written, reviewed or signed by the SDI physicians whose signatures appeared on the reports.  SDI fraudulently billed the patients' insurers for these unnecessary and invalid sleep study reports.

(2)     SDI forwarded the computer data gathered from Holter monitors during the sleep studies to cardiac diagnostic companies which separately prepared and billed the patients' insurers for cardiac risk assessment studies.  The Government alleged that these cardiac risk assessment tests were not performed, i.e. were not performed in a medically legitimate manner.

(3)     SDI induced the patients' physicians to participate in this scheme by advising them that they could separately bill the patients' insurers for the professional component for review and interpretation of the cardiac risk assessment studies and to bill the insurers for follow-up patient visits to review the cardiac risk assessment and sleep study reports.  SDI also received large fees from the cardiac diagnostic companies which the Government characterizes as "kickbacks."

The Government's allegations were based on information provided to the Government by three former SDI employees, Erin Beglinger, Randy Lollar and John Gardner, and two individuals, Darlene Steljes and Christine Gibaud who had previously operated sleep clinics in partnership with SDI and/or Todd Kaplan.  The Government's allegations were also based on the opinions of its medical consultants described in the affidavit and on the Government's review of insurance claims records for SDI.

Randy Lollar, a former SDI sales manager in Las Vegas, Nevada, was interviewed by the Government on March 28, 2001.  Erin Beglinger, a former regional director of SDI in Las Vegas, Nevada and a registered polysomnographer, was interviewed on February 21, 2001, April 13, 2001 and October 2, 2001.  John Gardner, a former vice-president and Chief Operating Officer of SDI, was interviewed by the Government on November 7, 2001.  Darlene Steljes was the owner of a certified

---

[1]The search warrant affidavit is referred to herein as the *Bomstad Affidavit.*

sleep clinic in Las Vegas, Nevada, who had entered into a limited liability company with Todd Kaplan in 1998-99, but terminated her relationship when SDI's business practices became of concern to her. Ms. Steljes was interviewed by the Government on June 18, 2001 and October 25, 2001.  Christine Gibaud was the former owner of a sleep study company located in Michigan.  In 1998, Ms. Gibaud also entered into a limited liability company with Todd Kaplan.  In 1999 Todd Kaplan took control of the company.  Ms. Gibaud was interviewed on September 13, 2001. *Bomstad Affidavit,* ¶20, pages 18-19.

Mr. Lollar was responsible for "selling" SDI's "revenue enhancement program" to physicians and placing SDI health service coordinators in their offices. *Bomstad Affidavit*, ¶20, page 18.  Mr. Lollar and Ms. Beglinger stated that SDI obtained patient referrals by placing its health service coordinators in the physicians' offices. The health service coordinators administered a questionnaire to the physician's patients, and based on the questionnaire results, the health service coordinator completed a sleep study referral to SDI which the physician signed and the health service coordinator then faxed to SDI to schedule the sleep study. *Bomstad Affidavit*, ¶27, page 22.  Ms. Beglinger reported that many of the patients referred for sleep studies did not need them and some patients had no idea why they were referred to SDI for a sleep study. *Id.*

According to the affidavit, the key element of SDI's revenue enhancement program was the cardiac risk assessment.  Each patient who was referred to SDI would receive the prescribed sleep study.  The cardiac diagnostic companies would also provide three diagnostic cardiac tests, 24 hour ECG monitoring, HRV and SAEGG.  SDI recommended or instructed the referring physicians to bill their patients' insurers for physician review and interpretation of the cardiac risk assessment tests and recommended that they bill $250.00 for each procedure even though the physicians did not perform, analyze or interpret the tests.  The physicians allegedly simply countersigned the test results.  SDI also informed the physicians that they could earn additional revenue by billing for office visits to review the results of the sleep studies and cardiac risk assessment with their patients. *Bomstad Affidavit*, ¶¶ 28, 29, pages 22-23.

The affidavit also alleged that the cardiac risk assessment tests were not proper because the sleep studies performed by SDI already included a cardiac component and the separate cardiac risk assessment tests were not medically necessary because they were not prescribed as a result of a

3

1    significant cardiac episode, such as a myocardial infarction.  The cardiac risk assessment tests were not

2    actually performed because they must be based on a 24 hour Holter monitor and the sleep studies only

3    lasted 6-8 hours.  The patients were not required to perform various physical activities correlated to the

4    data from the Holter monitor.  SDI and the cardiac diagnostic companies also defrauded the insurers by

5    falsely indicating that the sleep studies and cardiac risk assessment tests were performed on different

6    dates in order to avoid rejection of the billings.  *Bomstad Affidavit,* ¶¶ 31-40, pages 24-27.

7         Ms. Beglinger stated that the polysomnographer or technician performing the sleep study placed

8    a Holter monitor on each patient for the duration of the sleep study.  Ms. Beglinger stated that she

9    informed SDI that it could not bill for the 24 hour Holter monitor study when it was done for only eight

10   hours.  She was reportedly told by SDI that it used a special instructional code to properly bill for the

11   study.  *Bomstad Affidavit*, ¶20, page 23.  John Gardner stated that there was an ongoing concern at SDI

12   about billing for the 24 hour Holter monitor.  Mr. Gardner also reported that he was told by SDI officers

13   that SDI billed a modified CPT code for the Holter monitor.  *Bomstad Affidavit*, ¶ 30, pages 23-24.

14   According to the affidavit, a modifier "52" could be added to a CPT code to indicate reduced services.

15   One of the Government's medical consultants, Dr. Fong, advised that use of such a modifier on

16   Medicare claims would automatically trigger a manual review of the claim.  The Government's review

17   of billing data showed that SDI did not use any modifier when billing Medicare.  *Id.,* pages 23-24.

18        According to the affidavit, there were several reasons why SDI's insurance billings for sleep

19   studies were fraudulent.  Medicare and other private insurers would only pay for sleep studies

20   conducted in sleep labs.  The CPT billing codes for sleep studies also required that the patients be

21   continuously monitored during the sleep studies.  SDI regularly performed sleep studies in patients'

22   homes and hotel rooms.  The Holter monitor equipment that SDI used was not designed for continuous

23   monitoring.  *Bomstad Affidavit*, ¶ 41, pages 27-28.   Ms. Beglinger and Mr. Gardner stated that Robert

24   Kaplan, Todd Kaplan's brother and SDI's computer expert, connected laptop computers to the

25   equipment so that the sleep study could be monitored.  Ms. Beglinger advised, however, that this

26   system rarely worked.  *Id.,* page 28.

27        The affidavit also stated that Ms. Beglinger told the Government that the scheduling of a second

28   sleep study or CPAP titration studies, following the results of the first study, depended more on the

4

1  willingness of insurers to cover the procedure than the need of the patients.  Where the insurance plan

2  provided automatic coverage for a second sleep study, it was often scheduled before the results of the

3  first sleep study were available.  Although the affidavit attributed this information to Ms. Beglinger,

4  *Bomstad Affidavit*, ¶27, page 22, the Government states that this attribution was in error and that the

5  information was actually provided by Mr. Lollar.  *See Government's Response* (#56), page 12.

6        The Government asserted in the affidavit that there was probable cause to believe that the

7  physicians whose signatures appeared on the sleep study reports did not actually write, review or sign

8  the reports.  *Bomstad Affidavit*, ¶¶ 42-44, pages 28-29.  In support of these allegations, the affidavit

9  cited information provided by Ms. Beglinger, Mr. Gardner, Darlene Steljes and Christine Gibaud.  Ms.

10  Gibaud and Ms. Steljes told the Government that SDI's sleep study reports were of very poor quality,

11  lacked analysis, and were often contradictory in their conclusions.  Ms. Beglinger also observed that

12  SDI sleep study reports were of much poorer quality than reports from other sleep study companies and

13  that they lacked good interpretation.  *Bomstad Affidavit,* ¶42, page 28.

14        Ms. Beglinger and Ms. Steljes attempted to meet the physicians providing interpretation of the

15  sleep studies, but they were not allowed to do so.  Ms. Beglinger also reported that she spoke with

16  several SDI employees and none of them had seen the physicians who allegedly interpreted the sleep

17  studies and wrote the reports.  Ms. Beglinger also told the Government that Jack Brunk, SDI's secretary

18  and executive vice-president, told her that the sleep studies were written by a 17 year old high school

19  girl.  *Bomstad Affidavit,* ¶ 43, page 28.

20        John Gardner told the Government that Dr. Gavin Awerbuch's name appeared on many of the

21  sleep studies as the physician analyzing the sleep data.  Mr. Gardner reported that Jack Brunk told him

22  that Dr. Awerbuch trained Mr. Brunk to write sleep study reports.  Awerbuch instructed Brunk what to

23  write based on the computer scored results of the sleep study.  Brunk then placed Dr. Awerbuch's

24  signature on the sleep study reports using a signature stamp bearing Dr. Awerbuch's signature.

25  *Bomstad Affidavit,* ¶ 44, pages 28-29.   Ms. Steljes also stated that she observed reports that appeared to

26  be signed with a signature stamp for Dr. Awerbuch and Dr. Susan Sprau.  *Id.*  The affidavit states that

27  claims for sleep studies that are not actually reviewed and interpreted by a physician are false claims.

28  *Id.*

1        The Government also alleged that there was probable cause to believe that Todd Kaplan, his

2    spouse and SDI engaged in tax evasion or tax fraud.  The affidavit alleged that Defendant Todd Kaplan

3    and his spouse under-reported their income on their federal income tax returns from 1996 to 2000 and

4    that SDI failed to either file Forms 941 to account for employee withholding taxes or to collect and pay

5    over to the IRS the withheld tax for its employees.  The affidavit also alleged that SDI  under-reported

6    its gross income during the year 2000 in the approximate amount of $500,000.00.  As to Mr. and Mrs.

7    Kaplan, the affidavit alleges that during the years Mr. and Mrs. Kaplan only reported modest income

8    from employment, they listed substantially greater monthly or annual income on credit applications for

9    the purchase of expensive automobiles and in financial statements submitted to a California bank.

10    *Bomstad Affidavit,* ¶¶ 46-68, pages 29-34.

11    **DISCUSSION**

12    In *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the Supreme Court

13    held that the Fourth Amendment entitles a defendant to challenge the validity of a search warrant

14    affidavit if the defendant makes a substantial preliminary showing that (1) the affidavit contains

15    intentionally or recklessly false statements and (2) the affidavit purged of its falsities would not be

16    sufficient to support a finding of probable cause.  *See United States v. Martinez-Garcia*, 397 F.3d 1205,

17    1215 (9th Cir. 2005), *citing United States v. Reeves*, 210 F.3d 1041, 1044 (9th Cir. 2000).  In making

18    the initial determination whether a defendant is entitled to an evidentiary hearing, *Franks* states:

19
20
21
22
23
24
> There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant.  To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine.  There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof.  They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons.  Affidavits or sworn or otherwise reliable statements of witnesses should be furnished or their absence satisfactorily explained.  Allegations of negligence or innocent mistake are insufficient.

25    438 U.S. at 171.

26    *Franks* further stated that if the defendant makes a substantial showing that the affidavit

27    contains intentionally or recklessly false statements, "and if, when the material that is the subject of the

28    alleged falsity is set to one side, there remains sufficient content in the warrant affidavit to support a

1    finding of probable cause, no hearing is required." *Id., at* 171-172.  On the other hand, if the remaining

2    content is insufficient to support probable cause, then the defendant is entitled to an evidentiary hearing.

3    *Id.*  At such hearing, the defendant has the burden of proof by a preponderance of the evidence to

4    establish that the false statements were deliberately made or were made with a reckless disregard for the

5    truth.  *United States v. DeLeon*, 955 F.2d 1346, 1348 (9th Cir. 1992).  The impeachment that is

6    permitted in an evidentiary hearing is generally only that of the affiant and not of any nongovernmental

7    informant.  *DeLeon* states, however, that if law enforcement officers, other than the affiant, provide

8    false information or withhold material information that should have been included in the affidavit, their

9    conduct is also a proper subject for a *Franks* hearing.

10        In *United States v. Stanert*, 762 F.2d 775, 781, *amended by* 769 F.2d 1410 (9th Cir. 1985), the

11   court held that a substantial showing that the affiant made reckless omissions of material facts, as

12   opposed to deliberately false statements, can also support holding an evidentiary hearing if there would

13   have been no probable cause had the omitted information been included.  In this regard, *Stanert* stated

14   that "[t]he use of deliberately falsified information is not the only way by which police officers can

15   mislead a magistrate when making a probable cause determination.  By reporting less than the total

16   story, an affiant can manipulate inferences a magistrate will draw." *Id.  Stanert* further states:

17           Clear proof of deliberate or reckless omission is not required.  *See United*
             *States v. Chesner*, 678 F.2d 1353, 1362 (9th Cir. 1982).  Such proof is
18           reserved for the evidentiary hearing.  *Id.*  At this stage, all that is required
             is that the defendant make a substantial showing that the affiant
19           intentionally or recklessly omitted facts required to prevent technically
             true statements in the affidavit from being misleading.  *Id.*
20

21        The parties disagree whether the defendant is also required to show that the reckless omissions

22   were designed to mislead the court as was held in *United States v. Colkley*, 899 F.2d 297 (4th Cir.

23   1990).  *See also United States v. Reivich*, 793 F.2d 957 (8th Cir. 1986) and *United States v. Tomblin,* 46

24   F.3d 1369 (5th Cir. 1995).  *Colkley* also doubted whether an intent to deceive can be inferred from the

25   reckless omission standing alone, but noted that some courts have recognized this inference where the

26   omitted material was "clearly critical" to the finding of probable cause.  *Colkley,* 899 F.2d at 301, *citing*

27   *United States v. Martin*, 615 F.2d 318, 328 (5th Cir. 1980).

28   . . .

1    Defendants argue that the Ninth Circuit rejected the *Colkley* decision's "intent to deceive"

2    requirement in *Lombardi v. City of El Cajon*, 117 F.3d 1117 (9th Cir. 1997). *Lombardi* involved a civil

3    rights action against an officer who made reckless omissions in a state court search warrant affidavit by

4    failing to inform the court that the two unidentified informants, upon whose information the affidavit

5    was based, both had motives to lie about defendant's alleged possession of illegal drugs. The state

6    court found, however, that the officer omitted the information in order to protect the informants from

7    potential retribution by the defendant. Following the disclosure of this omitted information, the state

8    court suppressed the evidence obtained pursuant to the search warrant. The issue in the subsequent

9    civil rights action was whether the officer was entitled to qualified immunity based on the state court's

10   apparent finding that he acted in good faith and not with an intention to deceive the court. In the

11   context of the qualified immunity defense in the civil rights action, *Lombardi* interpreted *Franks* and

12   *Stenart* as not requiring a defendant to show that the officer subjectively intended to mislead the court.

13    The Government argues that *Lombardi* is distinguishable on the ground that it involved a civil

14   action and application of the qualified immunity defense. The Government also argues that *Lombardi*

15   was wrongfully decided and is inconsistent with the Ninth Circuit's prior decision in *United States v.*

16   *Botero*, 589 F.2d 430, 433 (9th Cir. 1978). *Botero* assumed, without specifically holding, that

17   omissions in a search warrant affidavit could provide the basis for a *Franks* challenge. The defendants

18   in that case argued that the evidence should have been suppressed because the search warrant affidavit

19   did not disclose the use of electronic tracking devices. The court, however, found that the affidavit did

20   mention the use of  tracking devices. The court further stated: "Moreover, omissions or misstatements

21   in a search warrant affidavit, although negligent, are fatal only if reckless and made with intent to

22   deceive the court." *Botero,* 589 F.2d at 433.

23    The perceived differences between the requirement set forth in *Colkley, Reivich* and *Tomblin*, on

24   the one hand, and *Lombardi*, on the other hand, are not that great when one considers the definition of

25   "recklessness" adopted by the Ninth Circuit in other cases. In *United States v. Senchenko*, 133 F.3d

26   1153, 1158 (9th Cir. 1998), the defendant argued that evidence seized pursuant to a search warrant

27   should have been suppressed because the affidavit stated that defendant was arrested while resetting a

28   snare trap, whereas in reality the defendant was arrested some distance from the snare trap. In affirming

8

the district court's decision following an evidentiary hearing that the errors in the affidavit were not

recklessly made, the Ninth Circuit stated that the affiant's misstatements or omissions lacked "the high

degree of awareness of the probable falsity that a finding of recklessness would require."  In regard to

whether a defendant has made a substantial showing sufficient to warrant an evidentiary hearing, the

Ninth Circuit's precedents such as *Stanert* do not appear as strict as the decision in *Colkley* would

suggest.  The decision in *Senchenko* indicates that in order for the plaintiff to meet his burden of proof

at the evidentiary hearing, however, the omissions must be such that the affiant was aware that the

omitted information rendered the affidavit false.

Under the second prong of *Franks*, the court must decide whether the false statements or

reckless omissions in the affidavit, if corrected or supplemented, would have resulted in an affidavit

that was insufficient to establish probable cause for the issuance of the warrant.  Probable cause is

determined by viewing the "totality of the circumstances" set forth in the affidavit.  *Stanert, supra,* at

778-779, *citing Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 52 (1983).  *Stanert,* quoting,

*Gates,* further states:

> Because probable cause is a fluid concept not readily, or even usefully,
> reduced to a neat set of legal rules,
>
> [t]he task of the issuing magistrate is simply to make a practical
> common-sense decision whether given all the circumstances set
> forth in the affidavit before him, including the "veracity" and
> "basis of knowledge" of the persons supplying hearsay
> information, there is a fair probability that contraband or evidence
> of a crime will be found at a particular place.  *Id.*

*Stanert* notes that:

> Although we are mindful that "only the probability, and not a prima facie
> showing of criminal activity is the standard of probable cause," *Spinelli v.
> United States*, 393 U.S.410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637
> (1969), we also recognize that "[s]ufficient information must be presented
> to the magistrate to allow that official to determine probable cause; his
> actions cannot be a mere ratification of the bare conclusions of others."
> *Gates,* 462 U.S. at 239, 103 S.Ct. At 2332.  "In order to ensure that such
> an abdication of the magistrate's duty does not occur, courts must
> continue to conscientiously review the sufficiency of affidavits on which
> warrants are issued." *Id.*

In the context of a *Franks* motion, however, the Court's task is not to decide whether there was

probable cause to issue a search warrant based on the original affidavit.  Pursuant to *United States v.*

9

1   *Leon*, 468 U.S. 897, 925, 104 S.Ct. 3405 (1984), evidence should not be suppressed if the government's

2   agents acted in the objective good faith belief that the warrant was valid.  Suppression of evidence

3   remains an appropriate remedy, however, "if the magistrate or judge in issuing a warrant was misled by

4   information in an affidavit that the affiant knew was false or would have known was false except for his

5   reckless disregard of the truth."  *Leon, supra, citing Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674,

6   57 L.Ed.2d 667 (1978).

7           In the case of deliberately false statements in an affidavit, it is arguably easier for the court to

8   analyze the affidavit under the second requirement of *Franks.*  The court simply strikes the false

9   statement and determines whether the affidavit, as corrected, still supports a finding of probable cause.

10  In the case of reckless omissions, however, the court must determine what information should have

11  been included in the affidavit to make it accurate or, as *Stanert* states, to "tell the whole story."  Not

12  surprisingly, the defendants and the government may disagree on what constitutes the whole story.

13  This difference between false statements and omissions  is the basis upon which courts such as *Colkley*

14  have imposed stringent standards in the case of alleged reckless omissions.

15          *United States v. Stanert* provides an example of the type of reckless omissions that justify

16  conducting a *Franks* hearing.  The government obtained a search warrant based on an officer's affidavit

17  that defendant was operating an illegal drug laboratory in his residence.  The affidavit was primarily

18  based on an informant's tip which was no more than a bare conclusion and which failed to reveal

19  whether the informant was relying on something more than casual rumor.  The affidavit also correctly

20  reported that an anonymous caller had reported an odor of ether emanating from defendant's residence.

21  The court noted, however, that ether is a legal substance and may have many legitimate uses.  To

22  support the issuance of the warrant, the officer's affidavit made other factual assertions which omitted

23  important information that diminished the validity of those assertions.  First, the officer stated that

24  another caller had advised the police that the occupants of the house were using ether either to free-base

25  cocaine or manufacture drugs.  The officer's underlying report, however, stated only that the caller

26  "opined" that a resident of the house was probably free-basing cocaine and made no mention of a drug

27  lab on the premises.  Second, the affidavit stated that defendant had previously been arrested in Panama

28  with fourteen pounds of cocaine, but did not inform the court that defendant had not been convicted of

1   any offense.  Third, the affidavit informed the court that there had been a previous explosion at

2   defendant's residence caused by ether fumes, but did not inform the judge that defendant had moved

3   into the residence after the explosion.  Thus, each of the additional items of information omitted key

4   facts which made those additional items also unreliable.  Because the additional items of information

5   were necessary to establish probable cause, the court held that defendant was entitled to an evidentiary

6   hearing as to whether the omissions in the affidavit were deliberately or recklessly made to mislead the

7   court into issuing a warrant not supported by probable cause.

8        In *United States v. Chesher*, 678 F.2d 1353 (9th Cir. 1982), the court held that defendant had

9   made a substantial showing of reckless omissions by the officer in obtaining a search warrant to search

10  defendant's residence for indicia of membership in the Hell's Angels.  The affidavit stated that there

11  was probable cause to believe that defendant was a current member of the Hell's Angels at the time of

12  the search warrant application.  The affidavit failed to disclose other information in the possession of

13  law enforcement that defendant had not been a member of the Hell's Angels for several years which

14  therefore undermined probable cause to believe that Hell's Agent indicia would be found in defendant's

15  residence.  The court held that defendant had made a sufficient showing that information was recklessly

16  omitted which eliminated the basis for probable cause.  Defendant was therefore entitled to a *Franks*

17  evidentiary hearing.

18       In *United States v. DeLeon*, 979 F.2d 761 (9th Cir. 1992), the court held that defendant was

19  entitled to a *Franks* hearing where a police officer informed the officer who authored the search warrant

20  affidavit that three men had seen and smelled marijuana growing on defendant's property.  In fact, the

21  police had obtained statements revealing the men had not seen marijuana, but that only one of them had

22  smelled it.  Because there was no reliable basis that the person who smelled the marijuana was qualified

23  by experience or training to give such an opinion, the court held that there would not have been

24  probable cause to support the issuance of a search warrant and defendant was therefore entitled to an

25  evidentiary hearing.

26       The factual issues in this case are more complex than those in *Stanert, Chesher* or *DeLeon*.

27  Unlike those cases which involved a single alleged illegal activity, the affidavit in this case alleged a

28  complex health care fraud scheme and separate allegations of tax evasion or tax fraud.  The

1   Government's allegation that SDI and Todd Kaplan engaged in health care fraud involved two

2   essentially separate activities.  First, the affidavit alleged that SDI, in combination with the referring

3   physicians, conspired to refer patients for unnecessary sleep studies which were not properly performed

4   and which resulted in sleep study reports that were not actually written, reviewed or signed by the

5   physicians whose names appeared on the reports.  Second, the affidavit alleged that SDI arranged for

6   cardiac diagnostic companies to perform unnecessary cardiac risk assessment tests in conjunction with

7   the sleep studies.  The Government alleged that these cardiac risk assessment tests were not actually

8   performed, i.e. were not performed in a valid medical manner, and were fraudulently billed to the

9   insurers.

10      In their Motion (#56), Defendants raise numerous alleged misrepresentations or reckless

11   omissions in the affidavit relating to the allegations of health care fraud and tax evasion.  The Court

12   analyzes each of these alleged misrepresentations or reckless omissions to determine whether

13   Defendants have made a "substantial showing" under the first prong of *Franks*, and if so whether

14   correction or supplementation of the affidavit would have resulted in an affidavit insufficient to support

15   probable cause, in whole or in part, under the second prong of *Franks*.

16      **1.   Whether the Affidavit Misrepresented or Recklessly Omitted Information**
          **As to Whether SDI's Physicians Actually Reviewed and Interpreted the**

17      **Sleep Study Data and Signed or Approved the Sleep Study Reports.**

18      Defendants contend that the Government's allegations that the SDI sleep study reports were not

19   written, reviewed or actually signed by the physicians whose signatures appeared on the reports,

20   *Bomstad Affidavit*, ¶¶ 42-44, page 28, was misleading and omitted material information that refuted

21   those allegations.  Defendants base their arguments on the Government's "302" summaries of the

22   informants' interviews, which they claim contained contradictory information that should have been

23   included in the affidavit.  In addition, Defendants have produced court records regarding litigation

24   between two of the informants and SDI/Kaplan which they argue should have been disclosed in the

25   affidavit.[2]

26

27   _____

28      [2]These summaries and documents are contained in the *Declaration of Marcus R. Mumford In
     Support of Defendants' Motion for a Franks Hearing* (#43), filed on December 2, 2005.  In addition,

1    According to the summary of Ms. Beglinger's February 28, 2001 interview, she told the

2  Government that the results of the sleep studies were sent to SDI's corporate offices where they were

3  interpreted by Dr. Susan Sprau and Dr. Gavin Awerbuch, who are Diplomates of the American Board

4  of Sleep Medicine.  Ms. Beglinger stated that although the sleep study reports were allegedly signed by

5  Dr. Sprau or Dr. Awerbuch, she was not sure if these doctors really existed.  She informed the

6  Government that she had recently visited SDI's corporate headquarters due to a promotion and asked to

7  meet with the two doctors.  Ms. Beglinger was not allowed to meet the doctors and was told by Jack

8  Brunk that the reports were actually written by a 17 year old high school girl named Andrea (last name

9  unknown).  *Mumford Declaration* (#43), exhibit 3.  In her third interview on October 2, 2001, Ms.

10  Beglinger described more fully the manner in which the sleep study data was scored by SDI employees.

11  *Mumford Declaration* (#43), exhibit 11.  She described the persons who did the scoring as young

12  people who really knew nothing about sleep studies and who were not certified respiratory therapists.

13  These employees manually scored the five stages of the sleep study on a computer by tagging important

14  events.  The computer then added these tagged events, and a four to six page computer report was

15  generated.  According to Ms. Beglinger, this report was given to the 17 year old high school girl who

16  "wrote" the sleep study report that was sent to the patient's referring physician.  *Id.*

17    According to the summary of Mr. Gardner's November 9, 2001 interview, Mr. Gardner stated

18  that Jack Brunk interfaced with the physicians and coordinated all clinical services.  *Mumford*

19  *Declaration* (#43), exhibit 4.  Mr. Gardner stated that SDI employees were trained as "scorers" to use a

20  computer program to interpret sleep study data.  The scorers looked for and marked stages of sleep

21  patterns and events which resulted in a "preliminary machine interpretation."  Mr. Gardner stated that

22  Dr. Gavin Awerbuch and Mr. Brunk worked out a protocol for physician review, analysis and

23  interpretation of the sleep study data, and Dr. Awerbuch instructed Brunk what to write in the reports

24  based on what was observed in the machine scored data.  A boilerplate report was developed and it was

25  Gardner's understanding that Brunk wrote the sleep study reports on behalf of Dr. Awerbuch.  Mr.

26

27  Defendants have submitted a *Supplemental Declaration of Mark S. Hardiman In Support of*
   *Defendants' Motion for a Franks Hearing* (#48), filed on December 9, 2005, which attaches insurance

28  policy and procedure documents and medical literature regarding the cardiac diagnostic tests.

1    Gardner stated that Mr. Brunk used the computer results and the technician notes to fill in the blanks on

2    the boilerplate report.  Mr. Gardner had no knowledge that a high school girl named Andrea wrote the

3    sleep study reports.  He did state, however, that there was a girl who typed up what Mr. Brunk wrote

4    and that this girl used standard language from the computer to type the report.  Portions of Mr.

5    Gardner's statement were cited in the affidavit, *Bomstad Affidavit,* ¶44, page 28, but the affidavit

6    omitted his statement he had no knowledge of a high school girl writing the reports.

7        Mr. Gardner also stated in his interview that on a regular basis, perhaps weekly, Mr. Brunk sent

8    all of the sleep study reports to Dr. Awerbuch for his review.  Mr. Gardner did not know if Dr.

9    Awerbuch actually reviewed the reports.  Mr. Gardner believed there was a blanket agreement that

10   authorized Mr. Brunk to use Dr. Awerbuch's signature stamp if Mr. Brunk operated according to the

11   protocol.  Mr. Gardner also stated that this system was in place when he went to work for SDI, and

12   based on his experience in hospital administration, he did not think there was a problem with this

13   arrangement.  Mr. Gardner indicated that Dr. Awerbuch was the only doctor that SDI used for a long

14   time, was the primary doctor used for Nevada, and that he did all the interpretations for Michigan

15   patients.  Mr. Gardner stated that Dr. Awerbuch may have been paid $100 initially for each sleep study,

16   but he later agreed to take equity in the company in lieu of actual payments.  *Mumford Declaration*

17   (#43), exhibit 4.

18       Mr. Gardner also stated that Dr. Susan Sprau interpreted SDI sleep studies and that Dr. Sprau

19   liked to use raw data to do her reports.  A messenger service delivered the scored data and possibly the

20   raw data to Dr. Sprau.  Mr. Gardner had no knowledge whether SDI used a signature stamp for Dr.

21   Sprau.  Mr. Gardner was also aware that a Dr. Michael Littner worked for SDI and scored and

22   interpreted some sleep studies, and did some training of scorers.  Mr. Gardner also identified another

23   doctor, Dr. Jeremy Cole, who became involved with SDI shortly before Mr. Gardner was fired.  Mr.

24   Gardner had no knowledge of Dr. Cole setting up a protocol for sleep study reports.  Dr. Sprau did

25   occasional interpretations for Nevada patients and Dr. Littner may have done some for Medicare

26   patients.  Mr. Gardner stated that Mr. Brunk decided which doctors did the interpretations.  Mr. Gardner

27   also stated that the amount that SDI paid the physicians for interpreting the sleep studies varied, and

28   that he believed Dr. Sprau may have billed more or earned more because she separately billed for her

1  own professional component.  *Mumford Declaration* (#43), exhibit 4

2  Defendants attack the Government's reliance on Ms. Beglinger, arguing that she only visited

3  SDI corporate headquarters one time and, therefore, did not have a basis to state whether or not the

4  physicians actually reviewed and interpreted the sleep studies and approved or signed the reports.

5  Defendants also raise an issue as to Ms. Beglinger's statement in her February 28, 2001 interview that

6  "she was not sure if these doctors (Awerbuch and Sprau) really exist."  *See Mumford Declaration* (#43),

7  exhibit 3.  The affidavit, however, did not cite this statement.  *See Bomstad Affidavit,* ¶¶ 41-45, pages

8  27-29.  There is nothing in the affidavit which suggests that Dr. Awerbuch or Dr. Sprau were not actual

9  physicians.  Nor did it contend that these doctors were not employed by SDI to review and interpret the

10  results of the sleep study data.  Furthermore, the summary of Ms. Beglinger's interview indicates that

11  her statement was not meant literally, but rather indicates that she doubted whether these doctors

12  actually reviewed the sleep study reports on which their names appeared.  In this regard, the affidavit

13  cited Ms. Beglinger's statement that she spoke with several SDI employees and none of them had seen

14  the physicians who allegedly interpreted the sleep studies and wrote the reports and that she was not

15  allowed to meet with the physicians.  *Bomstad Affidavit,* ¶ 43, page 28.  Thus, Defendants' argument

16  that the affidavit suggested to the magistrate judge that Dr. Awerbuch and Dr. Sprau did not actually

17  exist is without merit.

18  The affidavit also stated that Ms. Steljes was not allowed to meet the physicians.  *Bomstad*

19  *Affidavit,* ¶ 43, page 28.  This statement, however, is not supported by the summary of her June 18, 2001

20  interview.  *Mumford Declaration* (#43), exhibit 6.  Ms. Steljes stated that she and another officer of her

21  company traveled to California to see SDI's corporate offices.  Mr. Kaplan and the other SDI executives

22  took her to a building that SDI was planning to move to but refused to let her visit the corporate offices.

23  There was no statement in the summary of Ms. Steljes' interview that she asked to meet with physicians

24  or was refused permission to do so.[3]  Ms. Steljes also told the Government, however, that she did not

25  believe the sleep study reports were prepared or seen by Dr. Sprau and Dr. Awerbuch because there

26

27

28  [3]Whether Ms. Steljes made such a statement in her subsequent interview on October 25, 2001 is unknown since the Government has not produced that summary.

15

1   were so many sleep studies coming into SDI from all over the country that the doctors could probably

2   not see more than 20 percent of them.  Ms. Steljes observed sleep study reports that bore the signature

3   stamps of Dr. Sprau or Dr. Awerbuch but had never met or spoke with either physician.  Ms. Steljes

4   stated that she had one patient with Dr. Sprau, but that when she tried to call Dr. Sprau, she was only

5   able to reach a technician.  *Id.*

6          Paragraphs 42 through 44 of the affidavit provided a highly condensed version of the

7   information obtained by the Government regarding the allegedly fraudulent nature of SDI sleep study

8   reports.  The affidavit made it appear that the Government's allegation that the physicians employed by

9   SDI did not actually draft, review or sign the sleep study reports was stronger than it actually was.

10  Although the affidavit did not allege that these physicians did not actually exist, it was misleading in

11  referring to Ms. Beglinger's statements that none of the SDI employees she spoke to had ever seen the

12  doctors, but omitted Mr. Gardner's statement that the sleep study reports were sent to Dr. Awerbuch's

13  office and that the sleep study data was also sent to Dr. Sprau's office for her review and interpretation.

14  If, as Mr. Gardner indicated, the sleep study data and reports were sent to the doctors' offices, then it

15  was not particularly suspicious that the doctors were not seen at SDI's corporate headquarters as the

16  affidavit suggested.  Likewise, the affidavit appears misleading in citing Ms. Beglinger's statement that

17  Jack Brunk told her that a 17 year old girl wrote the sleep study reports, without also informing the

18  magistrate judge that Mr. Gardner stated that Mr. Brunk filled in the blank "boilerplate" reports based

19  on the computer data and technician notes and that "a girl" typed up what Mr. Brunk wrote.  There is, of

20  course, a difference between an untrained and unqualified person writing physician reports versus

21  typing up what another has written.  Mr. Gardner's statement would have placed Ms. Beglinger's

22  statement in a different and more benign context.

23          Other alleged omissions raised by Defendants, however, were not inconsistent with the affidavit

24  or significantly misleading.  As described in the affidavit, Ms. Steljes and Ms. Gibaud primarily

25  confirmed Ms. Beglinger's statement that SDI's sleep study reports were poorly drafted and lacked

26  good interpretation.  *Bomstad Affidavit,* ¶ 42, page 28.  This information appears to have been included

27  in the affidavit as circumstantial evidence that the reports were not drafted or reviewed by the

28  physicians.

1    The affidavit indicated that Ms. Steljes and Ms. Gibaud's business relationships with SDI

2   ended in 1999.  *See Bomstad Affidavit,* ¶ 20, pages 18-19.  The affidavit, therefore, did not mislead the

3   court that their information was more current than it was.  The affidavit did not inform the court that

4   Ms. Beglinger was employed by SDI from July 1999 to January 2001.  This information arguably

5   should have been included in the affidavit.  It was not a significant omission, however, because the

6   information that she and Mr. Gardner provided indicated an ongoing practice or conduct by SDI,

7   particularly as it related to the preparation of SDI's sleep study reports.

8    Mr. Gardner indicated that the manner in which Dr. Awerbuch's reports were prepared and

9   signed with a signature stamp had been in place for a substantial time period.  As the Government

10   argues, staleness is evaluated in light of the particular facts of the case and the nature of the criminal

11   activity and evidence sought.  Where the evidence sought relates to an ongoing criminal business or

12   activity, greater lapses of time are permitted.  *See United States v. Dozier*, 844 F.2d 701, 707 (9th Cir.

13   1988); *United States v. Greaney*, 929 F.2d 523, 525 (9th Cir. 1991); and *United States v. Landis*, 726

14   F.2d 540, 542 (9th Cir. 1984).  In this case, the information provided Ms. Beglinger and Mr. Gardner,

15   as well as the more dated information provided by Ms. Steljes, reasonably indicated that SDI's conduct

16   had been ongoing for many years and likely was continuing.

17    Defendants also argue that the affidavit was misleading because it omitted information that both

18   Ms. Steljes and Ms. Gibaud had been involved in litigation with SDI.  The information regarding Ms.

19   Steljes' and Ms. Gibaud's litigation with SDI, if known to the Government, should have been included

20   in the affidavit since it was relevant to their motives and credibility.  *See United States v. Hall*, 113 F.3d

21   157,160 (9th Cir. 1997); *United States v. Stanert*, 762 F.2d at 781.  As discussed herein, Ms. Steljes

22   provided information that was potentially against her own interest, i.e. that while she engaged in a

23   business partnership with SDI, her company participated in performing and billing for sleep studies and

24   cardiac risk assessments that she believed were of questionable legitimacy and which could have also

25   subjected her to charges of fraud.  Such statements against penal interest tend to support the credibility

26   of an informant.  *See United States v. Patayan-Soriano*, 361 F.3d 494, 504 (2004).  Thus, while the

27   magistrate judge would have had more cause to question the reliability of Ms. Steljes based on her

28   litigation with SDI and Kaplan, he would not have been required to totally reject or discount her

17

1   information.  Ms. Gibaud was cited as an informant only one time in the affidavit regarding the quality

2   of SDI's sleep studies.  *Bomstad Affidavit,* ¶ 42, page 28.  Her reported statement was consistent with

3   the information provided by Steljes and Beglinger.  The omission of information regarding her

4   litigation with SDI, if known to the Government, therefore was not critical.

5        The Court also finds that the affidavit did not misrepresent Ms. Beglinger's job title and position

6   as polysomnographer responsible for conducting sleep studies and also training and supervising other

7   technicians.  *See Bomstad Affidavit,* ¶ 20, page 18; *Mumford Declaration*, exhibits 3 and 11.  It appears

8   that Ms. Beglinger's information was based on her technical knowledge and experience in working for

9   SDI for a period of a year and a half, during which time she would reasonably have the opportunity to

10  become familiar with SDI's operations in conducting sleep studies, including the manner in which they

11  were performed and the quality of the resulting sleep study reports.

12       Although the affidavit could have misled the magistrate judge regarding the strength of the

13  Government's evidence, particularly in regard to Ms. Beglinger's assertion that the reports were written

14  by a high school girl and that other SDI employees had never seen these doctors, the Court disagrees

15  with Defendants' assertion that there was not probable cause to believe that Dr. Awerbuch did not

16  interpret the sleep study data or review and sign his reports.  In line with *Stanert's* instruction that the

17  affidavit should tell the "whole story," the Court cannot simply consider that part of the information

18  that Defendants assert should have been included in the affidavit.  The Court must also consider other

19  information relevant to those assertions that place the omitted facts in their proper context and within

20  the totality of the circumstances.

21       The Government had evidence, through Mr. Gardner, that Dr. Awerbuch did not write the

22  boilerplate sleep study reports and that they were actually written by Mr. Brunk who placed Dr.

23  Awerbuch's signature on the reports with a signature stamp.  *See Bomstad Affidavit,* ¶ 44, pages 28-29.

24  During his interview, Mr. Gardner stated that for several years Dr. Awerbuch did all of the SDI sleep

25  study interpretations and reports and, at the time of Mr. Gardner's departure from SDI, still did most of

26  the interpretations for Nevada and all of those in Michigan.  *Mumford Declaration* (#43), exhibit 5.

27  Although Mr. Gardner stated that Mr. Brunk sent the reports to Dr. Awerbuch for review, he did not

28  know whether the doctor actually reviewed them.  *Id.*  There was other evidence that arguably

1    supported a reasonable belief that he did not.  Ms. Steljes, Ms. Gibaud and Ms. Beglinger stated that the

2    SDI reports were of poor quality, lacked analysis and were contradictory in their conclusions –

3    suggesting an absence of actual or competent review of the data by the physician.  *Bomstad Affidavit,* ¶

4    42, page 28.  Ms. Steljes also stated that SDI generated so many sleep study reports that they could not

5    have been reviewed by the physicians.  *Mumford Declaration*, exhibit 6.  Based on these circumstances,

6    the Court finds that if all relevant information had been included in Agent Bomstad's affidavit, there

7    would arguably still have been probable cause to believe that Dr. Awerbuch did not actually interpret,

8    review or approve the sleep study reports that bore his signature stamp.

9        It does not follow, however, that because there may have been probable cause to believe that Dr.

10   Awerbuch's reports were fraudulent, that Dr. Sprau's or other physicians' sleep study reports were also

11   fraudulent.  The only evidence contained in the affidavit that Dr. Sprau did not sign the sleep study

12   reports was Ms. Steljes' statement that she had seen sleep study reports for Dr. Sprau as well as Dr.

13   Awerbuch that appeared to be signed with a signature stamp.  *Bomstad Affidavit,* ¶ 44, pages 28-29.

14   Ms. Steljes' interview statement that she attempted to call Dr. Sprau regarding one patient and was

15   unable to reach her, *Mumford Declaration* (#43), exhibit 6, did not constitute evidence that the doctor

16   did not provide the required medical service.  As discussed above, the fact that Dr. Sprau was not seen

17   at SDI's corporate offices was not significant in view of Mr. Gardner's uncontradicted statement that

18   the data was delivered to her office.  *Mumford Declaration* (#43), exhibit 5.

19       There was no evidence indicating that Mr. Brunk wrote or signed Dr. Sprau's reports.  The

20   affidavit was misleading in omitting Mr. Gardner's statement that he was unaware of whether SDI used

21   a signature stamp for Dr. Sprau and that Dr. Sprau liked to review the raw sleep study data in writing

22   her reports and that she separately billed for her review and interpretation.  *Id.*  Had this information

23   been accurately and completely described in the affidavit, there would not have been probable cause to

24   believe that the reports of Dr. Sprau (or other physicians besides Dr. Awerbuch) were not based on their

25   own review and interpretation of the sleep study data or that they did not actually write, review or sign

26   their sleep study reports.

27       The Court, therefore, finds that Defendants have made a substantial showing that the affidavit

28   was misleading regarding whether the SDI physicians actually wrote, reviewed or signed their reports,

1    or authorized the use of their signature stamps without having actually reviewed and approved the sleep

2    study reports.

3        **2.    Whether The Affidavit Misled the Magistrate Judge Regarding Ms.**
         **Beglinger's Opinion That Many of the Sleep Studies Were Unnecessary.**

4

5        Defendants argue that the affidavit was misleading because it cited Ms. Beglinger's statement

6    that many of the patients scheduled for sleep studies did not need them and some patients had no idea

7    why they were referred to SDI for a sleep study.  *See Bomstad Affidavit*, ¶ 27, page 22.  Defendants note

8    that Ms. Beglinger was not a physician and that the affidavit substituted her opinions for those of the

9    physicians who prescribed sleep studies for SDI patients.  It is not the Court's task, however, to decide

10   whether the magistrate judge incorrectly credited Ms. Beglinger's unqualified medical opinions

11   contained in the affidavit.  The issue is whether the magistrate judge was misled by intentionally false

12   statements or reckless omissions of fact regarding the basis for Ms. Beglinger's statement which if

13   included in the affidavit would have shown that her statement was not supported by a reliable basis.

14        There was no statement or suggestion in Agent Bomstad's affidavit that Ms. Beglinger was

15   qualified to render professional medical opinions or that Ms. Beglinger or any other person had

16   reviewed the patients' medical charts and made a determination that the patients did not need sleep

17   studies.  The affidavit, therefore, was not directly misleading in that regard.  In addition, as the

18   Government argues, the affidavit did not directly misstate Ms. Beglinger's actual statements during her

19   interviews.

20        Agent Bomstad's affidavit, again, provided a very condensed version of the information

21   obtained by the Government regarding a material fact.  The affidavit alleged that SDI's health service

22   coordinators administered the sleep study questionnaires to the patients and, based on the patients'

23   responses, completed physician referral forms for sleep studies to be performed by SDI.  The physician

24   then signed the referral which was forwarded to SDI's corporate headquarters to schedule the sleep

25   study.  *Bomstad Affidavit,* ¶ 27, page 22.  The implication of the affidavit was that the referring

26   physicians simply "rubber-stamped" the referrals prepared by SDI's health service coordinators.  Ms.

27   Beglinger's statement that "many of the patients scheduled for sleep studies did not need them" appears

28   to have been included in the affidavit to give weight to this implication.  Other than Ms. Beglinger's

1   statement, however, the Government apparently had no information regarding the number or percentage

2   of patients who were referred to SDI for unnecessary sleep studies.

3        The Government argues that the information provided by Ms. Beglinger supported the basis for

4   her statement that many of the patients did not need sleep studies.  According to the summary of Ms.

5   Beglinger's February 21, 2001 interview, she stated that SDI performed 63 sleep studies a week in Las

6   Vegas and that 35 of those were conducted at the sleep clinic where she worked.  Ms. Beglinger also

7   stated that she kept a log book of all the patients for whom she conducted sleep studies, which noted the

8   patient's name, age, doctor, type of study and other details.  Sometimes she noted in her log book that

9   the sleep study found no problems, yet the patient would receive a second study.   She also reported that

10  the patient's history and physical were sometimes sent to SDI's corporate offices, but that she never

11  received a copy of the patient's history and physical.  According to the summary, she observed "that

12  many of the patients come to the sleep clinic even though they do not need a sleep study.  Sometimes

13  the patients do not know why they were sent to the sleep clinic."  She also stated that the health service

14  coordinators received bonuses for meeting or exceeding their referral quotas.  Ms. Beglinger stated that

15  of the sleep studies she conducted, approximately 60 percent needed the study.  About 40 percent had

16  no problems and no need for a follow-up study.  *Mumford Declaration* (#43), exhibit 3.

17       As *Stanert,* in quoting *Illinois v. Gates*, states, "sufficient information must be presented to the

18  magistrate to allow that official to determine probable cause: his actions cannot be a mere ratification of

19  the conclusions of others."  762 F.2d at 781.  *Stanert* held that the affidavit in that case was partly

20  misleading where it misstated the informant's opinion and the opinion was based on nothing more than

21  speculation.  By including Ms. Beglinger's opinion in the affidavit, the Government, at minimum,

22  implied that it was based on some reliable foundation.  The information in Ms. Beglinger's interview

23  summary, however, does not show that she had an adequate basis for stating that "many of the patients

24  scheduled for sleep studies did not need them."  First, it is not clear what Ms. Beglinger meant by

25  "many."  According to the interview summary, she estimated that 40 percent of the patients had no

26  problems and no need *for a follow-up study*.  *Mumford Declaration* (#43), exhibit 3.  It is not clear

27  whether Ms. Beglinger actually stated that those patients were not legitimately referred for their initial

28  sleep studies.  Second, there was no evidence that Ms. Beglinger's statement was based on anything

1    more than speculation.  Ms. Beglinger's interview summaries indicated that she did not review the

2    patients' medical charts, and it is at best unclear whether she reviewed the patient questionnaires that

3    would have enabled her to render a founded opinion, albeit not a professional medical opinion, that

4    many of the sleep studies were unnecessary.

5         Defendants have made a substantial showing that the affidavit misled the court into believing

6    that Ms. Beglinger's opinion was based on reliable information.  Given the questionable basis for her

7    opinion, the Government should have disclosed to the magistrate judge the actual information provided

8    by Ms. Beglinger, which the Court finds would not have been sufficient to support probable cause to

9    believe that many patients referred to SDI for sleep studies did not need them.  The Government

10   appeared to have no other evidence to support this assertion.

11         **3.    Whether the Affidavit was Misleading Regarding Ms. Beglinger's**
            **Statements Concerning The Scheduling of Follow-up Sleep Studies.**

12

13        Defendants contend that the statement, attributed to Ms. Beglinger, that "the scheduling of

14   CPAP titration studies depended more on willingness of insurance to cover the procedure than the need

15   of the patients" was misleading.  *See Bomstad Affidavit,* ¶ 27, page 22.  This allegation was somewhat

16   vague but, in the context of the affidavit, reasonably suggested that SDI was performing unnecessary

17   CPAP titration tests.

18        In its *Response* the Government states that the statement in paragraph 27 of the affidavit was

19   incorrectly attributed to Ms. Beglinger, and that this information was in fact provided by SDI's former

20   sales manager, Randy Lollar.  According to the Government, Mr. Lollar reported that out of 212 sleep

21   studies a month, about 22-25 CPAP setups were done.  Mr. Lollar stated that in theory the referring

22   physicians should have the reading of the first sleep study before referring the patient for a second study

23   or titration study.  Mr. Lollar reported, however, that technicians were told that if the insurance

24   company approves the CPAP, they were "to set up the unit" regardless of the status of the second study.

25   *Government's Response*, page 12.   Mr. Lollar's reported statement, however, does not indicate how

26   many of the 22-25 CPAP setups actually resulted in the tests being conducted or whether those tests

27   were conducted only after the results of the first sleep study were known.  Arguably, it would not be

28   fraudulent to schedule a procedure so long as it was not conducted before the physician received the

1   results of the sleep study and prescribed CPAP titration studies.  At most, premature scheduling of

2   CPAP titration studies might be some indication that the results of the first sleep study were perfunctory

3   to conducting CPAP titration studies.

4          An inadvertent or negligent mistake in an affidavit is not grounds for a *Franks* hearing.

5   Defendants and the Court are, however, entitled to production of Mr. Lollar's interview summary to

6   confirm that it contains the information represented by the Government.  It appears to the Court that the

7   affidavit may have been misleading in suggesting to the magistrate judge that unnecessary CPAP

8   titration studies were routinely performed by SDI.  The Court will defer making findings on whether the

9   Defendants can make a substantial showing of reckless omissions in regard to this issue, however, until

10  it has reviewed Mr. Lollar's interview summary.

11         **4.      Whether the Affidavit Was Misleading Regarding Ms. Beglinger's
            Statement That the Equipment Used by SDI to Collect Sleep Study Data
12          Was Not Designed For Continuous Monitoring and Rarely Worked.**

13  The affidavit stated:

14         The equipment used by SDI collects the data on a flash card, and was not
           designed for continuous monitoring during the study.  Beglinger and
15         Gardner advised that Robert KAPLAN, Todd KAPLAN's brother and
           SDI's computer expert, connected laptop computers to the equipment so
16         the sleep studies could be monitored.  Beglinger advised that this system
           rarely worked.  *Bomstad Affidavit,* ¶ 41, pages 27-28.

17

18         Defendants argue that this statement was misleading because Ms. Beglinger had no basis for her

19  statement that "the system rarely worked" and the affidavit omitted the contradictory information

20  provided by Mr. Gardner that SDI was "well-equipped" to provide continuous monitoring of sleep

21  studies and cardiac risk assessment tests.

22         Ms. Beglinger stated that the equipment used by SDI for sleep studies was all portable and, in

23  her opinion, was intended for one or two hour screenings rather than a full eight hour sleep study.  She

24  stated that the same equipment was used in sleep labs, hotel rooms and homes where the studies were

25  performed.  Ms. Beglinger further stated that the sleep study equipment was not designed for full time

26  monitoring by a technician.  *Mumford Declaration* (#43), exhibit 11.  A computer person at SDI hooked

27  a cable to the sleep study equipment that interfaced with a laptop computer, which allowed the

28  technician to monitor the data during the study.  She reported, however, that the cable to laptop system

1  rarely worked and, therefore, most of the sleep studies done by SDI were not really monitored.  *Id.*  The

2  Court does not read Ms. Beglinger's following statement that: "SDI did do the full sleep study as

3  described in the CPT code book for codes 95810 and 95811" as a retreat from her statement that the

4  laptop system rarely worked and that most of the sleep studies were not really monitored.  *Id.*

5         Ms. Beglinger was a registered polysomnographer, who conducted sleep studies for SDI and

6  also trained and supervised other sleep study technicians.  It is reasonable to infer that she had personal

7  knowledge regarding the equipment that SDI used to conduct sleep studies and whether it actually

8  functioned.  Again, the troubling part of the affidavit is that the Government credited Ms. Beglinger's

9  general statement that the "system rarely worked" without apparently exploring the basis for Ms.

10 Beglinger statement  –  especially given the fact that the Government apparently had no other

11 information to support the allegation that the computer monitoring system rarely worked.

12        According to Mr. Gardner, the sleep study equipment was made by an Australian company.  The

13 equipment was reasonably portable and "they had large boxes used to transport the equipment."  He

14 stated that there was a box that contained the hardware and leads from that box that hooked to the

15 patient.  A laptop computer was used to monitor the data.  "It was his understanding that technicians are

16 able to monitor the studies on the laptop screen."  He also stated that there were roving technical

17 supervisors to assist with the studies.  According to the summary, Mr. Gardner stated that "[h]e has

18 heard there are 'old school' sleep study professionals who feel if you are not using large equipment that

19 generates large stacks of paper, then you are not doing it right."  *Mumford Declaration* (#43), exhibit 4.

20        As the Government notes in its *Response* (#56), Mr. Gardner did not actually state that SDI was

21 "well-equipped."  Nor did he directly contravene Ms. Beglinger's statement that the laptop computer

22 hook-up rarely worked.  Nor is it clear from his statement that he had any direct or specific knowledge

23 whether the laptop computer connections did or did not work.  His statements, however, at least,

24 suggest that contrary to Ms. Beglinger's statement, SDI had procedures in place, including technical

25 supervision, which allowed the sleep studies to be monitored through the laptop computer.  Given the

26 questionable foundation for Ms. Beglinger's opinion that "the system rarely worked," the affidavit

27 should have disclosed both Ms. Beglinger's and Mr. Gardner's statements relating to this issue.  In light

28 of the affidavit's reliance on other arguable misleading statements by Ms. Beglinger, however,

1  Defendants should not be precluded from exploring this issue during an evidentiary hearing.

2      **5.      Whether the Affidavit Was Misleading Regarding Ms. Beglinger's
             Statements Concerning the Quality of SDI's Sleep Study Reports.**
3

4          Defendants argue that Ms. Beglinger's statement that SDI reports were of much poorer quality

5  than the reports from other sleep study companies and lacked good analysis was not reliable and should

6  not have been included in the affidavit.  *See Bomstad Affidavit,* ¶ 42, page 28.  Ms. Beglinger was a

7  registered polysomnographer and, in that capacity, was competent to express an opinion regarding the

8  quality of SDI's reports compared to others she had read. It does not require a physician to render a

9  reliable opinion that a medical report lacks good quality in comparison to studies produced by other

10 clinics – where the person expressing the opinion has both technical competency and experience in

11 reviewing and understanding such reports.   Unlike other opinions by Ms. Beglinger cited in the

12 affidavit, she was not the "sole source" of this information.  Her opinion was supported by Ms. Steljes

13 and Ms. Gibaud.  *Id.*

14         Defendants' argue that the affidavit should have disclosed that the Government had no evidence

15 that the referring physicians complained about the quality of SDI's reports.  The absence of such

16 evidence, however, did not render Ms. Beglinger's, Ms. Steljes' or Ms. Gibaud's statements unreliable.

17 The absence of physician complaints could have varying explanations, including: (1) that there were no

18 such complaints because the reports were, in fact, of good quality; (2) physician complaints were made,

19 but were not provided to the informants, or (3) referring physicians did not complain because they were

20 beneficiaries of the fraudulent scheme.  All of these explanations are speculative.  The important point

21 is that the magistrate judge was not misled because he could have readily inferred that the Government

22 had no evidence that referring physicians complained about the quality of the reports.  The affidavit,

23 therefore, was based on reliable information provided by Ms. Beglinger, Ms. Steljes and Ms. Gibaud

24 regarding the quality of the SDI reports.  Defendants have failed to show that the Government omitted

25 relevant information contradicting this statement.

26     **6.      Whether the Affidavit Was Misleading in Failing to Disclose Ms. Steljes'
             Statement that SDI Was Operated Consistent With Advice of Its Counsel.**
27

28         Defendants argue that the Government recklessly omitted Ms. Steljes' statement that the legality

1  of SDI's operations was supported by legal opinions "from a Chicago attorney."  Defendants argue that

2  evidence that SDI had legal opinions supporting its conduct should have been provided to the court

3  because health care fraud is a scienter crime and such evidence would have negated probable cause to

4  believe that SDI was engaging in fraud.

5        According to Ms. Steljes' interview summary, three to four months after entering into her

6  partnership with SDI, Defendant's officers tried to get her to do cardiac risk assessments, including

7  Holter monitoring on all sleep study patients.  Ms. Steljes informed SDI's officers that she was not

8  convinced of the legitimacy of this and she told SDI that she needed more time to review the issue.

9  When she was out of the office, however, SDI brought in the equipment and started doing the cardiac

10  risk assessments.  Ms. Steljes also stated that she informed SDI that a Holter monitor could not be done

11  without prior authorization.  Later when she asked to see the authorizations, SDI's officers admitted

12  that they did not have authorizations for the Holter monitors and that SDI did the Holter monitor based

13  on the authorization for the sleep studies.  According to the summary, Steljes told SDI that they could

14  not do that and that she would have to speak with her contractors and insurance companies to get

15  authorizations for the Holter monitors.  Ms. Steljes told SDI that they would have to stop using the

16  Holter monitors and she instructed her staff not to use Holter monitors without her permission.  She

17  stated that this caused friction with SDI.  *Mumford Declaration* (#43), exhibit 6.

18        Ms. Steljes further stated that Mr. Kaplan, Mr. Brunk and another SDI employee, Mr. Parry,

19  explained to her the importance of doing the cardiac risk assessments as the means to get the physicians

20  to refer their patients to SDI for sleep studies, by billing for the professional review of the cardiac risk

21  assessments.  Kaplan, Brunk and Parry "said that in this day and age with so many cutbacks in medical

22  payments, it is a way for the doctors to make more money."  Steljes reportedly continued to argue with

23  Kaplan about this idea and she stated that she did not understand how all three groups, SDI, the

24  referring physicians and the cardiac diagnostic company, could bill for the cardiac risk assessments.  *Id.*

25        According to the summary, Steljes stated that "they," i.e. Kaplan, Brunk or SDI, showed her a

26  presentation from a booklet with plastic pages, documents and a letterhead opinion from a Chicago

27  attorney.  They showed this presentation to her twice, and Steljes stated that "it was so good that she

28  was almost convinced that the cardiac risk assessments were legitimate."  However, even though they

showed her a legal opinion indicating that the cardiac risk assessments are legal, "in the fine print, they place responsibility back on the doctors." Steljes also reported that doctors who had seen the presentation told her the cardiac risk assessment and their ability to bill for it was presented to them as totally legal. It appears from Ms. Steljes' statement that despite being shown this presentation, she was still not convinced that conducting and billing for the cardiac risk assessments was legitimate. *Id.*

Mr. Gardner stated that while he was employed at SDI, there was an ongoing concern and discussion regarding the legitimacy of how they were billing for the 24 hour Holter monitor. *Bomstad Affidavit*, ¶ 30, pages 23-24. According to Gardner, everyone knew a Holter monitor test was supposed to be 24 hours, and SDI was only doing them for six to eight hours of the sleep study. Gardner indicated that a female consultant was hired to provide an answer to this question. It took weeks to get an answer and even then the answer was not clear. *Mumford Declaration* (#43), exhibit 4. Mr. Gardner was employed by SDI during 1999 and 2000, which included a time period substantially after Steljes' relationship with SDI ended. It therefore appears from his statement that there was an ongoing concern regarding billing for the 24 hour Holter monitor even after Steljes was reportedly shown the presentation prior to terminating her relationship with SDI in 1999.

Arguably, the affidavit should have contained the foregoing information in order to "tell the whole story." *Stanert, supra.* The information provided by Steljes, however, was not a straightforward statement that she was shown legal opinions demonstrating the legality of SDI's conduct. Her statement instead indicates that throughout her partnership with SDI, she harbored substantial doubts about the legality of its conduct. Mr. Gardner's statement also tends to counter the assertion that SDI was operating in the belief that its practices were lawful based on prior legal opinions it had obtained. If this information had been included in the affidavit, there still would have been probable cause to believe that SDI's conduct in billing for the 24 hour Holter monitor and cardiac risk assessments was fraudulent notwithstanding that it may have obtained legal opinions supporting the alleged legality of its conduct.

### 7.   Whether the Affidavit Contained Material Omissions Regarding SDI's Physician Enhancement Program.

Defendants argue the affidavit contained deliberate or reckless misstatements and omissions

1   regarding SDI's physician enhancement program.  According to the affidavit, SDI's literature

2   "recommended" that the referring physicians bill the professional component of the cardiac risk

3   assessments when they use the services of SDI.  *Bomstad Affidavit,* ¶ 26, pages 21-22.  SDI

4   "instruct[ed]" the referring physicians to bill the professional component, physician review and

5   interpretation, for each of the cardiac diagnostic tests, and SDI "recommend[ed]" that the physicians

6   bill $250 for each of the three procedures.  *Id.* ¶ 29, page 23.  The affidavit alleged that the physicians,

7   however, did not perform, analyze or interpret the tests.

8        Defendants argue that these allegations were misleading because SDI only made "suggestions"

9   to the referring physicians regarding billing for review of the cardiac risk assessments and because the

10   Government had copies of contracts between SDI and referring physicians which stated that SDI did not

11   guarantee the legality of its recommendations and that it was the sole responsibility of the physicians to

12   assure that their billings complied with applicable regulations.  *See Mumford Declaration* (#43), exhibit

13   4, attaching contract documents apparently provided by Mr. Gardner.

14        There is no material difference between SDI making a "recommendation" as opposed to a

15   "suggestion" to the referring physicians regarding how or in what amounts they should bill for

16   professional review of the cardiac risk assessments.  Obviously, an "instruction" could be materially

17   different from a "recommendation."  However, in the context of the affidavit, the statement that SDI

18   "instructs" referring physician to bill the professional component would not have reasonably misled the

19   magistrate judge.

20        Nor did the omission of information that the SDI's physician contracts expressly disavowed any

21   guarantee by SDI reasonably mislead the magistrate judge.  First, the affidavit did not allege that SDI

22   falsely guaranteed to the physicians that they could lawfully bill for these services.  Second, the court

23   could reasonably infer that the physicians were responsible for the legality of their own billings

24   regardless of whatever advice or recommendation they received from SDI.  Third, the fact that SDI

25   absolved itself from any guarantee regarding its recommendations did not absolve it from responsibility

26   if it knew that the cardiac risk assessment tests were fraudulently performed and improperly billed by

27   the cardiac diagnostic companies.  The Court therefore finds that the affidavit was not misleading,

28   either in its phrasing or by omission of the information in the contracts.

28

1

2

    **8.**    **Whether the Affidavit Deliberately or Recklessly Misrepresented the Billing Data Reviewed by the Government.**

3

4

5

6

7

8

9

10

11

12

    The affidavit alleged that Ms. Beglinger told SDI that it could not bill for a 24 hour Holter monitor when it was used only for the duration of the six to eight hour sleep study.  She was informed by SDI that it used a special instructional code in its billings to account for the reduced services, i.e. a six to eight hour use of the Holter monitor as opposed to the standard code for billing a 24 hour Holter monitor.  *Bomstad Affidavit*, ¶ 30, pages 23-24.  Mr. Gardner also stated that he was informed by SDI that it billed a modified CPT code for the Holter.  *Id.*  According to the affidavit, a "52" modifier can be used to bill for reduced services.  The Government's consultant, Dr. Fong, advised that such a modifier with Medicare claims would automatically result in a manual review of the claim.  The affidavit stated that a "review of billing data shows that SDI did not use any modifier codes when billing Medicare." *Id.*

13

14

15

16

17

18

19

20

21

22

    Defendants allege that the affidavit was misleading because the Government did not review the actual billing data transmitted by SDI to Medicare or other insurers, but instead reviewed only "insurance claims data" and that there may have been discrepancies between how SDI actually billed its services and what was reflected in the insurance claims data.  Defendants have not demonstrated, however, that there actually were any such discrepancies.  Nor have Defendants produced any evidence that the Government was in possession of SDI's actual billing data such that it knew or should have known that SDI's CPT codes on its billing data differed (if it did) from what was reflected in the insurance claims records.  Such speculative allegations do not justify an evidentiary hearing under *Franks*.  Defendants have failed to demonstrate that the Government made any misleading statement or omitted relevant information from the affidavit sufficient to support a hearing on this ground.

23

24

    **9.**    **Whether the Affidavit Falsely Asserted that the Cardiac Risk Assessments Were Not Performed.**

25

26

27

28

    Defendants argue that the affidavit's assertion that the cardiac risk assessment tests were "not performed," *Bomstad Affidavit*, ¶ 28, pages 22-23, was false and misled the magistrate judge.  The assertion that these tests were "not performed" must be viewed in the context of the allegations in the affidavit.  Although the affidavit cited Ms. Beglinger's statement that she did not know whether patients

1   ever received the HRV and SAEGG (two of the three cardiac risk assessment tests), the affidavit also

2   cited Mr. Gardner's statement that Dr. William Shell of Beverly Glenn Medical Systems, one of the

3   cardiac diagnostic companies allegedly analyzing the Holter tapes, told him that a sophisticated

4   computer program was able to extract the data needed for the HRV and SAEGG tests from the Holter

5   tape recorded during the sleep study. *Id.,* ¶ 31, page 24.

6        The Government's affidavit alleged that this was not a medically legitimate method for

7   conducting cardiac risk assessment tests.  The Government's medical consultants, Drs. Mangold and

8   Lurvey, advised that HRV and SAEGG tests could not be conducted while the patient is asleep because

9   they require the patient to engage in certain volitional physical activities which need to be correlated

10  with data from the Holter monitor tapes.  *Bomstad Affidavit,* ¶ 32, page 24.  The affidavit cited Ms.

11  Beglinger's statement that sleep study patients were not required to perform these activities.  *Id.*  The

12  Government alleged that a Holter monitor test cannot be billed in conjunction with a sleep study

13  because the sleep study CPT billing code contains its own cardiac parameter.  *Id.,* ¶ 33, pages 24-25.

14  The affidavit also alleged that the Government's medical consultants advised that Medicare will only

15  authorize SAEGG after significant cardiac events such as a myocardial infarction.  *Id.*  The

16  Government's consultant, Dr. Fong, advised that HRV and SAEGG are not very predictive and are not

17  useful as screening tests.  *Id.*  The affidavit also alleged that these tests were not properly conducted or

18  billed because the patients were only attached to the Holter monitor for 6-8 hours during the sleep

19  study, rather than 24 hours as billed.  SDI and the cardiac diagnostic companies did not use any

20  modifier to show a reduced number of hours billed for these tests.  *Id.,* ¶ 34, page 25.  Finally, the

21  Government alleged that SDI and the cardiac diagnostic companies falsified their bills to indicate that

22  the cardiac risk assessments and sleep studies were done on different dates so that the billings would

23  not be rejected by the patients' insurers.  *Id.*, ¶ 40, page 27.  It was in this sense that the affidavit alleged

24  that the cardiac risk assessment tests were "not performed."

25        Although the affidavit cited Mr. Gardner's statement that Dr. Shell explained that his company's

26  sophisticated software was able to generate the information needed for the cardiac diagnostic tests,

27  Defendants argue that the affidavit misled the court that this was an improper method for conducting

28  the cardiac risk assessment tests.  In its *Response,* the Government argues that Dr. Shell and his

1   company were suspected participants in the fraudulent scheme and it was, therefore, unnecessary for the

2   Government to accept the legitimacy of Dr. Shell's reported statements.  In any event, the affidavit was

3   not misleading because Dr. Shell's reported explanation to Mr. Gardner was included in the affidavit.

4          Defendants also argue that the affidavit should have included Mr. Gardner's affirmative

5   statement that the tests were "all performed."  Omission of this statement in the affidavit, however, was

6   not material.  The affidavit was not inconsistent with the assertion that the cardiac risk assessment tests

7   were "performed" in a manner understood by Mr. Gardner based on his conversation with Dr. Shell.

8   The issue addressed in the affidavit was whether the manner in which these tests were performed was

9   legitimate.  Inclusion of Mr. Gardner's statement would not have altered the probable determination on

10  this point.

11         Defendants also argue that the billing recommendations that SDI sent to referring physicians

12  explaining the benefits of the cardiac risk assessment tests and advising them how to bill for their

13  professional review of these tests should have been discussed in the affidavit.  *See Mumford*

14  *Declaration* (#43), exhibit 4, attaching contract documents apparently provided by Mr. Gardner.  The

15  information contained in this document does not rebut the opinions of the Government's consultants

16  that these tests were not legitimately performed and its inclusion in the affidavit would also not have

17  altered the probable cause determination.   The magistrate judge would still have been able to conclude

18  that there was probable cause based on the affidavit's statements regarding the opinions of the

19  Government's consultants that the cardiac risk assessments were not medically necessary or performed

20  or billed in a legitimate manner.

21         Defendants argue that Dr. Shell's reported statements to Mr. Gardner "is corroborated by almost

22  a decade of medical industry practice."  *Defendant's Reply* (#68), page 16, n.12.  The Court has

23  reviewed the documents attached to the *Supplemental Declaration of Mark S. Hardiman In Support of*

24  *Defendants' Motion for a Franks Hearing* (#48) but cannot determine therefrom that the assertions

25  made in the affidavit are clearly contrary to the medical standards for performing such tests or the

26  Medicare requirements for validly billing for such services.  Defendants have not cited any specific

27  provisions set forth in these attached documents which clearly demonstrate the validity of the tests and

28  SDI's or the cardiac diagnostic company's billings for these tests.

1   The Court finds that Defendants have failed to make a substantial showing of either

2   intentionally false statements or reckless omissions in regard to the affidavit's allegation concerning the

3   legitimacy of the cardiac risk assessment tests.

4   **10.   Whether the Affidavit Was Misleading Because it Relied On the Opinions of Unqualified Medical Consultants.**

5

6   Defendants argue that the affidavit was misleading because the Government's three medical

7   consultants, Drs. Mangold, Lurvey and Fong, were not qualified to render opinions about the validity of

8   the cardiac risk assessment tests.  Defendants argue that Dr. Mangold is a plastic surgeon with no

9   apparent experience in the medical issues set forth in the affidavit.  Likewise, Defendants contend that

10  Dr. Lurvey is an endocrinologist and metabolism expert with no apparent experience in sleep studies or

11  the treatment of sleep apnea.  While Dr. Fong is a cardiologist, Defendants contend that he has no stated

12  knowledge or experience regarding sleep studies and the documented links between sleep apnea and

13  cardiac disease.  The Government responds that Dr. Mangold, Dr. Lurvey and Dr. Fong are well

14  qualified Medicare Consultants who are competent to express opinions on the medical issues and

15  billing procedures described in the affidavit.

16  It would, of course, be improper for the Government to submit an affidavit in support of an

17  application for a search warrant that was based on opinions by experts or other persons whom the

18  Government knows are not qualified and whose opinions are false.  The Court is also mindful,

19  however, that its task on a motion pursuant to *Franks v. Delaware* is not to decide whether the affidavit,

20  as presented to the magistrate judge, supported a finding of probable cause.  Arguably, the issuing

21  magistrate should have required the Government to more clearly demonstrate the qualifications and

22  basis for its consultants' opinions before he issued the search warrant.  The magistrate judge's arguable

23  failure to do so, however, does not justify this Court in ordering an evidentiary hearing pursuant to

24  *Franks* unless a substantial showing has been made that the magistrate judge was misled by the

25  consultants' opinions which the Government knew were false or should have known were false but for

26  its reckless disregard for the truth.

27  Although the affidavit contained little information regarding the qualifications of Dr. Mangold,

28  Dr. Lurvey or Dr. Fong, no evidence has been presented to the Court that these consultants were not

1   qualified to express their opinions or that the Government knew that they were not qualified.  Likewise,

2   no evidence has been presented that their opinions were so clearly wrong that the Government could not

3   have honestly relied on them in the affidavit.  In *United States v. Johns*, 851 F.2d 1131 (9th Cir. 1988),

4   for example, the court held that defendant had made a substantial showing that an officer's statement in

5   the affidavit was false where the defendants produced affidavits from two qualified expert witnesses

6   stating that it was *scientifically impossible* for the officer to have made the observations set forth in the

7   affidavit.

8        Here, Defendants have made no such showing.  Although Defendants state in their motion that

9   the Government could have easily verified the legitimacy of the cardiac risk assessment tests,

10  Defendants have not produced evidence akin to that in *Johns, supra,* to support their assertions.  The

11  Court therefore finds that Defendants have not made a substantial showing that the opinions of the

12  Government's consultants were without sufficient basis such that the Government submitted them

13  falsely or with reckless disregarded for the truth in order to mislead the magistrate judge.

14       Defendants also argue that the affidavit should have included Ms. Beglinger's statements

15  regarding the utility of using the 24 Holter monitor in conjunction with the sleep studies.  Ms. Beglinger

16  statements, however, were critical of the use of the Holter monitor.  She stated that the Holter monitor

17  was being overused, was being used on all patients and that she *did not know* how medical necessity

18  was being established for such extensive use of the Holter monitor.  Ms. Beglinger also stated that she

19  was not involved in the performance of the cardiac risk assessment tests on sleep study patients.

20  *Mumford Declaration* (#43), exhibit 3.

21       As stated previously, the Court agrees with Defendants' argument that Ms. Beglinger's opinion

22  that many patients did not need sleep studies was not supported by a reliable foundation and that the

23  basis for her opinion, or the lack thereof, should have been included in the affidavit so that the

24  magistrate judge could have made his own determination regarding its reliability.  By the same token,

25  Defendants cannot reasonably argue that Ms. Beglinger's statements regarding the use of Holter

26  monitors should have been included in the affidavit as a potential rebuttal of the opinions of the

27  Government's medical consultants.  There is no evidence that Ms. Beglinger's opinions, for or against

28  the use of the Holter monitors, were reliable.  Ms. Beglinger's statements, therefore, would not have

33

1   negated the opinions of the Government's medical consultants.

2          **11.     Whether the Affidavit Contained Reckless Omissions of Fact Regarding the
3          Allegations of Tax Evasion and Tax Fraud.**

4          The affidavit also alleged that there was probable cause to believe that SDI and Todd Kaplan

5   had engaged in tax evasion. The affidavit listed Todd and Denise Kaplan's adjusted gross income and

6   total tax liability on their Federal Income Tax 1040 forms for the years 1996 through 2000. *Bomstad*

7   *Affidavit,* ¶ 47, page 29.  In the years 1996, 1998 and 1999, the Kaplans reported a negative adjusted

8   gross income and paid no taxes.  In 1997 the Kaplans reported adjusted gross income of $31,679 and a

9   tax liability of $524.  The Kaplans also claimed the earned income tax credit for low income taxpayers

10  in 1999 and received a tax refund based on that credit.  In 2000, the Kaplans reported gross income of

11  $69,867 and a tax liability of $2,119.  *Id.*  According to the affidavit, other IRS records show that Mr.

12  Kaplan reported $137,833 in wages for 2000.  *Bomstad Affidavit,* ¶ 48, page 30.  Mr. Gardner stated,

13  however, that Todd Kaplan was paid $15,000 per month by SDI during 2000 and, therefore, should

14  have reported salary of at least $180,000 for that year.  *Id.*  Defendants do not rebut this assertion with

15  contrary evidence omitted by the Government.

16         In their Motion and Reply Briefs, Defendants argue that the tax returns show that Mr. and Mrs.

17  Kaplan had significant fluctuations in their non-SDI related business income and losses which reduced

18  their adjusted gross income by at least $230,459 for the years 1996-2000 and created carryover losses

19  that had a great impact on the Kaplans' tax liability from year to year.  In its affidavit, however, the

20  Government cited credit applications and financial statements that the Kaplans provided to automobile

21  finance companies and banks during these same years in which they represented that their monthly or

22  annual income was substantially greater than the gross salary or wages reported on their tax returns.

23  *See Bomstad Affidavit*, ¶¶ 57, 59, 60, 61, page 32.  Even assuming that the Kaplans's adjusted gross

24  income during these years was reduced by carryover losses, there appears to have been probable cause

25  to believe that the Kaplans were significantly under-reporting their gross salary or wages to the IRS.  It

26  may be that the Kaplans, instead, lied to their lenders about their gross income.  There was, however,

27  probable cause for the Government to believe that the Kaplans were misreporting their actual gross

28  income on their tax returns.

1    The Defendants argue that the Government's reliance on information regarding the Kaplan's

2  purchase of luxury automobiles in 2001 and their representations on credit applications for the purchase

3  of those automobiles was misleading because the Kaplans sold their interest in a company, Spectramed,

4  in 2001 which greatly increased their income for that year and explains their significant automobile

5  purchases that year.

6    The Government argues, however, that it had no knowledge of this sale, because the Kaplans'

7  2001 tax return was not filed until after the application for the search warrant.   The Government argues

8  that it cannot be charged with omitting information of which it had no knowledge.  The Government's

9  argument is supported by the fact that the search warrant application was made in late January 2002 and

10  the Kaplans' 2001 tax return was not dated, and presumably was not filed, until March 27, 2002.  *See*

11  *Mumford Declaration* (#43), exhibit 17.  Therefore, although the Government may have erroneously

12  assumed that the Kaplan's automobile purchases in 2001 were based on unreported income they

13  received in prior years, there is no evidence that the Government recklessly omitted contrary

14  information that would have provided a legitimate explanation for these purchases.  The Government's

15  apparent error in believing that the purchase of these automobiles was inconsistent with the Kaplans'

16  prior reported income would be more significant if the Kaplans' credit applications and financial

17  statements in the preceding years 1999, 1998, and 1996, *Bomstad Affidavit*, ¶¶ 57-60, page 32, had not

18  indicated that the Kaplans claimed substantially greater monthly and annual income than they reported

19  on their tax returns.

20    The Court finds unpersuasive Defendants' arguments that the Kaplans' automobiles were

21  purchased by SDI rather than by the Kaplans, individually.  First, as the Government notes, the credit

22  applications were in the Kaplans' individual names.  Secondly, as the Government argues, if the

23  automobiles were purchased by SDI for the Kaplans' use, this should have also been reflected as

24  income to them on their tax returns.  Similarly, the Defendants have provided no information to suggest

25  that SDI made loans or advances to Mr. Kaplan in lieu of salary, which he then erroneously reported as

26  salary on his credit applications and financial statements.  Even assuming that Mr. Kaplan can justify

27  these assertions in defense to the indictment charging him with tax evasion, these assertions do not

28  defeat probable cause at the time the search warrant application was made.

1    The affidavit also alleged that SDI significantly under-reported its gross sales on its 2000 tax

2    return.  According to the return, SDI reported $9,139,283 in gross sales. The affidavit states, however,

3    that SDI submitted a report to Dun & Bradstreet for the period ending December 31, 2000 which listed

4    its gross sales as $10,640,545, thus indicating that SDI under-reported its 2000 income by

5    approximately $500,000.  *Bomstad Affidavit,* ¶¶ 64-65, page 33.  Defendants have not responded to this

6    information.

7    The affidavit also stated that SDI was required to withhold and pay to the IRS employee taxes

8    and file quarterly IRS statements for employment withholding taxes.  The affidavit alleged, however,

9    that SDI did not file quarterly 941 forms or pay employee withholding taxes as required during 1996-

10   2000.  Finally, the affidavit stated that Todd Kaplan incorporated Comprehensive Cardiac Care as a

11   corporation in 2000.  The affidavit alleges, however, that no corporate income tax return was filed for

12   this corporation in 2000 as required by law.  *Id.,* ¶67, page 34.

13   Defendants claim that the Government was on notice that SDI used an employee leasing

14   company which may explain why SDI did not file employee tax withholding forms or pay withholding

15   taxes for its employees.  *Defendants' Motion* (#43), page 25, n. 11.  The affidavit, however, indicates

16   that SDI did not file any forms or pay any withholding taxes for *any* employees during the tax years

17   referenced in the affidavit.  *See Bomstad Affidavit,* ¶ 66, page 33.  The Court has not been presented

18   with any information that all of SDI's employees, including management personnel such as Mr. Kaplan

19   were "leased employees" or, if so, that the Government was aware of this.

20   The Court, therefore, concludes that Defendants' assertions of material omissions in the

21   affidavit regarding the allegations of tax evasion are without merit.

22                                          **CONCLUSION**

23   The Court finds that Defendants have failed to make a substantial showing that the affidavit was

24   so riddled with pervasive misrepresentations or omissions of material facts that the search warrant

25   should be suppressed in its entirety.  As set forth above, the Court finds that Defendants have failed to

26   make a substantial showing that the affidavit contained material misstatements or omissions regarding

27   the allegations of tax evasion or tax fraud.  Defendants are, therefore, not entitled to a *Franks*

28   evidentiary hearing regarding the validity of the search warrant on that issue.

1    The Court also finds that Defendants have failed to make a substantial showing that the affidavit

2    contained misstatements or reckless omissions that if corrected and supplemented, would not have

3    provided probable cause to believe that SDI and Kaplan engaged in health care fraud in regard to

4    performing and billing for unnecessary and improperly performed cardiac risk assessment tests.

5    Defendants are, therefore, also not entitled to a *Franks* evidentiary hearing regarding the validity of the

6    search warrant on that issue.

7    The Court finds, however, that Defendants have made a substantial showing of

8    misrepresentations or omissions of material information regarding the Government's allegations that

9    the sleep studies performed by SDI were fraudulent that would justify partial suppression of the search

10   warrant if the Defendants meet their burden of proof at a *Franks* hearing.  In this regard, Defendants

11   have made a substantial showing that the affidavit was misleading and omitted material information

12   regarding whether Dr. Susan Sprau or other SDI physicians drafted, reviewed, or signed the sleep study

13   reports bearing their signatures or signature stamps.  Had the information been disclosed in the

14   affidavit, there would not have been probable cause to believe that Dr. Sprau or other SDI physicians,

15   except Dr. Awerbuch, did not draft, review or sign their sleep study reports.

16   The Court also finds Defendants have made a substantial showing that the affidavit was

17   misleading and omitted material information regarding whether there was probable cause to believe that

18   patients referred to SDI for sleep studies did not need them based on the opinion of Erin Beglinger.

19   Standing alone, the evidence is less clear that Defendants have made a substantial showing that the

20   affidavit omitted material information regarding the reliability or basis for Ms. Beglinger's statement

21   that SDI's computer monitoring system rarely worked.  This allegation, however, is relevant to the

22   Government's allegation regarding whether the SDI physicians reviewed the sleep study data prior to

23   drafting, reviewing or signing their reports and is also arguably relevant to whether patients were

24   referred to SDI for unnecessary sleep studies.  The Court will, therefore, permit Defendants to examine

25   the affiant and/or other governmental agents regarding whether the Government misrepresented or

26   omitted material information from the affidavit regarding this allegation.  The Court defers its finding

27   as to whether the affidavit was misleading or omitted relevant information regarding the allegation in

28   the affidavit that the "scheduling of CPAP titration sleep studies depended more on willingness of

1  insurance to cover the procedure than [the] need of the patients," pending production of Mr. Lollar's

2  interview summary.  *Bomstad Affidavit,* ¶ 27, page 22

3       The Court further finds and recommends that at the evidentiary hearing in this matter,

4  Defendants may examine Agent Bomstad or other Government officers upon whose information Agent

5  Bomstad relied in the affidavit regarding the allegations that the affidavit was misleading or omitted

6  material factual information regarding the fraudulent nature of SDI's sleep study reports.  Defendants

7  are not entitled to call as witnesses any of the non-governmental employee informants including, but

8  not limited to, Erin Beglinger, Randy Lollar, John Gardner, Darlene Steljes, Christine Gibaud or the

9  medical consultants, Dr. Mangold, Dr. Lurvey or Dr. Fong.  Such non-governmental employee

10 informants are not subject to impeachment regarding the truthfulness or reliability of their statements

11 and, accordingly, are not proper witnesses at an evidentiary hearing pursuant to *Franks v. Delaware,*

12 *supra.*

13 **<u>RECOMMENDATION</u>**

14      **IT IS RECOMMENDED** that  Defendants SDI Future Health, Inc.'s Todd Kaplan's and Jack

15 Brunk's Motion for a *Franks* Hearing (#42) be **GRANTED**, in part, and **DENIED**, in part, in

16 accordance with the preceding findings and conclusion.

17      It is further recommended that the Government be required to produce to Defendants and to the

18 Court, the interview summary of informant Randy Lollar.

19 **NOTICE**

20      Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in

21 writing and filed with the Clerk of the Court within ten (10) days.  The Supreme Court has held that the

22 courts of appeal may determine that an appeal has been waived due to the failure to file objections

23 within the specified time.  *Thomas v. Arn*, 474 U.S 140, 142 (1985).  This circuit has also held that (1)

24 failure to file objections within the specified time and (2) failure to properly address and brief the

25 objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues

26 . . .

27 . . .

28 . . .

1   from the order of the District Court. *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi*

2   *Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

3         DATED this 25th day of August, 2006.

4
5                                              _____
                                             GEORGE FOLEY, JR.
6                                            UNITED STATES MAGISTRATE JUDGE

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28