1
2
3
4
5
6
7                           **UNITED STATES DISTRICT COURT**

8                                **DISTRICT OF NEVADA**

9

10   UNITED STATES OF AMERICA,                )
                                              )
11                          Plaintiff,         )        Case No.  2:05-cr-00078-PMP-GWF
                                              )
12   vs.                                       )        **FINDINGS AND**
                                              )        **RECOMMENDATION**
13   SDI FUTURE HEALTH, INC., TODD STUART      )
     KAPLAN, and JACK BRUNK,                   )
14                                             )
                            Defendants.        )
15   _____)

16           This matter is before the Court on Defendants' Motion Requesting an Evidentiary Hearing

17   Regarding the Government's Intrusion into Defendants' Privileged Information (#39), filed on

18   December 2, 2005; the Government's Opposition to Defendants' Motion Requesting an Evidentiary

19   Hearing Regarding Supposed Privileged Information (#55), filed on January 31, 2006; the Defendants'

20   Reply Memorandum of Points and Authorities in Support of Motion Requesting an Evidentiary Hearing

21   Regarding the Government's Instrusions Into Defendants' Privileged Information (#67), filed on March

22   15, 2006; Notice of Supplemental Authority in Further Support of Motion Requesting an Evidentiary

23   Hearing Regarding the Government's Intrusion into Defendants' Privileged Information (#110), filed

24   on July 20, 2006; and the United States' Response to Defendants' Supplemental Authority (#111), filed

25   on July 21, 2006.

26                                      **FACTS**

27           On January 31, 2002, the Government executed a search warrant on Defendant SDI's corporate

28   headquarters as part of the Government's investigation into alleged health care fraud by SDI and its

1   principal officer, Todd Kaplan.  The search warrant authorized the seizure of a broad range of SDI's

2   business records and SDI's and Todd Kaplan's and his spouse's state and federal income tax returns

3   and information relating to the preparation of those returns.  Among the categories of records to be

4   seized, the warrant authorized the seizure of SDI sleep study patient records.  Prior to issuing the search

5   warrant, the Magistrate Judge requested that the affidavit be modified regarding the procedures that the

6   Government would use in handling confidential patient records to protect their confidentiality.  The

7   Magistrate Judge added a handwritten notation to the search warrant, Attachment B, stating that patient

8   confidential medical information would be handled in accordance with the procedures set forth in the

9   affidavit.  *See Findings and Recommendations (#101), filed June 26, 2006, page 10*.  Nothing in the

10  affidavit or search warrant stated that the Government intended to seize documents containing SDI's

11  attorney-client privileged communications.  No express procedures were set forth in the affidavit or the

12  search warrant for handling attorney-client privileged documents if they were encountered during the

13  execution of the search warrant.

14          During the execution of the search warrant, SDI's president Todd Kaplan informed the

15  Government agents that some of the documents called for by the search warrant may be covered by the

16  attorney-client privilege.  The search was thereupon halted and two IRS-CI agents, who were not

17  otherwise involved in the investigation, were summoned to SDI's offices.  These "taint agents"

18  reviewed the documents in those rooms that SDI stated contained attorney-client privileged materials,

19  identified documents containing attorney-client privileged communications, and placed those

20  documents in boxes which were turned over to SDI during or at the conclusion of the search.  *See*

21  *Findings and Recommendations (#101), filed June 26, 2006, page 14*; *Defendants' Motion (#39),*

22  *Exhibit "3",* page 2.  The Government's agents proceeded with the search and seized substantial

23  quantities of paper documents and SDI's computer based records.  During the search, the Government

24  was also informed that some of SDI records were stored at an off-sight storage facility.  The

25  Government obtained consent from Defendants to search that facility and seized additional SDI records.

26  At the conclusion of the search, the Government provided SDI with two inventory documents listing the

27  items seized from SDI's corporate offices and the storage facility.  *See Findings and Recommendations*

28  *(#101), filed June 26, 2006, pages 14-15.*

Shortly after the execution of the search warrant on January 31, 2002, counsel for SDI, Fernando L. Aenile-Rocha,  communicated with Assistant United States Attorney ("AUSA") Steven Myhre and the Government agents in charge of the search.  *Defendants' Motion (#39), Exhibit "3"*.  On February 5, 2002, SDI's attorney sent a letter to AUSA Myhre stating that SDI had reviewed the contents of sealed boxes of attorney-client materials turned over to SDI.  SDI's counsel stated that SDI's Compliance Binder located in Mr. Kaplan's office was not included in the boxes, was missing, and was presumably seized by the Government.  SDI's counsel stated that this binder contained "numerous attorney-client privileged documents" and requested that it be returned to SDI.  *Id.*, page 2.

On February 8, 2002, SDI's counsel sent a second letter to AUSA Myhre regarding additional attorney-client privileged documents that had been seized.  *Defendants' Motion (#39), Exhibit "4"*. These documents included "at least two files which agents apparently seized from SDI employee Dennis Benton's office which were entitled 'Medicare Billing' and 'HSC Protocol.'"  SDI's counsel also stated that "some documents inside Evidence Box 145, bearing Control Number 243 and Locator Code S-1, may also be privileged."  *Id.*  A list of these items was apparently attached to counsel's letter.[1]  SDI's counsel also stated that because other privileged documents may have been seized, he proposed that SDI and its counsel be allowed to inspect all documents seized by the Government so that SDI could preserve its attorney-client privilege and the Government could minimize the possibility of any taint to its investigation as a result of an invasion of the attorney-client privilege.  *Id.*

On February 21, 2002, SDI's attorney sent a third letter to AUSA Myhre.  *Defendants' Motion (#39), Exhibit "5"*.  In this letter, SDI's attorney stated that in addition to the attorney-client privileged documents referenced in his two previous letters, it was his understanding that SDI seized all of SDI's legal bills. The letter stated that these bills ordinarily contain detailed description of the legal work performed by the attorneys which are privileged and should not be reviewed by the Government's agents.  SDI's counsel requested that these records be segregated, protected and returned to SDI as soon as possible.  *Id.,* page. 2.  Counsel's letter further stated:

---

[1]Although not attached to Defendants' *Exhibit "4"*, this list is attached to the copy of the same letter in *Exhibit "A-1"* of the *Government's Opposition* (#55).

> Although you have elected to rely upon a "dirty team" of federal agents to inspect SDI's privileged materials, instead of permitting me and an SDI representative to conduct this analysis, I urge you to reconsider or, at the very least to employ the services of an independent third-party "special master" to review all potentially privileged materials. Either approach would minimize any potential taint to the government's investigation and help preserve the integrity of SDI's privileged materials.

*Defendants' Motion (#39), Exhibit "5",* page 2.

SDI counsel's February 21, 2002 letter also stated that in accordance with AUSA Myhre's request, he was attaching a list of some of the law firms and attorneys that had provided legal services to SDI in the past, although he stated that this list was probably incomplete since the Government had possession of all of SDI's legal bills.  The letter also provided additional information to identify the "Compliance Binder" referenced in counsel's February 5, 2002 letter.  *Id.,* pages 2-3.

The *Government's Opposition*, page 3, correctly identifies four categories of documents or files that SDI's counsel claimed in his February 5, 8, and 21, 2002 letters contained privileged attorney-client information:

> 1. A Compliance Binder allegedly taken from Todd Kaplan's office which SDI's counsel stated contained  "numerous attorney-client privileged documents".
>
> 2. "Medicare Billing" and "HSC Protocol" files reportedly taken from SDI employee Dennis Benton's Office.
>
> 3. Some documents inside Evidence Box 145, bearing Control Number 243 and Locator Code S-1, "may also be privileged."
>
> 4. SDI's attorneys' legal bills.

According to the Government, it did not return the foregoing items.  *Opposition (#55),* page 3.

The Government did not respond in writing to SDI counsel's letters in February 2002.  Other than the statements in SDI counsel's letters, the Court has no information regarding the United States Attorney's oral responses to the attorney-client privilege issues raised in these letters.  According to SDI counsel's February 21 letter, 2002, *Defendants' Exhibit "5",* AUSA Myhre rejected SDI's counsel's request that a "special master" be appointed to review all potentially privileged documents and AUSA Myhre stated that the Government would use a "dirty team," i.e. a "taint team," to review allegedly privileged documents.  The Government apparently did not take any express position at that time that SDI's privilege assertions were invalid.

4

According to the Government:

> During the months following the execution of the search warrant, case agents reviewed and catalogued the hundreds of boxes of records seized from SDI.  As they did so, these agents segregated any items they encountered that appeared to contain attorney-client privileged material, whether or not SDI had expressly asserted any privilege for them.

*Government's Opposition (#55)*, page 4.

These segregated materials (the "taint documents") were reviewed by AUSA Camille Damm, the "taint attorney" who was not involved in the investigation of Defendants SDI, Kaplan or Brunk. *Government's Opposition (#55)*, pages 4-5; *Exhibit "B", Declaration of Camille Damm.*  According to Ms. Damm, she was instructed to review certain documents which she understood had been seized from SDI to determine whether any of those documents appeared to be covered by the attorney-client privilege.  *Id.,* ¶ 2.  Ms. Damm states that she reviewed several hundred pages of documents which she maintained in her office during the period of review.  *Id.,* ¶ 3.  She states that she segregated the documents into two groups: (1) those which she considered potentially privileged and (2) those which she did not consider potentially privileged.  She placed the potentially privileged documents in a sealed envelope.  Ms. Damm states that she replaced the non-privileged documents in their original boxes and the documents were returned to the prosecution team.  *Id.*, ¶ 4.   Neither the Government's Opposition nor Ms. Damm's Declaration states when she performed or completed her taint review.  There is no evidence that either Ms. Damm or the Government informed SDI's counsel prior to the filing of the indictment of the decisions made by taint counsel, Ms. Damm, regarding privilege.

On May 13, 2004, SDI's counsel, Mr. Aenile-Rocha, sent a letter to AUSA Crane M. Pomeranz regarding "several recent events . . . that appear to constitute a pattern of intrusions by the government into SDI's attorney-client privilege."  *Defendants' Motion (#39), Exhibit "6",* page 1.  According to this letter, during an interview of former SDI employee Dennis Benton on March 10, 2004, Government agents produced and attempted to question Mr. Benton about "one or more memoranda" Mr. Benton wrote to [SDI attorney] Kelly Simenson, Esq. and about a presentation that Mr. Benton made to SDI's board of directors in July 2001 that included privileged information provided to SDI by its attorneys. These were apparently documents that the Government seized on January 31, 2002 and which SDI's counsel had arguably asserted were privileged in his February 2002 letters.  According to SDI counsel's

1  letter, during the interview, Mr. Benton's attorney informed the Government that the documents in

2  question were privileged attorney-client communications.

3        SDI counsel's May 13, 2004 letter also proceeded to recount the information contained in his

4  letters sent to AUSA Myhre in February 2002.  In his May 13, 2004 letter, SDI's counsel noted that

5  despite his previous requests, the privileged materials were never returned and that the recent interview

6  of Mr. Benton led him to believe that the Government was using these and possibly other privileged

7  materials in furtherance of its investigation.  *Id.,* page 2.  The letter further stated:

8            Thus, it appears that despite my specific requests to the government on
   February 5, 2002, February 8, 2002, and again on February 21, 2002, the
9            government has invaded SDI's attorney-client privilege.  Indeed, after
   receiving specific notice to return these materials, the government instead
10           decided to review the privileged materials and use them in its
   investigation.

11

12 *Defendants' Motion (#39), Exhibit "6", page 3.*

13       SDI counsel's letter went on to discuss a telephone conference between Mr. Aenile-Rocha and

14 AUSA Pomeranz on November 10, 2003 regarding an earlier Government interview with Mr. Benton

15 and a letter that Mr. Benton wrote to SDI's accountants, which included an attached memorandum that

16 Mr. Benton had written to SDI's counsel.  In his May 13, 2004 letter, Mr. Aenile-Rocha indicated that

17 AUSA Pomeranz had advised him that the Government had "apparently used a 'dirty team' prosecutor

18 to review the document" and that the Government "caused the privileged memorandum to be filed

19 under seal with the district court."  *Id.* page 3.  Subsequent to this November 10, 2003 discussion,

20 however, SDI questioned Mr. Benton about this memorandum and Mr. Benton reportedly showed the

21 Government's attorneys the memorandum which was contained on his laptop computer.  Mr. Aenile-

22 Rocha further stated that during their conversation on November 10, 2004, AUSA Pomeranz took the

23 position that the privilege had been waived through SDI's disclosure of the memorandum to a third

24 party, SDI's accountants, and that AUSA Pomeranz had given Mr. Aenile-Rocha additional time to

25 consider the issue and provide a response by November 26, 2004.  Mr. Aenile-Rocha referred to a letter

26 from AUSA Pomeranz dated December 8, 2003.

27       According to AUSA Pomeranz's  December 8, 2004 letter, which was attached to *Defendants'*

28 *Motion (#39),* AUSA Pomeranz confirmed that an agreement was reached between counsel on

1  November 26, 2003 regarding a limited waiver of SDI's attorney-client privilege regarding the attorney

2  memorandum attached to the letter to SDI's accountants.  AUSA Pomeranz's December 8, 2004 letter

3  stated:

4            As I explained to you, an attorney in this office unconnected with the
          investigation reviewed the letter and filed it under seal.  We now intend

5            on moving to unseal the letter so that the attorneys and investigators
          working on this matter may review its contents.[2]

6

7  *Defendants' Motion (#39), Exhibit "6-D".*

8        AUSA Pomeranz responded to SDI's counsel's May 13, 2004 letter on May 20, 2004.

9  *Government's Opposition, Exhibit "2".*  In his May 20, 2004 letter, AUSA Pomeranz stated that the

10  Government had not improperly invaded or otherwise abused any privileges possessed by SDI or

11  anyone else.  AUSA Pomeranz stated that because of the ongoing nature of the investigation, the

12  Government was not in a position to share with Mr. Aenile-Rocha or his clients what documents the

13  Government has or does not have, what any witnesses have said or not said or what documents the

14  Government has reviewed or not reviewed.  Nor would the Government comment on what documents

15  SDI believed or did not believe were seized or not seized or otherwise obtained by the Government.

16  AUSA Pomeranz further noted that as of the date of his letter, SDI had not filed any process under the

17  Federal Rules of Criminal Procedure for the return of any materials that SDI believes were improperly

18  seized, including any supposedly privileged materials.  In addition, AUSA Pomeranz commented that

19  SDI "had more than ample opportunity to do so given the extraordinary access it was granted to review

20  the materials seized both during and after the execution of the search warrant."  *Id.*

21        Following SDI's counsel's May 13, 2004 letter and prior to the filing of the Indictment on

22  March 2, 2005, it does not appear that Defendants' counsel communicated further with the Government

23  or took any other action regarding Defendants' assertions of attorney-client privilege.  Beginning in or

24  _____

25       [2]SDI's counsel apparently understood this statement as indicating that the Government had filed
the letter under seal with the district court and that the Government would file a motion with the court

26  to unseal the letter.  It appears, however, that ASUA Pomeranz only indicated that the taint team
attorney had sealed the letter from use by the investigating prosecutors and agents, and that they would

27  now "unseal" it for purposes of using it in their investigation.  No evidence has been provided that the

28  documents were, in fact, filed under seal with the court.

about May 2005, Defendants' criminal defense counsel and Government's counsel began exchanging email communications and other correspondence regarding the parties respective discovery productions. On July 7, 2005, Defendants' counsel sent a letter to AUSA Myhre discussing a number of discovery issues. Included in this letter was the following statement:

> We also need to address the outstanding issue of materials that the government has deemed "not pertinent" or "privileged." Your suggestion that the government is entitled to keep such materials, without so much as providing defendants with a copy, is unfounded. We therefore renew our request that the government promptly return all materials deemed "not pertinent" or "privileged" or, at minimum, provide defendants with electronic copies of such materials. Please let me know which option the government would prefer.

*Defendants' Motion (#39), Exhibit "9", page 2.*

On August 17, 2005, AUSA Myhre responded to Defendants' counsel's August 11, 2005 and July 7, 2005 letters addressing the various discovery issues. In regard to Defendants' claimed privileged documents, AUSA Myhre's letter stated:

> *Privileged Information.* Please identify with specificity those documents you believe the government possesses that are subject to any privilege. The government is aware of one document that is potentially privileged and will be seeking a ruling from the Court shortly as to any potential privilege that may apply. I am given to understand from our taint team that the document pertains to billing records between SDI and outside counsel.

*Defendants' Motion (#39), Exhibit "10", page 2.*

On September 3, 2005, AUSA Myhre sent a follow-up letter regarding the issue of privileged documents. In this letter, he stated that the Government was aware of potentially privileged materials and would shortly be seeking a ruling from the Court as to any potential privilege that may apply. The letter further stated that the Government had segregated the documents into two categories. One category consisted of two or three documents which the Government's taint attorney had identified as potentially privileged. In the second category were approximately two boxes of documents that the taint attorney, after review, has determined are not privileged. Mr. Myhre proposed that before joining the issue with the court, that Defendants have the opportunity to review the documents, assess whether they are privileged and assert any privilege on behalf of Defendants. *Defendants' Motion (#39), Exhibit "11".* On September 7, 2005, Defendants' counsel agreed to this proposal, and requested that the

documents be bate stamped.  *Defendants' Motion (#39), Exhibit "12"*.  The Government agreed to make the documents available to Defendants' counsel for inspection, but declined to bate stamp them.  *Defendants' Motion (#39), Exhibit "13"*.  The documents determined to be potentially privileged by the taint counsel were forwarded to Defendants' counsel on September 28, 2005.  *Defendants' Motion (#39), Exhibit "14"*.

Defendants have submitted to the Court for *in camera* review approximately 518 pages of documents that were allegedly included in the Government's Rule 16 production.  Because Defendants did not provide the Government with a copy of its *in camera* submission or a log or index of the documents, the Government has not confirmed whether these documents are, in fact, contained in its Rule 16 production.  It is also not clear to the Court whether the Defendants' *in camera* submission also includes documents that the taint attorney has deemed potentially privileged (and which presumably have not been provided to the prosecution team.)   The Court has reviewed these documents and they appear to consist substantially of SDI's attorney's billings, some correspondence, drafts of agreements or procedure documents and some handwritten notes.

## DISCUSSION

Defendants request that the Court conduct an evidentiary hearing to explore whether the Government improperly intruded on Defendants' attorney-client privilege through the abuse of its "taint team" procedures, and, if so, to determine the extent to which sanctions should be imposed against the Government or its counsel.  In response, the Government asserts a number of objections to conducting an evidentiary hearing, including that Defendants have waived their attorney-client privilege by failing to timely assert it or take timely court action to enforce it.  To the extent Defendants have not waived the attorney-client privilege, the Government argues that the appropriate action and remedy is for Defendants to file a motion to suppress particular documents they claim as privileged so that they may not be introduced at trial.

Because the allegedly attorney-client privileged documents were seized prior to the indictment, the Government argues that Defendants' Sixth Amendment rights are not implicated.  The Government also argues that the alleged intrusion by the Government into Defendants' attorney-client privilege does not rise to the level of a due process violation under the Fifth Amendment, or outrageous or flagrant

1   misconduct that would warrant dismissal of the indictment or other sanction besides suppression of any

2   privileged attorney-client communications.  The Government also argues that Defendants have failed to

3   make any showing of substantial prejudice to warrant an evidentiary hearing.

4       **1.   Government's Use of "Taint Attorney" to Review and Make Privilege
            Determinations Regarding Seized Documents.**

5

6       Defendants' Motion takes issue with the Government's decision to employ a "taint attorney" or

7   "taint agents" to review SDI's  potentially attorney-client privileged documents and decide which

8   documents were not privileged and would be provided to the prosecution team.  Federal courts have

9   taken a skeptical view of the Government's use of "taint teams" as an appropriate method for

10  determining whether seized or subpoenaed records are protected by the attorney-client privilege. The

11  reason for this is well stated in *In re Grand Jury Subpoenas 04-124-03 and 04-124-05*, 454 F.3d 511,

12  523 (6th Cir. 2006):

13          Furthermore, taint teams present inevitable, and reasonably foreseeable,
            risks to privilege, for they have been implicated in the past in leaks of
14          confidential information to prosecutors.  That is to say, the government
            taint team may also have an interest in preserving the privilege, but it also
15          possesses a conflicting interest in pursuing the investigation, and, human
            nature being what it is, occasionally some taint team attorneys will make
16          mistakes or violate their ethical obligations.  It is thus logical to suppose
            that taint teams pose a serious risk to holders of the privilege, and this
17          supposition is supported by past experience.

18      The Sixth Circuit also stated that it is reasonable to presume that the government's taint team

19  might have a more restrictive view of privilege than the defendant's attorneys.  *Id.*  The court also noted

20  that government taint teams seem to be used primarily in limited, exigent circumstances in which

21  government officials have already obtained the physical control of potentially-privileged documents

22  through the exercise of a search warrant.  In such cases, the potentially-privileged documents are

23  already in the government's possession, and so the use of the taint team to sift the wheat from the chaff

24  constitutes an action respectful of, rather injurious to, the protection of the privilege.  *Id.*, 454 F.3d at

25  522, *citing United States v. Abbell*, 914 F.Supp. 519 (S.D. Fla. 1995).  In reversing the district court's

26  approval of a government taint team to review the records, the Sixth Circuit held that exigent

27  circumstances warranting use of a taint team were not present because the records had not yet been

28  obtained by the government.  The court therefore directed that a special master be appointed to

10

1   expeditiously conduct a computer word search for key words that would identify attorney related

2   documents and to segregate those records from non-attorney related documents that could be promptly

3   forwarded to the grand jury.  The movant would be provided an opportunity to review the documents,

4   identify those to which he claimed privilege and the court would then decide the privilege claims.

5        Other courts have also criticized  and, in some instances, disapproved of the use of government

6   taint teams to resolve attorney-client privilege or work-product privilege issues.  *See United States v.*

7   *Neill*, 952 F.Supp. 834 (D.D.C. 1997) (criticizing use of government "taint teams" to review allegedly

8   privileged documents, but finding no violation of defendants' constitutional rights where the

9   government demonstrated at an evidentiary hearing that the taint team properly performed its functions

10  and no privileged information was turned over to the prosecution team.)  Some of these cases involved

11  warrants for the searches of law offices.  *See, e.g. United States v. Neill, supra; United States v. Kaplan*,

12  2003 WL 22880914 (S.D.N.Y. 2003);  *In re Search Warrant for Law Offices Executed on March 19,*

13  *2002*, 153 F.R.D. 55 (S.D.N.Y. 1994).  In such cases there is a heightened concern for the protection of

14  privileged attorney-client information that is either not the subject of the search or does not fall within

15  the "crime-fraud" exception to the privilege.  In such cases, the government has provided procedures for

16  use of a government taint team in conducting the search.  *See Neill, supra.*

17       Other courts have approved use of the taint teams to conduct initial reviews of potentially

18  privileged documents as opposed to requiring that the documents be submitted to the court for an *in*

19  *camera* review or that a special master be appointed.  *See In the Matter of the Search of 544*

20  *Westheimer Road*, 2006 WL 1881370 (S.D. Tex. 2006); *United States v. Grant*, 2004 WL 1171258

21  (S.D.N.Y. 2004).   In *In the Matter of the Search of 544 Westheimer Road*, the court denied movant's

22  request to have the seized documents reviewed by a special master before allowing the government to

23  proceed with its investigation.  The court, instead, approved the government's proposed taint team

24  procedure.  In so holding, the court stated:

25          [T]he court recognizes that other courts have questioned and/or rejected
             the use of the taint team procedure.  *See In Re Search of the Scranton*
26          *Hous. Auth.,* [] 2006 WL 1722565, at 5 (M.D.Pa. June 22, 2006) (citing
             various cases questioning or rejecting taint team procedures); *see also In*
27          *Re Search Warrant of Law Offices Executed on March 17, 1992,* 153
             F.R.D. 5 (S.D.N.Y. 1994).  The Court nevertheless determines that such
28          procedures will allow expeditious review of all seized documents, will

11

1
2
3
4
5
6

allow the Government to continue with its investigations, and will nevertheless allow the Court, at ERHC's request, to resolve ultimate privilege disputes before any potentially privileged materials are disclosed to the prosecution team. Although the Court determines the Government's proposed taint team procedure will sufficiently protect any potentially privileged documents, it echoes the sentiments voiced in *Grant* and reinforces that its decision is "based upon the expectation and presumption that the Government's privilege team and the trial prosecutors will conduct themselves with integrity." *Grant*, 2004 WL 1171258, at 3.

7   The court further stated that its approval of the taint team procedure did not foreclose the

8 movant from filing a motion to suppress at a later time.   In *United States v. Grant*, 2004 WL 1171258

9 (S.D.N.Y. 2004), the court also stated that review of documents by the government's taint team would

10 not constitute a waiver of defendant's attorney-client privilege.

11   Defendants have raised a number of issues regarding the adequacy of the Government's taint

12 procedures, some of which appear to have merit and some which do not.  Defendants criticize the

13 Government's failure to include in the search warrant application any procedures for dealing with

14 potentially attorney-client privileged documents.  Regardless of whether this criticism is justified, it is

15 undisputed that when SDI informed the Government that attorney-client privileged records were located

16 in the office, a "taint team" was summoned to identify and segregate attorney-client privileged

17 documents.  The taint agents reportedly identified and segregated documents which were not seized

18 during the search.  The Government's use of a "taint team" under these circumstances was not

19 improper.  *See In re Grand Jury Subpoenas 04-124-03 and 04-124-05, supra.*  Whether the "taint team"

20 correctly identified all records that were subject to a legitimate claim of attorney-client privilege,

21 however, is another matter.

22   Following the search, the Government rejected SDI's proposal that a special master be

23 appointed to review the documents and advised SDI's counsel that it intended to use a taint team to

24 review allegedly privileged documents.  Because the Government did not provide or implement any

25 procedure for notifying SDI of the taint attorney's privilege decisions or afford SDI an opportunity to

26 challenge those determinations in court before the documents were provided to the prosecution team, it

27 is doubtful that the court would have approved the Government's taint procedures if SDI had

28 challenged them.  *See, e.g. In re Grand Jury Subpoenas 04-124-03 and 04-124-05* and  *In the Matter of*

1   *the Search of 544 Westheimer Road, supra.*  Defendants, however, did not pursue timely judicial action

2   to challenge the Government's taint review procedures or to seek to have their allegedly privileged

3   documents returned.

4   Defendants also argue that the Government's taint procedures were wholly inadequate because

5   the case agents reviewed the seized documents and segregated items that appeared to contain attorney-

6   client privileged material which were only then turned over to the taint attorney.  Defendants appear to

7   suggest that all of the seized records should have been first reviewed by taint agents before the

8   investigating agents had any opportunity to see them.  In cases involving the search of a law office, the

9   manner in which the search is conducted is subject to a heightened degree of scrutiny and special care

10   to avoid unnecessary intrusion on attorney-client communications.  *DeMassa v. Nunez*, 770 F.2d 1505,

11   1506 (9th Cir. 1985);  *In re Grand Jury Subpoenas Dated Dec. 10, 1987*, 926 F.2d  847, 856 (9th Cir.

12   1991).  In regard to such searches, therefore, it may be incumbent on the Government to have a taint

13   team review of all records before they are reviewed by the investigating agents or the prosecuting team.

14   The search warrant in this case, however, was directed at seizing non-privileged business

15   records and tax returns and tax preparation documents.  As stated, during the search, taint agents

16   reviewed documents in offices identified by SDI as containing privileged documents.  Given the scope

17   of the seizure, it is not surprising that the taint agents may have allowed seizure of certain records that

18   were potentially privileged, or that potentially privileged records were located in other offices not

19   inspected by the taint agents or possibly on SDI's computers.   Defendants have cited no authority,

20   however, which holds that where the Government seizes voluminous business records, it must first

21   employ a taint team to review all of the records to identify potentially privileged documents.  On the

22   other hand, SDI's counsel did timely notify the Government of certain seized files or documents that

23   allegedly contained attorney-client privileged documents.  SDI's counsel also informed the Government

24   of the identities of law firms and attorneys who represented SDI so that the Government could identify

25   potentially privileged documents and protect them from review by the case agents or prosecuting

26   attorneys until a privilege determination was made.   Other than the very general statements in the

27   Government's *Opposition* and Ms. Damm's Declaration, the Government provides little or no

28   information as to what steps were taken to segregate such allegedly privileged documents before they

13

1  were reviewed the case agents.

2       In sum, SDI had some arguably valid objections to the Government's taint procedures.  The

3  problem is that SDI waited more than three years after the search to raise those objections with the

4  Court.  That stated, the Court generally agrees with the statement by the court in *United States v. Neill,*

5  *supra,* 952 F.Supp. at 841 that:

6           Where the government chooses to take matters into its own hands rather
           than using more traditional alternatives of submitting disputed documents
7           under seal for *in camera* review by a neutral and detached magistrate or
           by court-appointed special masters, (citations omitted), it bears the burden
8           to rebut the presumption that tainted material was provided to the
           prosecution team.  *Briggs,* 698 F.2d at 495, n.29 ("the government is, of
9           course, free to rebut this presumption by showing for example,
           procedures in place to prevent such intragovernmental
10          communications.").

11      **2.      Defendants' Alleged Waiver of Attorney-Client Privilege.**

12      The Government argues that Defendants' Motion should be denied because they waived their

13 attorney-client privileges.  In part, the Government asserts that Defendants explicitly waived their

14 attorney-client privilege as to certain documents.  Primarily, the Government argues that Defendants

15 implicitly waived their alleged attorney-client privilege by failing to assert it in a timely manner and in

16 failing to take timely and diligent court action to protect the privilege.

17      **A.      Government's Assertion of Explicit Waiver.**

18      The Government argues that Defendants explicitly waived the attorney-client privilege

19 regarding the memoranda from SDI's attorneys that were attached to the letter that SDI employee

20 Dennis Benton sent to SDI's accountants.  There is no confidential accountant-client privilege under

21 federal law.  *Couch v. United States*, 409 U.S. 322, 335, 93 S.Ct. 611 (1973).  Accordingly, the

22 attorney-client privilege was waived when Mr. Benton sent the memoranda to SDI's accountants.

23 *United States v. Stewart*, 287 F.Supp.2d 461, 464-65 (S.D.N.Y. 2003).

24      In any event, AUSA Pomeranz's December 8, 2003 letter to SDI's counsel confirmed an

25 agreement between the parties for a "limited waiver" of SDI's privilege to these documents.  SDI

26 counsel's May 13, 2004 letter to Mr. Pomeranz appears to confirm this agreement, and Defendants have

27 not produced any evidence or argument that SDI's counsel objected to Mr. Pomeranz's letter dated

28 December 8, 2003.  Accordingly, as to the memoranda attached to Mr. Benton's letter to SDI's

14

1   accountants, the Court finds that the attorney-client privilege was waived by SDI.

2   **B.**   **Government's Argument that Defendants Implicitly Waived Their Attorney-Client**
      **Privileges Regarding the Seized Documents**.

3

4   The Government argues that Defendants implicitly waived their attorney-client privilege

5   regarding the other documents seized by the Government during the January 31, 2002 search by failing

6   to take timely court action to protect their privilege.  In support of this assertion, the Government argues

7   that because the attorney-client privilege impedes the full and free discovery of the truth, it is narrowly

8   construed.  *United States v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002); *United States v. Plache*, 913

9   F2d 1375, 1379 (9th Cir. 1990); *Weil v. Investment/Indicators, Research and Magmt., Inc.*, 647 F.2d 18,

10  25 (9th. 1981); *United States v. White,* 970 F.2d 328, 334 (9th Cir. 1992).  The party asserting the

11  privilege has the burden of proving its applicability, including that the party has not waived it.  *Weil,*

12  *supra,* 647 F.2d at 25.

13  The Government's waiver argument divides into two categories.  First, the Government argues

14  that Defendants waived their attorney-client privilege as to the allegedly privileged documents

15  identified in SDI counsel's February 5, 8 and 21, 2002 letters because Defendants failed to timely

16  pursue judicial action to enforce their privilege.  Second, the Government argues that Defendants

17  waived their attorney-client privilege as to other seized documents because they made no specific claim

18  of privilege and also failed to pursue timely judicial action to enforce the privilege.  In support of its

19  arguments, the Government relies on *United States v. de la Jara*, 973 F.2d 746 (9th Cir. 1992);  *In re*

20  *Grand Jury (Impounded)*, 138 F.3d 978 (3rd Cir. 1998); *Bowles v. National Ass'n of Home Builders*,

21  224 F.R.D. 246 (D. D.C. 2004); and *Burlington Northern & Sante Fe Railway Co. v. District Court*.,

22  408 F.3d 1142 (9th Cir. 2005).

23  In *United States v. de la Jara*, the government seized a letter that defendant's attorney had

24  written to him.  At trial, the letter was admitted, over objection, based on the "crime-fraud" exception to

25  the attorney-client privilege.  The court affirmed defendant's conviction on the grounds that defendant

26  waived the attorney-client privilege by failing to take any action prior to trial to preserve it.  The court

27  stated that a party does not waive the attorney-client privilege for documents which he is *compelled* to

28  produce.  *Id.,* at 749, *citing Transamerica Computer v. International Business Machines*, 573 F.2d 646,

15

651 (9th Cir. 1978).  The privilege may be waived by implication, however, even when the disclosure

was involuntary, if the privilege holder fails to pursue all reasonable means of preserving the

confidentiality of the privileged matter.  *Id., citing Transamerica Computer, supra*, 573 F.2d at 650.  In

holding that the defendant implicitly waived the privilege, the court stated:

> De la Jara did nothing to recover the letter or protect its confidentiality during the six month interlude between its seizure and introduction into evidence.  By immediately attempting to recover the letter, appellant could have minimized the damage caused by the breach of confidentiality.  As a result of his failure to act, however, he allowed "the mantle of confidentiality which once protected the document []" to be "irretrievably breached," thereby waiving his privilege.  *Permian Corp. v. United States*, 665 F.2d 1214, 1220 (D.C.Cir. 1981) (quoting *In re Grand Jury Investigation of Ocean Transportation*, 604 F.2d 672, 675 (D.C.Cir.), *cert. denied*, 444 U.S. 915, 100 S.Ct. 229, 62 L.Ed. 2d 169 (1979).  The district court thus committed no reversible error in permitting the letter to be introduced into evidence.

*United States v. de la Jara, supra,* 973 F.2d at 750.

In *In re Grand Jury (Impounded)*, *supra,* 138 F.3d at 981-82, the movant, Capano, was the target

of a federal grand jury investigation into the suspected kidnaping of a woman.  The government

subpoenaed a file from Capano's law firm which contained a "time line" and memorandum regarding

Capano's contacts with the woman.  The government provided these documents to a taint attorney who

determined that they were not privileged and provided the documents to the prosecutor conducting the

investigation.  Capano's counsel promptly notified the government that the file contained work-product

privilege information.  The United States attorney advised Capano's counsel that the documents were

not privileged and the government would not return them.  Capano thereafter waited three months

before filing a motion to compel the government to return the file.  In affirming the district court's

decision that Capano waived the privilege, the court held that although Capano timely asserted the

privilege after he learned that the government had obtained the file, he failed to timely move for its

return once he was on notice that the government disagreed with his assertion of the privilege and

would not relinquish the file voluntarily.  In so holding, the court stated:

> The United States was a direct adversary of Capano, and its continued use of the documents directly undermined the purpose of the attorney work product privilege of protecting confidential documents prepared in anticipation of litigation from a party's adversary.  Capano's repeated admonitions to his adversary to return the protected documents did not

16

prevent the continuing harm resulting from the disclosure. Judicial enforcement of the privilege was the only remedy that Capano could have obtained which would have foreclosed the United States from further use of the seized file. Without such judicial vindication, the United States was free to continue to utilize the documents, thereby negating their confidential character.

In the case of such an involuntary disclosure, a reasonable person would not only inform his or her adversary of the breach of the privilege, but also would seek a judicial determination of the controversy if his or her adversary took an opposing stance. Merely asserting the privilege to an adversary is not sufficient to protect the privilege in these circumstances inasmuch as the adversary has possession of the materials claimed to be privileged and thus can make use of them. Moreover, if the district court countenanced Capano's delay in judicially asserting his privilege and then upheld his claim of privilege, the grand jury's use of the seized file potentially could have tainted its investigation.[3]

*In re Grand Jury (Impounded), supra,* 138 F.3d at 982.

In *Bowles v. National Ass'n of Home Builders*, 224 F.R.D. 246 (D. D.C. 2004), the plaintiff acquired possession of defendant's privileged documents while employed as its president. Upon being terminated, plaintiff took the privileged documents with her and refused to return them upon being requested to do so by defendant. Defendant thereafter waited approximately one year into the litigation before filing a motion for return of the documents. Citing *de la Jara* and *In re Grand Jury (Impounded)*, the court held that defendant failed to take timely action to enforce its privilege. In so holding, the court stated:

. . . NAHB knew that an existing adversary already had possession of the documents. Indeed, NAHB was on notice that plaintiff was using the documents against her in these very proceedings. The harm to NAHB from this possession was immediate. Taking steps to prevent the "further disclosure" of the documents would do not good here; the disclosure had already breached the confidentiality in the documents in every way that mattered insofar as an opposing party had possession of the documents and was using them in litigation. At this point, NAHB had a clear obligation to "move expeditiously for relief" by taking "legal measures" to preserve its privilege in the documents. (citation omitted).

---

[3]The concurring judge, however, rejected the majority's concern that the government's use of the privileged file might have tainted the grand jury investigation. The concurring judge stated that the government assumed that risk when it seized and made use of privileged information in its investigation. Because the defendant had intentionally delayed filing his motion for his own advantage, however, the concurring judge agreed that his work-product privilege should be deemed waived.

1    *Bowles v. National Ass'n of Home Builders*, 224 F.R.D. at 255.

2        In *Burlington Northern & Sante Fe Railway Co. v. District Court*, 408 F.3d 1142 (9th Cir.

3    2005), the court affirmed the district court's decision that defendant waived its attorney-client privilege

4    by failing to provide an adequate privilege log of the allegedly privileged documents for five months.

5    The court rejected a *per se* rule that a privilege log must be provided within the 30-day time limit for

6    responding to a discovery request, instead holding that the court should consider all the relevant

7    circumstances in determining whether failure to provide a log waives the privilege.

8        The Government also argues that *United States v. Neill*, 952 F.Supp. 834 (D.D.C. 1997), cited

9    by Defendants, supports its implicit waiver argument.  In *Neill*, the government executed search

10   warrants on an attorney's office and home.  The government implemented taint procedures in executing

11   the warrants to minimize the potential intrusion upon the attorney-client privilege.  Taint agents

12   reviewed all potentially privileged documents prior to seizure and segregated and sealed any items that

13   might be subject to the attorney-client privilege.  The government designated taint attorneys to review

14   the potentially privileged documents which had been seized during the search.  Although defendant's

15   counsel objected to the government's taint procedures, defendants never filed a motion to compel the

16   government to return the seized documents under Fed.R.Crim. Pro. 41(e) or a motion for protective

17   order.  As to the documents that defendants had asserted were privileged and which were reviewed by

18   the taint team,  *Neill* did not find that there had been any waiver of the privilege.  Instead, the court

19   found that the taint agents had properly performed their review and had not disclosed privileged

20   materials to the prosecutors.  During the execution of the search warrants, the agents also seized

21   defendants' computer files.  As to the computer files, defendants never asserted an attorney-client

22   privilege.  The court, therefore, held that defendants waived any privilege as to these documents

23   because they failed to timely assert the attorney-client privilege for each specific communication or

24   document.  *Neill, supra,* 952 F.Supp. at 842.

25       In addition to the foregoing cases, the Court also notes the decision in *United States v. Ary*, 2005

26   WL 2367541 (D. Kans. 2005), in which the defendant initially notified the government that seized

27   computers and other files may contain attorney-client privileged materials.  A government taint agent

28   reviewed certain files and returned privileged materials to the defendant's counsel.  Over a year later,

the defendant's counsel reviewed the government's Rule 16 production of records, but did not raise any

privilege claims to specific documents at that time.  Two months later, defendant filed a motion to

suppress privileged documents.  Under these circumstances, the court held that the privilege was

waived.

In this case, SDI notified the Government within a few days and weeks after the execution of the

search warrant that certain allegedly attorney-client privileged documents or files had been seized.  In

his February 5, 8, and 21, 2002 letters to the Government, SDI's counsel identified the following

categories of documents that Defendants claimed were privileged and should be returned to SDI:

> 1.   A Compliance Binder allegedly taken from Todd Kaplan's office which SDI's counsel stated contained  "numerous attorney-client privileged documents.
>
> 2.   "Medicare Billing" and "HSC Protocol" files reportedly taken from SDI employee Dennis Benton's Office.
>
> 3.   Some documents inside Evidence Box 145, bearing Control Number 243 and Locator Code S-1, may also be privileged."
>
> 4.   SDI's attorneys' legal bills.

As to these documents or files, SDI timely placed the Government on notice of its claim that the

seized materials were protected by the attorney-client privilege.[4]  SDI's counsel also notified the

Government that other seized files or computer records might contain attorney-client privileged

documents.  Unlike *de la Jara,* therefore, Defendants cannot be charged with failing to timely assert any

attorney-client privilege respecting these documents.  Furthermore, where, as here, the Government

elects to appoint a taint attorney to review and make privilege determinations, the Defendants cannot be

deemed to have waived their privileges, at least pending notification of the taint attorney's

determination of privilege.  *See, e.g. In the Matter of the Search of 544 Westheimer Road*, 2006 WL

1881370 (S.D. Tex. 2006); *United States v. Grant*, 2004 WL 1171258 (S.D.N.Y. 2004).

*In re Grand Jury (Impounded)* and *Bowles v. National Ass'n of Home Builders*, *supra,* do not

require a finding that Defendants waived the attorney-client privilege as to the specific documents or

---

[4]Assuming that Defendants or their counsel were granted access by the Government to review these records, they arguably should have supplemented their privilege claims by more specifically describing the documents that they allege were protected by the attorney-client privilege.

1   files set forth in SDI counsel's February 5, 8 and 21, 2002 letters.  As the court in *In re Grand Jury*

2   *(Impounded)* stated: "a reasonable person would not only inform his or her adversary of the breach of

3   the privilege, but also would seek a judicial determination of the controversy *if his or her adversary*

4   *took an opposing stance.*"  138 F.3d at 982. (Emphasis added.)  Unlike *In re Grand Jury (Impounded)*,

5   however, the Government did not respond to SDI's counsel's February 2002 letters by asserting the

6   documents were not entitled to attorney-client privilege protection and that the Government intended to

7   use the documents in its investigation of SDI.  Nor did the Government subsequently notify Defendants

8   of the taint attorney's privilege determinations until late 2005, in response to which the Defendants

9   filed their instant Motion.

10          Unlike *Bowles v. National Ass'n of Home Builders*, *supra,* the evidence also does not clearly

11   show the Defendants knew that the Government was, in fact, using SDI's allegedly privileged

12   documents in its investigation.  Defendants' position in this regard, however, is undercut to some extent

13   by the following statement in SDI counsel's May 13, 2004 letter to AUSA Pomeranz:

14                  Thus, it appears that despite my specific requests to the government on
                    February 5, 2002, February 8, 2002, and again on February 21, 2002, the
15                  government has invaded SDI's attorney-client privilege.  Indeed, after
                    receiving specific notice to return these materials, the government instead
16                  decided to review the privileged materials and use them in its
                    investigation.

17

18   *Defendants' Motion (#39), Exhibit "6",* page 3.

19          In its May 20, 2004 response letter, the Government generally denied SDI counsel's assertions

20   that it had engaged in "a pattern of intrusion" into SDI's privileged attorney-client materials or that the

21   Government had failed to return privileged documents to SDI.  The Government further noted that

22   Defendants had not pursued process under the Federal Rule of Criminal Procedure "for the return of

23   any materials that SDI believes were improperly seized, including any supposedly privileged materials."

24   *Government's Opposition (#55), Exhibit "2".*  Although a reasonably prudent attorney would have

25   questioned whether the Government intended to respect Defendants' assertions of privilege, the

26   Government did not take the position, as it could have done, that the documents described in SDI's

27   previous letters were not privileged and that the Government intended to use them in its investigation.

28   . . .

20

1    The Government's August 17, 2005, September , 2005 and September 9, 2005  letters,

2  *Defendants' Exhibits "10", "11"* and *"13",* also indicate that at that late date, the Government still

3  recognized that some of SDI's records were potentially protected by the attorney-client privilege.

4  AUSA Myhre's August 17, 2005 letter stated that "[t]he government is aware of one document that is

5  potentially privileged and will be seeking a ruling from the Court shortly as to any potential privilege

6  that may apply.  I am given to understand from our taint team that the document pertains to billing

7  records between SDI and outside counsel." *Exhibit "10"*, page 2.  In his September 3, 2005 letter,

8  AUSA Myhre again stated that the Government was "aware of potentially privileged materials."  He

9  indicated that the Government had segregated these documents into two categories.  In one category

10  were two or three documents the taint attorney has identified as potentially privileged.  In the second

11  category were approximately two boxes of documents that the taint attorney, after review, determined

12  were not privileged.  *Exhibit "11"*.  The Government's taint attorney, Ms. Damm, also corresponded

13  with Defendants' counsel regarding the documents which she reviewed and which she had determined

14  were potentially privileged and were kept under seal, versus those that were determined not to be

15  privileged and which she had made available to the prosecution team.  The Government and taint

16  counsel, in addition, proposed that the parties meet and confer in an attempt to resolve their differences

17  regarding allegedly privileged documents.

18    In cases involving the "inadvertent" disclosure of privileged attorney-client information, courts

19  in the Ninth Circuit apply the totality of the circumstances approach.  *United States ex rel Bagley v.*

20  *TRW, Inc.*, 204 F.R.D. 170, 177 (C.D. Cal. 2001).  Under that approach, the courts consider the

21  following factors: (1) the reasonableness of the precautions to prevent inadvertent disclosure; (2) the

22  time taken to rectify the error; (3) the scope of the discovery; (4) extent of the disclosure; and (5) the

23  "overriding issue of fairness."  In this case, the disclosure was involuntary, rather than inadvertent.  The

24  key factors, as indicated by *de la Jara* and *In re Grand Jury (Impounded)*, *supra,* therefore relate to

25  Defendants' efforts following the seizure to protect their privilege and the overriding issue of fairness.

26    The Court agrees with the approach taken in *United States v. Neill*, *supra,* which involved

27  similar circumstances.  As to documents which Defendants identified and asserted claims of privilege in

28  SDI counsel's letters dated February 5, 8 and 21, 2002, the Court finds that Defendants have not waived

1   their attorney-client privilege.  In so finding, the Court weighs and balances Defendants' failure to take

2   earlier judicial action to enforce their privilege against the failure of the Government to timely notify

3   Defendants of the privilege determinations made by the taint attorney, combined with the fact that in

4   August-September 2005, the Government still recognized that some of the documents were potentially

5   privileged.

6          In regard to other documents, including computer based records, as to which SDI never asserted

7   specific attorney-client privileges, the record supports the conclusion that SDI waived its attorney-client

8   privilege by failing to assert it or to take timely action to protect it.  In their *Reply (#67)*, Defendants

9   attempt to distinguish *de la Jara* and *In re Grand Jury (Impounded)* on the ground that those cases

10  involved a single document and that *Bowles v. National Ass'n of Home Builders* involved a finite

11  number of ascertainable documents.  In contrast, Defendants argue that the Government seized

12  hundreds of thousands of documents which it maintained in its sole control.  This is not a sufficient

13  basis for distinguishing those cases.

14         There is no evidence, nor is there any basis for believing that the hundreds of thousands of paper

15  documents and computer records seized by the Government constituted potentially privileged attorney-

16  client communications.  Within days and weeks after the seizure of its documents, SDI was able to

17  identify potentially privileged documents and files that had been seized by the Government.  SDI's

18  counsel also advised the Government that there might be other privileged documents contained in the

19  seized records which could only be determined after SDI having an opportunity to review the seized

20  records.  At that point, the Court would agree that SDI had not waived its privileges because it had, as

21  yet, no opportunity to inspect its files and identify additional privileged records.  *See In re Grand Jury*

22  *Subpoenas 04-124-03 and 04-124-05*, 454 F.3d at 515 (stating that movant could not be criticized for

23  failing to provide a privilege log before he had an opportunity to review the records.)  *See also*

24  *Burlington Northern & Sante Fe Railway Co. v. District Court*., 408 F.3d 1142 (9th Cir. 2005)

25  (timeliness of privilege log is determined by the relevant circumstances including the ability of the party

26  to review the documents and identify privileged materials.)  On the other hand, the Court does not agree

27  that a mere generalized assertion that seized records may contain attorney-client privileged materials is,

28  in and of itself, sufficient to preserve the defendant's privilege indefinitely.  *See United States v. Ary*,

1    2005 WL 2367541 (D. Kans. 2005).

2         SDI counsel's February 21, 2002 letter to AUSA Myhre stated that the Government agreed to

3    make certain SDI records available for copying on February 22, 2002, and "to allow SDI's

4    representatives to use a scanner and laptop to copy all needed records, ZIP disks and CD ROMS."

5    *Defendants' Motion (#39), Exhibit "5",* pages 1-2.  According to this letter, the Government also

6    agreed to return other documents to SDI.  No evidence has been presented that the Government

7    subsequently refused to return records it agreed to return, or that the Government refused to permit SDI

8    to copy the documents and computer records.  AUSA Pomeranz's May 20, 2004 letter to SDI's counsel

9    noted the "extraordinary access" that SDI was granted "to review the materials seized both during and

10   after the execution of the search warrant."  *Government's Opposition (#55)*, *Exhibit "A-2."*  No

11   evidence has been submitted by Defendants showing that they disputed the Government's assertion in

12   this regard.

13        It appears that SDI was granted access to the seized records which it could have reviewed to

14   identify additional privileged attorney-client communications.  Therefore, it was unreasonable for SDI

15   to fail to take steps to identify and assert its privilege regarding other documents within a reasonable

16   time after it was granted access to the seized records.   Assuming, for sake of argument, that the

17   Government had refused to permit SDI to inspect and copy the seized records after February 21, 2002,

18   it would have been incumbent on Defendants to timely pursue judicial action to obtain the records so

19   that additional privileged documents could be identified and objections made to the Government's use

20   of those records.  The Court therefore finds that Defendants waived any attorney-client privilege

21   regarding documents seized during the search of SDI's corporate headquarters and offsite storage

22   facility on January 31, 2002 that the Defendants did not identify in SDI counsel's letters dated February

23   5, 8 and 21, 2002.  Defendants therefore are not entitled to an evidentiary hearing regarding the

24   Government's alleged improper intrusion into the Defendants' attorney-client privilege regarding those

25   records as to which Defendants made no timely assertion of privilege.

26        **C.    Whether the Government's Intrusion Into Defendant's Attorney-Client Privilege
              Warrants An Evidentiary Hearing.**

27

28        Having found that Defendants have not waived their attorney-client privilege objections to the

documents identified in SDI counsel's letters dated February 5, 8 and 21, 2002, the issue is whether
Defendants have raised sufficient grounds to require an evidentiary hearing to determine whether the
indictment should be dismissed, or whether other sanctions should be imposed on the Government or
its counsel based on the Government's use of Defendants' attorney-client communications.  Defendants
have not requested any specific form of sanction in their Motion, but rather state that the appropriate
level of sanction should be determined based on the evidence adduced at the hearing.  Defendants state
that such appropriate sanctions may include suppression of all evidence improperly obtained and
reviewed by the Government and its taint team, disqualification of the Government attorneys who had
access to privileged information, dismissal of the indictment or other sanctions against the prosecutors
who reviewed the privileged information.  *Defendants' Motion (#39)*, page 15.

       The general remedy for violation of the attorney-client privilege is to suppress introduction of
the privileged information at trial.  The Government argues that there are only three potential
constitutional or legal grounds upon which the Court could consider a motion to dismiss the indictment
or the imposition of other severe sanctions, apart from suppression of privileged information.  These
grounds are (1) a violation of Defendants' right to counsel under the Sixth Amendment, (2) a violation
of Defendants' right to substantive due process under the Fifth Amendment, or (3) the court's inherent
power to punish flagrant prosecutorial misconduct which causes defendant to suffer substantial
prejudice.

### 1.    Alleged Violation of Defendants' Sixth Amendment Rights.

       The first issue is whether Defendants have a viable claim for violation of their Sixth
Amendment right to counsel resulting from the Government's alleged intrusion upon the attorney-client
relationship.  The Ninth Circuit adheres to the bright line rule that the Sixth Amendment right to
counsel attaches only upon the initiation of formal criminal charges.  *United States v. Hayes*, 231, F.3d
663, 675 (9th Cir. 2000); *United States v. Percy*, 250 F.3d 720, 725 (9th Cir. 2001); *United States v.
Kingston*, 971 F.2d 481 (9th Cir. 1992).  In *United States v. Rogers*, 751 F.2d 1074, 1077-78 (9th Cir.
1985), the court stated that defendant's Sixth Amendment right to counsel was not involved where,
during a pre-indictment criminal investigation, defendant's former attorney made statements to the IRS
regarding legal advice he had given to defendant regarding tax shelters that were the subject of the

1    investigation.  In *United States v. White*, 970 F.2d 328, 333-334 (7th Cir. 1992), the court held that the

2    government's interview of defendants' former bankruptcy attorney regarding whether defendants

3    committed bankruptcy fraud did not raise a Sixth Amendment issue because the attorney was not

4    representing defendants in any criminal matter at the time the government approached him.  In *United*

5    *States v. Kennedy*, 225 F.3d 1187, 1193-93 (10th Cir. 2000), the court held that defendant was not

6    entitled to an evidentiary hearing regarding alleged violations of his Sixth Amendment rights where the

7    alleged intrusion into the attorney-client relationship occurred a year before the indictment.  In *United*

8    *States v. Lin Lyn Trading, Ltd.*, 149 F.3d 112, (10th Cir. (1998), the court held that defendant's Sixth

9    Amendment rights were not implicated where prior to indictment, government agents seized a notebook

10   containing confidential attorney-client communications.  The court also held that the seizure of

11   attorney-client communications prior to indictment did not become a Sixth Amendment violation once

12   the indictment was filed.  In the face of this authority, the Court agrees with the Government that the

13   suggestion in *United States v. Neill*, 952 F.Supp. 834 (D.D.C. 1997), that the Sixth Amendment applies

14   to pre-indictment seizures of attorney-client communications is incorrect.

15          Even in the cases where the Government intrudes upon the defendant's attorney-client

16   relationship after the Sixth Amendment right to counsel has attached, the intrusion is not, in and of

17   itself, a violation of the Sixth Amendment.  *United States v. Irwin*, 612 F.2d 1182, 1187 (9th Cir. 1980).

18   Such a violation occurs only if the defendant suffers substantial prejudice, such as where privileged

19   information is introduced at trial, the prosecution obtains the defense plans and strategy, or the

20   governmental intrusion destroys the defendant's confidence in his attorney.  *Id.*  A violation of a

21   defendant's Sixth Amendment rights does not require dismissal of the indictment and dismissal is not

22   appropriate if less drastic remedies would preserve defendant's ability to receive a fair trial.  *United*

23   *States v. Rogers, supra,* 1078-79, *citing United States v.* Morrison, 449 U.S. 361, 364, 101 S.Ct. 665,

24   667, 66 L.Ed.2d 564 (1981); Black *v. United States*, 385 U.S. 26, 87 L.Ed.2d 190, 17 L.Ed.2d 26

25   (1966); and *O'Brien v. United States*, 386 U.S. 345, 87 S.Ct. 1158, 18 L.Ed.2d 94 (1967).

26          The Court need not reach these issues under the Sixth Amendment, however, because the

27   seizure of Defendants' allegedly privileged attorney-client communications substantially predates the

28   filing of the indictment or other formal criminal proceedings. The allegedly privileged documents were

25

1   seized by the Government on January 31, 2002.  Following the seizure, the Government continued with

2   its investigation.  SDI, Todd Kaplan and Jack Brunk were subsequently indicted on March 2, 2005,

3   more than three years after the seizure.  The alleged attorney-client privileged records at issue do not

4   involve confidential communications regarding defense plans or strategies in defending against pending

5   criminal charges.  Accordingly, Defendants have not demonstrated a violation of their Sixth

6   Amendment rights.

7        **2.**     **Violation of Defendants' Rights to Due Process Under the Fifth Amendment/**
          **Court's Inherent Supervisory Powers to Dismiss Indictment or Impose Other**

8             **Sanctions For Prosecutorial Misconduct.**

9         A defendant may assert a claim that his or her rights under the Due Process Clause of the Fifth

10   Amendment have been violated by prosecutorial misconduct occurring prior to or after indictment.

11   *United States v. Kennedy*, 225 F.3d 1187, 1194-95 (10th Cir. 2000).  The governmental misconduct

12   required to establish a due process violation, however, must be so outrageous as to shock the

13   conscience of the court.  *Id., see also United States v. Voigt*, 89 F.3d 1050, 1064-65 (3rd Cir.), *cert.*

14   *denied* 519 U.S. 1047, 117 S.Ct. 623, 136 L.Ed.2d 546 (1996), quoting *Rochin v. California*, 342 U.S.

15   165, 72 S.Ct. 204, 96 L.Ed 183 (1952) and *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36

16   L.Ed.2d 366 (1973).   Cases in which courts have found a due process violation justifying dismissal of

17   an indictment or barring further prosecution are extremely limited.  *See Rochin*, *supra,* (police conduct

18   in pumping defendant's stomach to obtain incriminating evidence of illegal drug use.)  The Third

19   Circuit in *Voigt,* citing its earlier decision in *United States v. Jannotti*, 673 F.2d 578 (3rd Cir.) (*in banc*)

20   *cert. denied* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982), noted that the judiciary is

21   extremely hesitant to find law enforcement conduct so offensive that it violates the Due Process Clause.

22   The court noted that this constitutional defense is reserved for "*only the most intolerable government*

23   *conduct." Voigt, supra, at 1065, citing Jannotti,* at 608.  As a result, the doctrine of outrageous

24   government misconduct, although often invoked by defendants, is rarely applied by the courts.  *United*

25   *States v. Santana*, 6 F.3d 1, 4 (1st Cir. 1992).

26         In regard to an alleged Fifth Amendment due process violation resulting from governmental

27   intrusion into the attorney-client relationship, *Voigt* adopted the following test:

28   . . .

> [I]n order to raise a colorable claim of outrageousness pertaining to alleged governmental intrusion into the attorney-client relationship, the defendant's submissions must demonstrate an issue of fact as to each of the three following elements: (1) the government's objective awareness of an ongoing, personal attorney-client relationship between its informant and the defendant; (2) deliberate intrusion into that relationship; and (3) actual and substantial prejudice.

*Voigt, supra,* 89 F.3d at 1067.

The *Voigt* test was also adopted by the Tenth Circuit in *Kennedy, supra.* Both *Voigt* and *Kennedy* involved circumstances in which the government allegedly obtained privileged information voluntarily disclosed by an attorney. In the context of the Government's seizure of allegedly attorney-client privileged documents, *United States v. Segal,* 313, F.Supp.2d 774, 780 n. 8 (N.D. Ill. 2004) reformulates the test as follows: (1) governmental knowledge of the attorney-client relationship; (2) deliberate intrusion into that relationship; and (3) actual and substantial prejudice.

As the cases cited in *Kennedy* and *Voigt* demonstrate, the governmental misconduct in deliberately intruding into the attorney-client relationship and prejudice suffered by a defendant must be very severe for the court to conclude that the government's misconduct violates "'fundamental fairness, shocking to the universal sense of justice' mandated by the Due Process Clause of the Fifth Amendment." *Voigt, supra,* at 1065, quoting *United States v. Russell,* 411 U.S. at 431-32. *See also United States v. Fernandez,* 388 F.3d 1199, 1238 (9th Cir. 2004). In this regard, *Kennedy* cited *United States v. Schell,* 775 F.2d 559, 562-566 (4th Cir. 1985), which held that defendants' due process rights were violated when their attorney represented them during grand jury proceedings, and then participated in their prosecution after indictments were issued in the same matter. In *United States v. Marshank,* 777 F.Supp. 1507, 1521-23 (N.D.Cal. 1991), the court concluded that the government's pre-indictment intrusion into defendant-attorney client relationship was so pervasive as to require dismissal where the defendant's attorney participated in the criminal investigation of his client and the government knowingly assisted the attorney in violating the attorney-client privilege and hid the violation from the court.

In contrast, *Voigt* cited *United States v. Ofshe,* 817 F.2d 1508, (11th Cir.), *cert. denied,* 484 U.S. 963, 108 S.Ct. 451, 98 L.Ed.2d 391 (1987), in which the government used a defense attorney as an informant against the defendant in a matter unrelated to the subject of the attorney's representation.

27

1  Although the attorney provided the government with confidential information regarding the defense

2  strategy, the court concluded that the government's conduct was not so outrageous as to violate the

3  Fifth Amendment because the attorney's cooperation involved a different crime than the one for which

4  he represented the defendant, and defendant's co-counsel zealously represented him at trial and there

5  was no demonstrable evidence that his defense was prejudiced.  *Voigt also* cited another case, *United*

6  *States v. Levy,* 577 F.2d 200 (3rd Cir. 1978), in which a prosecution was dismissed because the

7  government employed a co-defendant to obtain the defendant's confidential defense strategy and

8  prejudiced his defense at trial.

9      In *Kennedy*, the petitioner argued that his conviction should be overturned and the indictment

10 dismissed based on the government's misconduct in obtaining incriminating evidence from his former

11 counsel which it used to obtain his indictment.  The district court denied petitioner's request for an

12 evidentiary hearing and denied his petition on the grounds that the former attorney did not testify

13 against him at trial and his defense was, therefore, not prejudiced.  The Tenth Circuit held that the

14 district court should have considered not only the evidence admitted in the case, but also any

15 information that the government received from the former attorney during its investigation.

16 Nevertheless, the court concluded that under the *Voigt* test, defendant had not shown how the allegedly

17 privileged information "infected the trial to such an extent that it resulted in a fundamentally unfair

18 trial."  Nor had defendant demonstrated that the government's conduct in interviewing petitioner's

19 former attorney during its investigation was sufficiently outrageous to support granting a new trial or

20 dismissing the indictment.  Consequently, the court held that the district court did not abuse its

21 discretion in refusing to grant an evidentiary hearing.  225 F.3d at 1196.

22     In *Voigt*, the government obtained information from an employee of a trust to build its case

23 against the defendant-trust operator.  The informant was an attorney, but it was greatly disputed whether

24 she served or acted in the role of attorney for the trust or defendant during the periods that she provided

25 information to the government regarding defendant's fraudulent activities.  The district court denied

26 defendant's request for a pre-trial evidentiary hearing as to whether the government violated his Fifth

27 Amendment rights by intrusion into the attorney-client relationship.  The Third Circuit held that

28 although the issue was a close one, the district court should have conducted an evidentiary hearing to

1    determine the admissibility of the evidence prior to trial and establish a clear record for appellate

2    review.  The court held, however, the failure to grant an evidentiary hearing was harmless based on its

3    review of the trial record.  The court noted that at trial, defendant's counsel vigorously cross-examined

4    the government agent as to whether he knew or believed that the informant acted in the capacity of

5    attorney for the defendant and the trust.  The record failed to show that the government outrageously

6    violated defendant's due process rights in its use of the informant.  See *also United States v. Rogers*,

7    751 F.2d 1074, 1077-78 (9th Cir. 1985) and *United States v. White*, 970 F.2d 328, 333-334 (7th Cir.

8    1992), in which the government obtained incriminating evidence through voluntary disclosures made to

9    the government by defendants' former attorneys in alleged violation of their ethical obligations.  In

10   neither of those cases did the courts find sufficient grounds to support a claim that the prosecution's

11   conduct was sufficiently outrageous or that the government's use of allegedly privileged information

12   infected the trial to such an extent that it constituted an unfair trial.

13       Defendants have cited *United States v. Horn*, 811 F.Supp. 739 (D.N.H. 1992), in support of

14   their request for an evidentiary hearing.  *Horn* involved a violation of the defendants' Sixth

15   Amendment rights.  In that case, the defense counsel made arrangements to obtain copies of a small and

16   select number of voluminous documents that the government had subpoenaed for the grand jury in

17   order to prepare cross-examination of key government witnesses and as part of the defense trial

18   strategy.  At the prosecutor's request, the copy service provided her with duplicate copies of everything

19   requested by the defendants' counsel.  Once the defense counsel discovered this, they requested that the

20   prosecution seal the records and not make any use of them until the court could rule on their privileged

21   nature.  The prosecutor refused and not only reviewed the documents herself, but used them in

22   preparing government witnesses for trial.  The prosecutor also violated a court order regarding non-use

23   of the documents and lied to the court regarding the extent of the violation.  Despite finding that the

24   documents selected by defense counsel constituted protected opinion work product and that the

25   prosecutor engaged in serious misconduct in violation of defendant's Sixth Amendment rights, the

26   court held that the prosecutor's misconduct did not warrant dismissal of the indictment.  Instead, the

27   court imposed tailored remedies, including requiring the government to provide summaries of expected

28   witness testimony, permitting defendants to depose certain witnesses before trial, prohibiting the

29

1  government from introducing the documents or eliciting testimony about them during direct or cross

2  examination, and disqualifying the lead prosecutor based on her severe misconduct and the likely

3  inability to correct the taint if she remained on the case.

4       *Horn* is, of course, distinguishable from this case because it involved a Sixth Amendment

5  violation and a deliberate intrusion into the defendant's trial preparation and strategy for cross-

6  examining the government's witnesses.  The allegedly privileged documents seized by the Government

7  in this case may relate to legal advice or confidential communications that SDI received from its

8  counsel prior to the execution of the search warrant.  Such information may be relevant to whether SDI

9  was conducting its business in a lawful manner or was engaging in health care fraud.  The allegedly

10  privileged information is, therefore, more akin to that obtained by the government in cases such as

11  *United States v. Rogers*, *United States v. Kennedy* or *United States v. White*, *supra*.[5]  In *United States v.*

12  *Rogers, supra,* 751 F.2d at 1078, the court, citing *United States v. Morrison*, 449 U.S. 361, 364, 101

13  S.Ct. 665, 667, 66 L.Ed.2d 564 (1981), stated that where evidence is seized or obtained in violation of

14  defendant's constitutional rights, the suppression of the evidence, and not dismissal of the indictment is

15  the appropriate remedy.  *Rogers* held that the fact that allegedly privileged attorney-client information

16  may have been used by the government in pursuing its investigation and seeking an indictment did not

17  justify dismissing the indictment.  In so holding, the court stated:

18          There is a fundamental distinction between the use of privileged
        information at trial, and its use during the investigative period.  *See*
19          *United States v. Calandra*, 414 U.S. 338, 349, 94 S.Ct. 613, 620 38
        L.Ed.2d 561 (1974) ("Because the grand jury does not finally adjudicate
20          guilt or innocence, it has traditionally been allowed to pursue its
        investigative and accusatorial functions unimpeded by the evidentiary and
21          procedural restrictions applicable to a criminal trial.").

22       *Rogers* cited *United States v. Mackey*, 405 F.Supp. 854 (E.D.N.Y. 1975), in which the court

23  held that admission before a grand jury of evidence that violates the attorney-client privilege, but which

24  does not stand on constitutional footing, does not imply any right to a dismissal of the indictment.

25  *Rogers* thus held that the alleged use of the attorney's statement before the grand jury in that case did

26  

27      [5]Again, in those cases the government obtained allegedly incriminating information through
interviews with defendants' former attorneys.  Here, of course, the government allegedly seized
28  confidential attorney-client communications.

1    not warrant dismissal of the indictment.

2         In *United States v. Kingston*, 971 F.2d 481 (9th Cir. 1992), the court also held that defendant

3    was not entitled to dismissal of the indictment because defendant's attorney was subpoenaed and

4    testified before the grand jury in alleged violation of defendant's attorney-client privilege.  The court

5    again noted that unless the defendant shows that he was prejudiced, the alleged violation of his

6    attorney-client privilege in the grand jury proceedings does not bar the prosecution from proceeding,

7    but instead requires the suppression of illegally seized evidence at trial.

8         The Court may also exercise its supervisory powers to dismiss an indictment in response to

9    outrageous government conduct that falls short of a due process violation.  *United States v. Fernandez*,

10   388 F.3d 1199, 1239 (9th Cir. 2004), *citing United States v. Ross*, 372 F.23d 1097, 1109 (9th Cir.

11   2004).  To justify the exercise of the court's supervisory powers, the prosecutorial conduct must (1) be

12   flagrant and (2) cause substantial prejudice to defendant.  In *United States v. Barrera-Moreno*, 951 F.2d

13   1089, 1092 (9th Cir. 1991), the court states that dismissal is appropriate when the investigative or

14   prosecutorial process has violated a federal constitutional or statutory right and no lesser remedial

15   action is available.  The dividing line between what constitutes outrageous governmental misconduct

16   constituting a violation of due process and outrageous or flagrant misconduct short of a due process

17   violation is not otherwise clear.

18        Defendants' motion, with some distinctions discussed herein, is similar to the motion before the

19   court in *United States v. Segal*, 313 F.Supp.2d 774 (N.D. Ill. 2004).  In *Segal*, the government

20   conducted a criminal investigation of defendant and his brokerage firm for fraudulent activities.

21   Pursuant to a search warrant, the government seized over two hundred boxes of documents and a

22   significant amount of electronic information including several personal computers and back-up tapes.

23   Approximately 11 months after the seizure, defendants filed a motion for return of all seized attorney-

24   client privileged information and an order barring the government from using these communications for

25   any purpose.  The court noted that the defendants had repeatedly requested the government to identify

26   which seized electronic communications it had reviewed and also alleged that the government had

27   failed to follow Department of Justice Guidelines for searching potentially privileged electronic

28   materials.  In response to defendant's motion, the government submitted affidavits regarding the

31

1    conduct of its agents in reviewing the seized records for privileged materials and segregating those

2    materials.  In regard to the paper documents, the government stated that it had segregated and had not

3    reviewed potentially privileged documents seized during the search.[6]

4           The court in *Segal* denied defendants' request that the Government not review or use

5    defendants' attorney-client privilege communications for any purpose.  The court stated:

6                    We decline to issue such a broad order because the attorney-client
                      privilege is a narrowly construed evidentiary rule designed to "encourage
7                     full disclosure and to facilitate open communications between attorneys
                      and their clients."  *United States v. BDO Seidman*, 337 F.3d 802, 810-11
8                     (7th Cir. 2003).  We will issue a narrower order to protect Defendants'
                      attorney-client privileged communications.  We order the Government
9                     not to review the documents on Defendants' privilege log[7] and not to use
                      these documents as evidence at trial unless and until the Court determines
10                    that Defendants' claim of privilege is unfounded.

11          The court in *Segal* also denied defendants' motion that the government be barred from

12   introducing at trial any evidence derived from its violation of defendants' attorney-client privilege.  The

13   court noted that under the fruit of the poisonous tree doctrine, a defendant is entitled to the suppression

14   of derivative evidence obtained from a constitutional violation.  *Segal,* at 780, citing *Wong Sun v.*

15   *United States*, 371 U.S. 471,416, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).  The court stated, however, that

16   the attorney-client privilege is an evidentiary privilege, not a constitutional right.  The violation of the

17   attorney-client privilege does not require suppression of derivative evidence.  *Id., citing United States v.*

18   *Marashi*, 913 F.2d 724, 731 n. 11 (9th Cir. 1990).  The court further stated that violation of a

19   defendant's attorney-client privilege will only violate defendant's due process rights if the violation was

20   caused by serious governmental misconduct that is outrageous enough to shock the judicial conscience.

21   *Id., citing United States v. White*, *United States v. Kennedy* and *United States v. Voigt, supra*.  The court

22   held that the government's ill-advised failure to pro-actively use the screening procedures identified by

23   defendants did not violate defendants' due process rights because there was no evidence that the

24

25          [6]*Segal* does not indicate whether the government raised the eleven month delay between the
     seizure of the evidence and defendants' motion for return of the privileged documents as constituting a
26   waiver of the attorney-client privilege.

27          [7]In response to a prior motion by defendants, the court ordered them to submit a privilege log of
28   allegedly privileged documents.

1   government deliberately read communications that it affirmatively knew were privileged and

2   defendants had not identified any derivative evidence that they believe the government intended to use

3   at trial.

4          In regard to defendants' related claim that the government had elicited protected attorney-client

5   privileged communications from the executives of the brokerage firm, *Segal* noted that the defendants

6   were placing the cart before the horse because they had not affirmatively established that any of the

7   elicited communications were, in fact, privileged.  The court found on the record before it that the

8   government had not knowingly violated the attorney-client privilege and therefore defendants had not

9   made a sufficient showing of outrageous misconduct to support a finding of a violation of their due

10  process rights.  The court concluded that defendants were entitled to suppression of all disclosed

11  privileged information which they could prove were attorney-client privileged communications.  The

12  court found, however, that defendants had not made the necessary showing to support the suppression

13  of derivative evidence.  *Segal, supra,* 313 F.Supp.2d at 781-82.

14         The Government's taint attorney, Ms. Damm, reviewed several hundred pages of documents

15  and has determined that some, if not many, of those documents are not privileged and has turned them

16  over to the prosecution team.  Reportedly, the taint attorney has identified some documents that are

17  potentially privileged and has not provided them to the prosecution team.  Apparently, the documents

18  which Ms. Damm determined are not privileged and which have been disclosed to the prosecution

19  team, are included in the 500 plus pages of documents that Defendants have submitted under seal for *in*

20  *camera* review by the Court.  The Court cannot determine, however, whether the Defendants' *in*

21  *camera* submission also includes the documents that Ms. Damm has identified as potentially privileged,

22  but has not yet provided to the prosecution team.

23         In order for the Court to have any basis to consider whether there has been any outrageous and

24  prejudicial violation of Defendants' due process rights, the issue of privilege should first be determined.

25  Neither the Defendants nor the Government have specifically addressed whether the documents in issue

26  are attorney-client privileged documents or fall within the "crime-fraud" exception to the attorney-client

27  privilege.  It is Defendants' burden to establish all elements of the attorney-client privilege.  *United*

28  *States v. Martin*, 278 F.3d 988, 999-1000 (9th Cir. 2002).  Conversely, if the Government contends that

1   the attorney-client privilege does not apply based on the crime-fraud exception to the privilege, it is the

2   Government's burden to prove the application of that exception. *Id.,* at 1001.  Based on a preliminary

3   review of the documents submitted by Defendants for *in camera* review, the documents would appear

4   to be of the type potentially protected by the attorney-client privilege.  Absent full briefing and hearing

5   on the applicability of the privilege and any exception to it, however, the Court is not prepared to decide

6   this predicate issue.  Assuming, for sake of argument, that the Court were to find that the attorney-client

7   privilege does not apply to documents that have been provided to the prosecution team, then

8   Defendants' request for an evidentiary hearing regarding prosecutorial misconduct obviously fails.

9           As to the documents that the Government's taint attorney has identified as potentially

10  privileged, but which have not been turned over to the Government's prosecution team, the Defendants

11  should file a motion *under seal* and serve it on the Government's taint counsel supporting their claim of

12  privilege and that the documents should be returned to Defendants.  As to the documents that

13  Defendants claim are privileged and which have already been provided to the Government's

14  prosecution team, the Defendants should file an appropriate motion making an affirmative specific

15  showing that the documents are protected by the attorney-client privilege.  If the Government alleges

16  the "crime-fraud" exception, then it must establish that the exception applies.  The Court will then

17  determine whether the documents should be suppressed for use at trial.

18          Only then would a basis even exist for the Court to address whether the Government's alleged

19  violation of the attorney-client privilege warrants an evidentiary hearing to consider possible imposition

20  of sanctions.  The instances of alleged prejudice cited by Defendants at page 14 of their *Reply (#67)* do

21  not constitute a colorable showing outrageous governmental misconduct or substantial prejudice.

22  Defendants state that the Government *attempted* to question former SDI employee Dennis Benton

23  regarding several privileged documents.  From Defendant's briefs and exhibits, however, it does not

24  appear that Mr. Benton answered the Government's questions.  Nor is there any indication that he or

25  other witnesses were examined about privileged information before the grand jury, which had it

26  occurred would not, in and of itself, warrant dismissal. *United States v. Rogers*, *supra.*  The fact that

27  Mr. Benton was interviewed about a document as to which the Defendants subsequently waived the

28  privilege also does not demonstrate substantial prejudice.  To the extent that the Government should not

1  have used this document prior to Defendants' limited waiver of the privilege, the subsequent waiver

2  made such use harmless.  Furthermore, it appears that Defendants waived the privilege because it

3  probably did not apply due to the fact that SDI/Mr. Benton disclosed the document to a third party.

4  Defendants' reliance on *United States v. Horn*, 811 F.Supp. 739 (D.N.H. 1992), in this regard is also

5  misplaced because, in that case, the government used defendant's work product and trial preparation

6  and strategy to prepare the government's witnesses for cross-examination by defendant's counsel.

7          Defendants' other claim of prejudice resulting from the Government's review of thousands of

8  Defendants' documents without first determining whether they contained privileged information lacks

9  merit based on the Court's conclusion that Defendants have waived any privilege to those documents.

10  In the same regard, Defendants' arguments regarding the deficiencies in the Government's taint

11  procedures lack merit, given Defendants' failure to seek timely judicial action regarding those

12  procedures.  Certainly, at this point, the Government's alleged abuse of the taint procedures does not

13  warrant an evidentiary hearing before a determination is made as to whether the prosecution team has,

14  in fact, had access to privileged documents.

15                                             **CONCLUSION**

16          Accordingly, the Court finds that Defendants have explicitly waived their attorney-client

17  privilege to the memoranda attached to SDI employee Benton's letter to SDI's accountants.  The Court

18  further finds that Defendants have waived their attorney-client privilege as to documents that were not

19  listed in SDI counsel's February 2002 letters to the Government.  As to the remaining documents to

20  which Defendants' privilege has not been waived, a decision to grant an evidentiary hearing would be

21  premature prior to a determination that attorney-client privileged materials have been turned over to the

22  prosecution team and used by it.  The Court also finds, however, that Defendants have not made a

23  showing that there has been any outrageous conduct by the Government in using their allegedly

24  privileged materials, or that Defendants have suffered substantial prejudice that would justify dismissal

25  of the indictment or imposition of severe sanctions.

26                                          **RECOMMENDATION**

27          **IT IS RECOMMENDED** that Defendants' Motion Requesting an Evidentiary Hearing

28  Regarding the Government's Intrusion into Defendant's Privileged Information (#39) be **denied**.  It is

                                                    35

further recommended that Defendants and the Government be directed to brief their respective positions on the attorney-client privilege regarding the documents that Defendant SDI's counsel identified in his February 5, 8 and 21, 2002 letters to the Government and that the Government set forth its position regarding application of the "crime fraud" exception as to any documents otherwise deemed to be privileged.  Pending the Court's decision on these privilege issues, the Court may further consider whether an evidentiary hearing regarding the Government's alleged misconduct in intruding upon the attorney-client privilege is warranted.

### NOTICE

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within ten (10) days.  The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time.  *Thomas v. Arn*, 474 U.S 140, 142 (1985).  This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court.  *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 16th day of October, 2006.

_____
GEORGE FOLEY, JR.
UNITED STATES MAGISTRATE JUDGE